UNITED STATES DISTRICT COURT **11 CIV 8331**
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL SHAPIRO, on behalf of himself as an individual, and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | **RECEIVED** NOV 17 2011 U.S.D.C. S.D. N.Y. CASHIERS |
| v. | **JURY TRIAL DEMANDED** |
| JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES, LTD., | |
| Defendants. | |

---

## CLASS ACTION COMPLAINT

---

EC.46995.1

# TABLE OF CONTENTS

I.   NATURE OF ACTION ............................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................. 8

III. PARTIES ..................................................................................................................... 8

IV.  GENERAL ALLEGATIONS .................................................................................. 12

V.   CLASS ACTION ALLEGATIONS ........................................................................ 19

VI.  CLAIMS FOR RELIEF .......................................................................................... 20

COUNT I
Knowing Participation In A Breach Of Trust ................................................... 20

COUNT II
Aiding And Abetting Fraud .............................................................................. 25

COUNT III
Aiding And Abetting Breach Of Fiduciary Duty ............................................. 28

COUNT IV
Breach Of Fiduciary Duty ................................................................................ 33

COUNT V
Conversion ........................................................................................................ 33

COUNT VI
Aiding And Abetting Conversion ..................................................................... 34

COUNT VII
Unjust Enrichment ............................................................................................ 38

VII. PRAYER FOR RELIEF .......................................................................................... 40

DEMAND FOR JURY TRIAL ......................................................................................... 41

Plaintiff Paul Shapiro ("Plaintiff") files this class action complaint against JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd., (collectively, "JPMC" or "Defendants"). Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by and through his attorneys, and based upon the Trustee's investigation set forth in the Amended Complaint (Redacted) filed in Case No. 1:11-cv-00913 (CM) (MHD). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF ACTION

1.    On June 24, 2011, Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS" or "BMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA") and the estate of Bernard L. Madoff, by and through his counsel, filed an Amended Complaint (Redacted) in Case No. 1:11-cv-00913 (CM) (MHO) against JPMC. On November 1, 2011, the Court dismissed the common law counts 21-28 of the Trustee's Amended Complaint for lack of standing, holding that those claims belong instead to the customers of BLMIS.

2.    By this complaint, Plaintiff, on behalf of himself, individually, and on behalf of all customers who directly had capital invested with BLMIS as of December 12, 2008 and suffered damages (collectively, the "Class"), brings claims for knowing participation in a breach of trust, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, breach of fiduciary duty, conversion, aiding and abetting conversion, and unjust enrichment.

3.    Bernard L. Madoff, though BLMIS, committed one of the largest, if not the largest, Ponzi scheme in the history of the United States. Though he promised to invest customers' money using a strategy called Split Strike Conversion ("SSC Strategy"), not a single

penny of customers' money was invested using the SSC Strategy. Rather, customer money was used to pay other existing customers as they requested to cash in their accounts.

4.     While numerous financial institutions enabled Madoff's fraud, JPMC was at the very center of that fraud, and thoroughly complicit in it. JPMC could not perform even cursory due diligence on Madoff or BLMIS without bumping up against evidence of Madoff's fraud. JPMC had before it the very nuts and bolts of the Ponzi scheme: the money customers deposited into BLMIS' main account was not used to buy or sell securities, but instead was merely transferred to other customers in patterns that could serve no legitimate business purpose. Millions of dollars routinely bounced back and forth between Madoff and one of JPMC's most important customers, Norman Levy ("Levy"). JPMC could see that Madoff's regulatory filings were materially inconsistent with BLMIS' actual finances. JPMC chose to enable Madoff's fraud, not just through the various ways it participated in his activity, but by helping to cover Madoff's naked theft with the imprimatur of a globally recognized financial institution.

5.     JPMC was Madoff's and BLMIS' primary banker for over 20 years, and was responsible for knowing the business of its customers - in this case very large customers. From 1986 on, all of the money that Madoff stole from his customers passed through BLMIS' account at JPMC, the so-called "703 Account," where it was commingled and ultimately washed. JPMC had everything it needed to unmask and stop the fraud-it had unique information from which it could have reached only one plausible conclusion: Madoff was a fraud.

6.     Indeed, billions of dollars flowed through the 703 Account, but virtually none of it was used to pursue any type of investment strategy as it should have been had BLMIS been legitimate. Instead, emblematic of a Ponzi scheme, the money in the 703 Account merely flowed back and forth between Madoff and his customers. JPMC knew that Madoff was engaging in

EC.46995.1

fraud based on the obvious fact that the account activity reflected no legitimate business purpose. JPMC allowed Madoff to funnel billions of dollars through the 703 Account by ignoring clearly illicit transaction activity within that account-including billions of dollars in suspicious transactions with its own private banking customers-and disregarding its own anti-money laundering policies. If those large transactions that did not jibe with any legitimate business purpose triggered any warnings, they were suppressed as the drive for fees and profits became a substitute for common sense, ethics and legal obligations.

7.      Not only was JPMC aware that the 703 Account activity was inconsistent with BLMIS' purported business of investing on behalf of customers, but it reviewed Financial and Operational Combined Uniform Single Reports ("FOCUS Reports") that Madoff filed with the Securities and Exchange Commission ("SEC"). The FOCUS Reports contained glaring irregularities that should have been probed by JPMC. For example, not only did BLMIS fail to report its loans from JPMC, it also failed to report any commission revenue. JPMC ignored these material omissions in BLMIS' FOCUS Reports. By its silence, JPMC lent legitimacy and cover to BLMIS' operations as JPMC collected hundreds of millions of dollars in fees and profits and facilitated the largest financial fraud in history.

8.      JPMC had yet further knowledge that Madoff engaged in banking activities with no legitimate business purpose. According to two former employees of another financial institution, in or about 1997, that institution observed and investigated Madoff's nearly daily circular transactions between an-account Madoff controlled at that financial institution and a Madoff account at JPMC (then, The Chase Manhattan Bank ("Chase")). On virtually a daily basis, a Madoff employee would physically deposit a check drawn on Madoff's account at the other financial institution into his account at JPMC. The next day, funds in or near the same

3

amount-generally at least $1 million but less than $10 million-would be wired back from Madoff's JPMC account to the account at the other financial institution. According to the investigator at the other financial institution, now a former employee, as well as another former employee, the investigator and others at the financial institution questioned Madoff's employees about the transactions, and, having failed to receive a satisfactory explanation for the suspicious account activity, that financial institution closed Madoff's account. Not only should the suspicious activity have been as apparent to JPMC as it was to the other financial institution, but following normal operating procedures, the financial institution's investigator would have contacted his counterpart at JPMC regarding the suspicious transactions on two occasions: (1) in the course of his inquiry; and (2) at the conclusion of the inquiry, to report that the other financial institution was closing the account  The circular transactions in which JPMC participated at this time presaged the same sort of circular transactions in which Madoff would engage later within JPMC-transactions JPMC permitted to occur despite their evident lack of legitimacy.

9.      In addition to being Madoff's and BLMIS' banker, JPMC also profited from the Ponzi scheme by selling structured products related to BLMIS feeder funds to its clients. In the course of structuring these products, JPMC performed due diligence on BLMIS beginning in 2006, using information it obtained from those responsible at JPMC for the 703 Account, as well as information provided by various BLMIS feeder funds. At some point between 2006 and the Fall of 2008, if not before, JPMC unquestionably knew that: BLMIS' returns were consistently too good--even in down market--to be true; Madoff would not allow transparency into his strategy; JPMC, one of the world's leading and most knowledgeable derivatives dealers, could not identify, and Madoff refused to provide information on, his purported over-the-counter

("OTC") counterparties; BLMIS' auditor was a small, unknown firm; Madoff and/or BLMIS had a conflict of interest by acting as the clearing broker, sub-custodian, and sub-investment adviser; feeder fund administrators could not reconcile the daily position numbers they got from Madoff with any third party source to confirm their accuracy; and there was public speculation that Madoff operated a Ponzi scheme, or was engaged in other illegal activity, such as front running.

10.    JPMC's due diligence yet again revealed fraud at BLMIS. But JPMC was not concerned with the devastating effect of fraud on investors. It was concerned only with its own bottom line, and did nothing but a cost-benefit analysis in deciding to become part of Madoff's fraud: "Based on overall estimated size of BLM strategy, it would take [a] ... fraud in the order of $3bn or more ... for JPMC to be affected." JPMC also relied on the Securities Investor Protection Corporation ("SIPC") to protect its profits: "JPMorgan's investment in BLM ... is treated as customer money ... and therefore [is] covered by SIPC." By the fall of 2008, in the midst of a worldwide economic downturn, the cost-benefit analysis had changed. JPMC, no longer comfortable with the risk of fraud, decided to redeem its $276 million in investments in BLMIS feeder funds. JPMC also received an additional transfer of $145 million from BLMIS in June 2006.

11.    JPMC looked the other way, ignoring the evidence of fraud, even in the aftermath of other well-known frauds. In response to those who, prior to Madoff's arrest, found it "[h]ard to believe that [fraud] would be going on over years with regulators [sic] blessing," the Chief Risk Officer of JPMC's Investment Bank responded, "you will recall that Refco was also regulated by the same crowd you refer to below and there was noise about them for years before it was discovered to be rotten to the core." This was not the first time JPMC had looked the other way to garner revenue and accommodate important bank clients. In 2003, JPMC had been

5

accused of the same sort of conduct in connection with the Enron fraud. As the SEC alleged in its complaint, JPMC aided and abetted Enron's manipulation of its financials through a series of complex financial transactions called "prepays." JPMC "was willing to engage in [these] transactions because [it] generated substantial fees and as an accommodation to an important client." Moreover, JPMC was recently sued in relation to its alleged participation in a Ponzi scheme operated by Minnesota businessman Tom Petters.

12.    Indeed, JPMC's due diligence team was further concerned about fraud at BLMIS in the wake of the Petters fraud. Some of these concerns centered on BLMIS' small, unknown auditor, Friehling & Horowitz ("Friehling"):

> The "DO" [due diligence] done by all counterparties seems suspect. Given the scale and duration of the Petters fraud it cannot be sufficient that there's simply trust in an individual and there's been a long operating history. ... Let's go see Friehling and Horowitz the next time we're in NY ... to see that the address isn't a car wash at least.

13.    In or about September 2008, as JPMC was re-evaluating its hedge fund investments in the midst of the worldwide financial crisis, Alain Krueger, of JPMC's London office, had a telephone call with individuals at Aurelia Finance, S.A. ("Aurelia Finance"), a Swiss company that purchased and distributed JPMC's structured products. During the course of that call, the individuals at Aurelia Finance made references to "Colombian friends" and insisted that JPMC maintain its BLMIS-related hedge. That conversation triggered a concern that Colombian drug money was somehow involved in the BLMIS-Aurelia Finance relationship, which led to an internal investigation at JPMC of BLMIS and Aurelia Finance for money laundering. Significantly, it was only when its own money was at stake that JPMC decided to report BLMIS to a government authority.

EC.46995.1

14.    As reported in the French press, by the end of October 2008, JPMC admitted in a filing of suspicious activity made to the United Kingdom's Serious Organized Crime Agency ("SOCA") that it knew that Madoff was too good to be true," and a likely fraud:

> (1) ... [T]he investment performance achieved by [BLMIS') funds .... is so consistently and significantly ahead of its peers year-on-year, even in the prevailing market conditions, as to appear too good to be true-meaning that it probably is; and

> (2) the lack of transparency around Madoff Securities trading techniques, the implementation of its investment strategy and the identity of its OTC option counterparties; and

> (3) its unwillingness to provide helpful information.

15.    None of this information was new to JPMC-it had known it for years. It was only in an effort to protect its own investments that JPMC finally decided to inform a government authority about BLMIS. JPMC further sought permission from SOCA to redeem its Aurelia Finance-related investments and admitted that "as a result [of these issues with BLMIS] JPMC has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds."

16.    Even when it admitted knowing that Madoff had to be a fraud in October 2008, JPMC still did nothing to stop the fraud. It did not even put a restriction on the 703 Account. JPMC made at least half a billion dollars in revenue off the backs of Madoff's victims as well as in excess of $400 million in transfers. Plaintiff seeks recovery of these funds as well as at least $19 billion in damages suffered by BLMIS customers for JPMC's role in allowing the Ponzi scheme to continue unabated for years, with an exact amount to be determined at trial.

17.    It was Madoff himself who ultimately proclaimed his fraud to the world in December 2008, and the thread of the relationships allowing the fraud to exist and fester began to be revealed as well. JPMC's complicity in Madoff's fraud, however, remained disguised, cloaked by JPMC in the myth that Madoff acted alone and fooled JPMC. But that is the fable.

7

The true story is set forth in the Trustee's Amended Complaint (Redacted) filed in Case No. 1:11-cv-00913 (CM) (MHO) on June 24, 2011, as incorporated by reference herein.

## II.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2).  This Court also has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint emanates from this state, at least some of the Defendants are based in this state, and all Defendants appear to be authorized to do business here, have sufficient minimum contacts with this state, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.    Venue in this Court is proper under 28 U.S.C. §1391 because many of the transactions, acts, and practices described herein occurred within the jurisdiction of this district.

## III.    PARTIES

20.    Plaintiff Paul Shapiro is an individual residing in New York.  Plaintiff was a customer of BLMIS, and incurred losses and/or damages as a result of the activities alleged herein.  Plaintiff was injured as a result of the conduct alleged herein.  JPMC received Plaintiff's property as cash received, acquired or held by or for the account of BLMIS from or for the account of Plaintiff, and the proceeds of any such property transferred by BLMIS, including property unlawfully converted ("Customer Property").  Plaintiff has suffered injury-in-fact for which Plaintiff is entitled to seek monetary damages or equitable relief.

21.    Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a financial holding company incorporated under Delaware law with its principal place of business at 270 Park Avenue, New York, New York 10017.  JPMorgan Chase is one of the largest banking institutions in the United States, with approximately $2.0 trillion in assets and $165.4 billion in stockholders' equity as of December 31, 2009.

8

EC.46995.1

22.     JPMorgan Chase played a role in the Defendants' relationship with BLMIS. JPMorgan Chase created and implemented anti-money-laundering policies that governed how the Defendants monitored the activity in the 703 Account. Further, JPMorgan Chase was involved in the products the Defendants structured and issued relating to the BLMIS and was repeatedly referenced in the term sheets for those products.

23.     Defendant JPMorgan Chase Bank, N.A. ("Chase Bank") is one of JPMorgan Chase's main bank subsidiaries and is organized under the laws of the United States with its principal place of business at 111 Polaris Parkway, Columbus, Ohio 43240. Chase Bank is a national banking association in the United States with locations in 23 states, including a location in New York, New York. Prior to November 2004, JPMorgan Chase Bank was a New York state chartered bank, regulated by the New York State Banking Department. On July 9, 2004, JPMorgan Chase Bank requested approval to convert to a national banking association. This request was approved by the Office of the Comptroller of the Currency ("OCC") on October 13, 2004. At that time, the bank's name was changed to JPMorgan Chase Bank, N.A.

24.     Upon information and belief, the Risk Management Division of the Investment Bank operates at least in part under the legal entity Chase Bank. Chase Bank also acted as guarantor and common depository for products JPMC structured and issued related to the BLMIS.

25.     Defendant J.P. Morgan Securities LLC ("JPM Securities (US)") is the principal non-bank subsidiary of JPMorgan Chase and is organized under the laws of Delaware. JPM Securities (US)'s operations are conducted in JPMorgan Chase's New York, New York offices. JPM Securities (US) is JPMorgan Chase's United States Investment Banking arm, through which it conducts securities underwriting, dealing, and brokerage activities in the United States. JPM

9

Securities (US) is an SEC-registered broker-dealer and investment adviser, and a member of the Financial Industry Regulatory Authority ("FINRA").

26.     Upon information and belief, JPMorgan Chase's Financial Institutions Group and Broker/Dealer Group operate at least in part under the legal entity JPM Securities (US).

27.     Defendant J.P. Morgan Securities Ltd. ("JPM Securities (UK)") is organized under the laws of England with its registered office at 125 London Wall, London, EC2Y SAJ. JPMSecurities (UK) is JPMorgan Chase's United Kingdom Investment Banking arm, through which it conducts securities underwriting, securities dealing, and brokerage activities.  JPM Securities (UK) is an indirect subsidiary of Chase Bank. JPM Securities (UK) routinely conducts business in New York, New York and its employees regularly work with JPMorgan Chase employees in the New York, New York offices and attend meetings at those offices.

28.     Upon information and belief, JPMorgan Chase's Equity Exotics & Hybrids Desk and the Equity Derivatives Group operate at least in part under the legal entity JPM Securities (UK). JPM Securities (UK) also played an integral role in structuring and issuing products related to the BLMIS.

29.     This Court has personal jurisdiction over all of the Defendants captioned herein. All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

30.     The Defendants have:  (a) intentionally taken full advantage of the rights, benefits, and privileges of conducting business and/or transactions in the State of New York; (b) purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and by receiving Customer Property to their benefit; (c) derived significant revenue from New York; (d) maintained minimum contacts and/or general

business contacts with New York in connection with the claims alleged herein; and (e) committed tortious acts both within and without New York, causing injury in New York, and (i) regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in New York, or (ii) expect or should reasonably expect the acts to have consequences in New York and derive substantial revenue from interstate and international commerce.

31.     JPMorgan Chase operates six business segments: Investment Banking, Commercial Banking, Treasury & Security Services, Asset Management, Retail Financial Services, and Card Services. Within or alongside these various business segments, JPMorgan Chase's activities are further divided among numerous divisions and groups.

32.     JPMorgan Chase does not operate its various business segments, divisions, and groups within the confines of separate legal entities.  Rather, the firm operates through many legal entities under the enormous umbrella that is the financial holding company, JPMorgan Chase.

33.     Matt Zames, who heads Interest Rate Trading, Global Foreign Exchange, Public Finance, Global Mortgages, Tax-Oriented Investments, and Global Fixed Income, explained the significance of JPMorgan Chase's legal entities as "not relevant to how we run our business. " Zames used himself as an example; "I guess I'm still an employee of [JPM Securities (US)]. Having said that, people that report to me are under [Chase Bank] as well."

34.     Plaintiff brings this action against all Defendants because, upon information and belief, each Defendant, individually, participated in, promoted, aided and abetted the fraud.  In addition, all of the Defendants operated as a single indivisible entity.  Therefore, each of the Defendants is liable for the actions of the other Defendants.

11

IV.    **GENERAL ALLEGATIONS**

35.    Madoff is a former chairman of the Board of Directors of the NASDAQ stock market. He controlled the investment adviser services and finances at BMIS, and he is the sole owner of BMIS, a company which Madoff appears to have founded in the 1960s.

36.    Defendant BMIS was a broker-dealer and investment adviser registered with the SEC. BMIS formally engaged in three operations, which include investment adviser services, market making services, and proprietary trading.

37.    A number of fund managers recently expressed wariness of investing with Madoff because there was little or no transparency to link his reported financial returns to actual investment transactions.

38.    On or about December 10, 2008, Madoff is reported to have told two senior employees that he was "finished," that he had "absolutely nothing," that "it's all just one big lie" and that the business was basically "a giant Ponzi-scheme." In substance, Madoff admitted that he had for years been paying returns to certain investors out of the principal received from other investors. Madoff also stated that BMIS was insolvent, and that it had been for years. Madoff also estimated the losses from this Ponzi-scheme to be approximately $50 billion dollars.

39.    There were several red flags with regard to Madoff's illicit use of investment funds, including the following: (i) Madoff's investment returns appeared to outperform the market with a vengeance despite the fact that money managers rarely beat the market indexes by any substantial amount over time; (ii) Madoff's investment returns appeared to earn steady monthly increases of 1% or more, even when markets went bad; (iii) no one was able to replicate Madoff's remarkable results with the strategies he claimed to be using; (iv) Madoff was not using professional auditors commensurate with the $17 billion that he claimed to have under management (he reported using a tiny office in upstate New York that apparently was not even

12

open all of the time); (v) Madoff claimed to hold publicly traded investments in his own advisory firm, without using a reliable custodian, namely a large, independent financial institution that distributes financial reports directly to investors; (vi) Madoff kept the records of his investment advisory business under lock and key, with little or no internal oversight of his activities; (vii) Madoff's suspicious investment activities had been cited to the SEC on more than one occasion; and (viii) a number of other hedge-fund advisers say that they had examined Madoff's operations and warned investors off.

40.    JPMC is or has been regulated by both federal and New York state agencies. Until November 2004, New York State regulated JPMorgan Chase Bank.

41.    Pursuant to the regulations of these agencies, JPMC was required to report to regulators any suspicious activity in the accounts of JPMC customers. JPMC also was required to create and implement policies and procedures for identifying potentially illegal activity. Then, following the Enron fraud, JPMC was required to implement and report to various regulators its commitment to improve its policies and procedures for oversight and control.

42.    Plaintiff is informed and believes, based on the facts currently available, as detailed above, that JPMC omitted and misrepresented material facts to both federal and state regulators. JPMC defrauded these regulators to the detriment of customers, creditors, and/or BLMIS.

43.    Throughout its relationship with BLMIS, Madoff, and certain BLMIS customers, JPMC had access to a wealth of information about Madoff's and/or BLMIS' illegal activities. Among other things, this information revealed inconsistencies between BLMIS' financial statements, activity in the 703 Account, and BLMIS' purported business, and indicated that Madoff and/or BLMIS were engaged in illegal activities.

EC.46995.1

44.    JPMC had yet further knowledge that Madoff engaged in banking activities with no legitimate business purpose. According to two former employees of another financial institution, in or about 1997, that institution observed and investigated Madoff's nearly daily circular transactions between an account Madoff controlled at that financial institution and a Madoff account at JPMC (then, The Chase Manhattan Bank ("Chase")). On virtually a daily basis, a Madoff employee would physically deposit a check drawn on Madoff's account at the other financial institution into his account at JPMC. The next day, funds in or near the same amount-generally at least $1 million but less than $10 million-would be wired back from Madoff's JPMC account to the account at the other financial institution. According to the investigator at the other financial institution, now a former employee, as well as another former employee, the investigator and others at the financial institution questioned Madoff's employees about the transactions, and, having failed to receive a satisfactory explanation for the suspicious account activity, that financial institution closed Madoff's account. Not only should the suspicious activity have been as apparent to JPMC as it was to the other financial institution, but following normal operating procedures, the financial institution's investigator would have contacted his counterpart at JPMC regarding the suspicious transactions on two occasions:  (1) in the course of his inquiry; and (2) at the conclusion of the inquiry, to report that the other financial institution was closing the account. The circular transactions in which JPMC participated at this time presaged the same sort of circular transactions in which Madoff and Levy would engage later within JPMC-transactions JPMC permitted to occur despite their evident lack of legitimacy.

45.    The Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating the customers' funds in the 703 Account. At a minimum, the

Defendants knew of suspicious transactions in the 703 Account that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating the funds of customers, and the Defendants failed to inquire whether Madoff and/or BLMIS were misappropriating those funds.  A reasonable inquiry would have revealed that the only plausible explanation for the suspicious transactions was that Madoff and/or BLMIS were misappropriating the customers' funds in violation of their fiduciary duties.

46.    The Defendants knew since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only plausibly be explained by fraud. In December 2001, the Defendants were aware of what appeared to be a check fraud scheme between Madoff and/or BLMIS and Levy.  The Defendants were also aware of highly suspicious activity in the 703 Account, including: large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and the suspicious activity between the 703 Account and clients of JPMC's Private Bank, including Levy.  No later than January 2007, the Defendants' automated transaction monitoring system alerted the Defendants to this unusual activity.

47.    The Defendants were aware since at least 2004 that Madoff and/or BLMIS submitted false information to the SEC.  The FOCUS Reports Madoff and/or BLMIS provided to the SEC and Defendants contained glaring inaccuracies.  The Defendants reviewed and thus knew that the information in the FOCUS Reports dramatically misstated BLMIS' cash on hand, omitted loans, and that the reports showed no evidence of any customer accounts.

48.    After performing minimal due diligence on Madoff and/or BLMIS and the BLMIS feeder funds, the Defendants knew Madoff and/or BLMIS were engaging in fraud, or

15

consciously avoided such knowledge. Since at least 2006, the Defendants knew, among other things, that: BLMIS' returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding BLMIS, including that BLMIS feeder funds would not give the Defendants access to their account agreements with BLMIS; and BLMIS' auditor was unregistered and was not subject to peer review.

49.    Since at least 2007, the Defendants knew, among other things, that: Madoff did not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder funds the names of the counterparties to the options transactions BLMIS was purportedly entering into on their behalf; there was no independent verification of the trades BLMIS was supposedly executing for its customers; there was no verification that any of BLMIS customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operation of BLMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder funds in response to their questions about Madoff and/or BLMIS. No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

50.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that: certain BLMIS feeder funds refused to answer the Defendants' questions about Madoff and BLMIS; there were similarities between Madoff's operation of BLMIS and the Petters fraud; and Madoff's family members had critical roles at BLMIS. No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity relating to a BLMIS feeder fund.

51.    JPMC is required under the Bank Secrecy Act, the Patriot Act, and was required under New York laws and regulations, to file reports with appropriate regulators when it discovers suspicious activity by any of its customers. Such activity includes, inter alia, transactions where the bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging. As alleged in detail above, there were numerous suspicious transactions with Levy and Sterling Equities in the 703 Account, which should have triggered investigations and reports to regulators. Nor did the 703 Account serve a legitimate business purpose, as money in that account did not go and invest any of the funds. The only plausible explanation was that Madoff and/or BLMIS were engaging in fraud. Based on the investigation to date, Plaintiff has no reason to believe that JPMC made reports to federal or state regulators concerning suspicious activity in the 703 Account. Although there was no legitimate business purpose for the activity in the 703 Account, the 703 Account was never closed, which would have been consistent with reports to regulators for such egregious conduct.

52.    JPMC is required under the Bank Secrecy Act, the Patriot Act and was required under New York laws and regulations, to maintain rigorous anti money-laundering policies and procedures. Because of its participation in the Enron fraud, JPMC was required to be more vigilant in overseeing and reporting suspicious activity in the 703 Account. If it had followed its purported improved procedures, the regulators would have had information that would have led to the uncovering of the Ponzi scheme, because the only plausible explanation was that Madoff and/or BLMIS were engaging in fraud.

17

53.     Based on the information uniquely available to JPMC, JPMC knew that the only plausible explanation regarding the business engaged in through Madoff and/or BLMIS was fraud. JPMC therefore knowingly failed to communicate these facts to regulators, despite its obligation to do so.

54.     In light of the above information, JPMC's failure to fully and accurately report to regulators was reckless and evidence of conscious misbehavior on the part of JPMC.  JPMC ignored its duty to monitor the 703 Account, various materials from Madoff and/or BLMIS, its commitment to effectively manage risk following the SEC's enforcement action, and its internal policies and procedures aimed at detecting the numerous red flags surrounding BLMIS' operations.

55.     JPMC's failure to fully and accurately report allowed it to maintain a number of profitable relationships with important Private Bank clients and continue to obtain hundreds of millions of dollars in revenue.

56.     As one of the world's largest banks, and one that advertised itself as the gold standard of compliance, JPMC lent Madoff's and/or BLMIS' operation legitimacy and cover that was reasonably relied upon by the BLMIS customers who transferred money to Madoff and/or BLMIS.

57.     JPMC proclaimed itself to be a bank that substantially complied with all applicable banking laws and regulations.  JPMC intended for BLMIS customers to rely upon its commitment to compliance when they were transacting business with JPMC through deposits into the 703 Account.

58.     Given JPMC's global reputation and its boasts about its compliance, the regulators reasonably relied on JPMC to adequately monitor and fully and accurately report on

EC.46995.1

Madoff and/or BLMIS. The Plaintiff and the Class reasonably relied on JPMC's supposed compliance with government regulations when they chose to continue giving money to Madoff and/or BLMIS. If JPMC had not defrauded federal and state regulators, the holes in JPMC's compliance programs and the fraudulent activity in the 703 Account would have been exposed to BLMIS customers, or the BLMIS scheme could not have continued.

## V.    CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed Class consisting of all persons or entities who directly had capital invested with BLMIS as of December 12, 2008 and suffered damages. Excluded from the proposed Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

60.    The members of the proposed Class are so numerous that joinder of all members is impracticable. Plaintiff believes that there are several hundred, if not thousands, of members in the proposed Class. Members of the proposed Class may be identified from records maintained by the Defendants.

61.    Plaintiff's claims are typical of the claims of the members of the proposed Class as all members of the proposed Class are similarly affected by Defendants' wrongful conduct as alleged herein.

62.    Plaintiff will fairly and adequately protect the interests of the members of the proposed Class and has retained counsel competent and experienced in complex class litigation.

63.    Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. Among the questions of law and fact common to the proposed Class are:

19

a.    Whether Defendants violated duties owed to Plaintiff and the Class as alleged

herein, including without limitation;

i.    knowing participation in a breach of trust;

ii.    aiding and abetting fraud;

iii.    aiding and abetting breach of fiduciary duty, and/or

iv.    unlawfully converting property of the class members.

b.    Whether Defendants aided and abetted in BLMIS' fraud of Plaintiff and the Class;

and

c.    To what extent the members of the Class have sustained damages, and the proper

measure of damages.

64.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joining all members is impracticable, and this action will

be manageable as a class action.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### Knowing Participation In A Breach Of Trust

65.    Paragraphs 1 through 64 are realleged and incorporated by reference as if set forth

fully herein.

66.    In purporting to act as investment advisers, Madoff and/or BLMIS had fiduciary

duties to BLMIS customers.  Madoff and/or BLMIS were in a position of superior knowledge

and expertise to BLMIS customers, who reposed their trust and confidence in Madoff and/or

BLMIS. This created a relationship of high trust and confidence whereby Madoff and/or BLMIS

were entrusted with the funds BLMIS customers deposited into the 703 Account.

20

EC.46995.1

67.     The Defendants knew that Madoff and/or BLMIS were operating an investment advisory business or, at a minimum, were operating as broker-dealers with authority over discretionary accounts, and in that capacity were using the 703 Account as a fiduciary account. For example, since the 1990s, the Defendants knew that Madoff and/or BLMIS had discretionary control over Levy's money, managing to increase Levy's wealth from $180 million to $1.5 billion.

68.     In addition, since at least 2006, the Defendants knew, among other things, that Madoff and/or BLMIS were registered investment advisers, as evinced by public filings, and that Madoff and/or BLMIS were exercising discretion over their customer accounts.

69.     Moreover, since at least 2007, the Defendants knew that Madoff and/or BLMIS were implementing a discretionary strategy.  The Defendants were also told by BLMIS customers that Madoff and/or BLMIS had discretion to choose the counterparties to all of their customers' options trades, and that BLMIS customers showed JPMC copies of the customer, option, and trading agreements between BLMIS and its customers. Indeed, no later than 2007, the Defendants were structuring products based on BLMIS feeder funds and investing directly in those feeder funds.

70.     JPMC further knew that many BLMIS customers were fiduciaries and trustees in their own right who had delegated their fiduciary duties to Madoff and that Madoff exercised fiduciary powers as a trustee or custodian for retirement plans.

71.     Madoff and/or BLMIS breached this trust by misappropriating and diverting the BLMIS customer funds in the 703 Account.

72.     The Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting the customer funds in the 703 Account. At a minimum,

EC.46995.1

the Defendants knew of suspicious transactions in the 703 Account that would have led a reasonably prudent person strongly to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of IA Business customers, and the Defendants recklessly failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds. Reasonable inquiry would have revealed that the only plausible explanation for the suspicious transactions was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

73.    The Defendants knew since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only plausibly be explained by fraud. For example, in December 2001, the Defendants were aware of what appeared to be a check-fraud scheme. The Defendants were also aware of highly suspicious activity in the 703 Account, including: the utter absence of investment activity with customer funds and the distribution of such funds to other BLMIS customers instead; large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; and the regular use of hand-written checks for millions of dollars. No later than January 2007, the Defendants' automated transaction monitoring system alerted the Defendants to this unusual activity.

74.    The Defendants were aware since at least 2004 that Madoff and/or BLMIS submitted false information to the SEC. The FOCUS Reports Madoff provided to the SEC and Defendants contained glaring inaccuracies. The Defendants reviewed and thus knew that the information in the FOCUS Reports dramatically misstated BLMIS' cash on hand and omitted loans, and that the reports showed no evidence of any BLMIS customer accounts.

75.    After performing minimal due diligence on Madoff and BLMIS and the BLMIS feeder funds, the Defendants knew Madoff was engaging in fraud, or consciously avoided such knowledge. Since at least 2006, the Defendants knew, among other things, that: Madoff's and/or BLMIS' returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BLMIS, including that BLMIS feeder funds would not give the Defendants access to their account agreements with Madoff and/or BLMIS; and Madoff's and/or BLMIS' auditor was unregistered and was not subject to peer review.

76.    Since at least 2007, the Defendants knew, among other things, that: Madoff did not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder funds the names of the counterparties to the options transactions BLMIS was purportedly entering into on their behalf; there was no independent verification of the trades Madoff was supposedly executing for his customers; there was no verification that any of BLMIS customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operation of BLMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder funds in response to their questions about Madoff and/or BLMIS. No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

77.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that: certain BLMIS feeder funds refused to answer the Defendants' questions about Madoff and BLMIS; there were similarities between Madoff s operations of BLMIS and the Petters fraud; and Madoff's family members had critical roles at BLMIS.  No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the

23

BLMIS feeder funds in which the Defendants had invested was likely engaged in illegal activity relating to a BLMIS feeder fund.

78.     In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that Madoff and/or BLMIS were a fraud.  It was this concern that led the Defendants to submit requests to redeem their interests in the BLMIS feeder funds in October 2008.  After Madoff's arrest, employees of the Defendants admitted that they were not surprised to hear Madoff was operating a Ponzi scheme.

79.     Despite this knowledge, the Defendants moved billions of dollars in and out of the 703 Account at Madoff's behest and allowed BLMIS customers' funds to be used to make payments to Madoff, as well as to his friends and family, and to fund redemptions from other investors, rather than to make investments on behalf of customers.  The Defendants allowed Madoff and/or BLMIS to misappropriate billions of dollars from the 703 Account, in breach of Madoff's and/or BLMIS' duties as fiduciaries.

80.     The Defendants are therefore liable for all funds Madoff and/or BLMIS misappropriated from the 703 Account after the point at which the Defendants knew or through reasonable inquiry would have known that Madoff and/or BLMIS were misappropriating those funds.

81.     As a result of the Defendants' knowing participation in this breach of trust, Plaintiff and the Class lost billions of dollars.  At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.

82.     As a direct and proximate result of Defendants' knowing participation in breach of trust, Plaintiff and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

24

## COUNT II

### Aiding And Abetting Fraud

83.     Paragraphs 1 through 82 are realleged and incorporated by reference as if set forth fully herein.

84.     Madoff committed a massive fraud through BLMIS.  The Defendants had actual knowledge of the fraud and lent substantial assistance to Madoff and/or BLMIS in committing the fraud.  At a minimum, the Defendants consciously avoided knowledge of the fraud.  The Defendants suspected a fraud and realized there was a high probability of fraud, but refrained from confirming it, in order to later deny knowledge of the fraud.  The Defendants' actions proximately caused the fraud that resulted in billions of dollars in damages to customers, creditors, and/or BLMIS.

85.     Plaintiff brings this claim against all Defendants because, upon information and belief, each Defendant, individually, aided and abetted the fraud.  In addition, all of the Defendants operated as a single, indivisible entity.  Therefore, each of the Defendants is liable for the actions of the other Defendants.

86.     Madoff committed the largest Ponzi scheme in history through BLMIS. Madoff told customers that their money would be invested pursuant to the SSC Strategy, but instead stole that money and did not invest any of the customers' funds as he claimed.  The Ponzi scheme has resulted in billions of dollars in losses to customers of BLMIS.

87.     The Defendants knew, or at least consciously avoided knowledge, of the fraud.  The Defendants knew since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only be plausibly explained by fraud.  The Defendants were also aware of highly suspicious activity in the 703

Account, including: large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; and the regular use of hand written checks for millions of dollars. No later than January 2007, the Defendants' automated transaction monitoring system alerted the Defendants as to this unusual activity.

88.     The Defendants were aware since at least 2004 that Madoff through BLMIS submitted false information to the SEC. The FOCUS Reports Madoff through BLMIS provided to the SEC and Defendants contained glaring inaccuracies. The Defendants reviewed and thus knew that the information in the FOCUS Reports dramatically misstated BLMIS' cash on hand, omitted loans, and that the reports showed no evidence of any customer accounts.

89.     After performing minimal due diligence on Madoff and BLMIS, the Defendants knew Madoff through BLMIS was engaging in fraud, or consciously avoided such knowledge. Since at least 2006, the Defendants knew, among other things, that: BLMIS' returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BLMIS; and BLMIS' auditor was unregistered and was not subject to peer review.

90.     Since at least 2007, the Defendants knew, among other things, that: Madoff did not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder funds the names of the counterparties to the options transactions BLMIS was purportedly entering into on their behalf; there was no independent verification of the trades BLMIS was supposedly executing for its customers; there was no verification that any of BLMIS' customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operations at BLMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder

funds in response to their questions about BLMIS. No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

91.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that: certain BLMIS feeder funds refused to answer the Defendants' questions about Madoff and BLMIS; there were similarities between Madoff's operations at BLMIS and the Petters fraud; and Madoff's family members had critical roles at BLMIS. No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity relating to a BLMIS feeder fund.

92.    In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that Madoff and/or BLMIS were a fraud. It was this concern that led the Defendants to submit requests to redeem their interests in the BLMIS feeder funds in October 2008. After Madoff's arrest, employees of the Defendants admitted that they were not surprised to hear Madoff was operating a Ponzi scheme.

93.    The Defendants knew Madoff was a fraud. At a minimum, the Defendants were repeatedly faced with evidence that there was a high probability of fraud, and made a conscious decision not to confirm that fact.

94.    The Defendants substantially assisted Madoff through BLMIS in committing the fraud by, among other things: funneling approximately $250 million into BLMIS by way of the Defendants' investments in BLMIS feeder funds; lending Madoff through BLMIS over one hundred million dollars without which the Ponzi scheme could not have continued; allowing Madoff through BLMIS to use the 703 Account to run the Ponzi scheme; executing transfers at Madoffs and/or BLMIS' behest and honoring hand-written checks for tens of millions of dollars

EC.46995.1

that were necessary for the operation of the Ponzi scheme; providing short-term investment vehicles that generated revenue necessary for the continuation of the Ponzi scheme; choosing not to execute its AML policy, which it touted to its customers, by effectively failing to provide an account sponsor to the 703 Account; ignoring over ninety instances of irregular activity in the 703 Account, and dismissing the one alert that was issued in January 2007; providing unsupervised Private Bank accounts to some of BLMIS' biggest customers; and ignoring false statements made by Madoff through BLMIS in regulatory filings.

95.    The Defendants' assistance was a proximate cause of the fraud. Without the Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme for over two decades.

96.    As a result of the Defendants' aiding and abetting Madoff's and/or BLMIS' fraud, customers, creditors, and/or BLMIS lost billions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion. As a direct and proximate result of Defendants' activities, Plaintiff and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT III

### Aiding And Abetting Breach Of Fiduciary Duty

97.    Paragraphs 1 through 96 are realleged and incorporated by reference as if set forth fully herein.

98.    Madoff and/or BLMIS owed a fiduciary duty to BLMIS customers. Madoff and/or BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme and stealing billions of dollars from BLMIS customers. JPMC knowingly participated in the breach, causing harm to customers, creditors, and/or BLMIS. At a minimum, the Defendants consciously

EC.46995.1

avoided knowledge of the breach. The Defendants suspected Madoff and/or BLMIS were breaching a fiduciary duty and realized there was a high probability Madoff and/or BLMIS were breaching a fiduciary duty, but refrained from continuing it, in order to later deny knowledge of the breach.

99.    Plaintiff brings this claim against all Defendants because, upon information and belief, each Defendant, individually, aided and abetted the breach of fiduciary duty by Madoff and/or BLMIS. In addition, all of the Defendants operated as a single, indivisible entity. Therefore, each of the Defendants is liable for the actions of the other Defendants.

100.    Madoff and/or BLMIS were in a fiduciary relationship with BLMIS' customers. Madoff and/or BLMIS were in a superior position over BLMIS' customers, which required those customers to repose trust and confidence in Madoff and/or BLMIS. In addition, pursuant to various account agreements BLMIS' customers executed, Madoff and/or BLMIS, agreed to take BLMIS' customers' money and invest it pursuant to the SSC Strategy. Instead, Madoff and/or BLMIS took their money and used it to benefit Madoff and others close to him. Madoff and/or BLMIS never made any trades, or invested any of the money, they received from their customers.

101.    The Defendants knew Madoff and/or BLMIS had a fiduciary duty to BLMIS' customers and that Madoff and/or BLMIS breached that duty. The Defendants were aware that BLMIS was a broker-dealer and an investment adviser, and had reviewed account agreements in which BLMIS agreed to invest customers' money pursuant to specific terms.

102.    The Defendants also knew, or at least consciously avoided the knowledge that, Madoff and/or BLMIS breached that fiduciary duty by engaging in fraud. The Defendants knew

29

since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only plausibly be explained by fraud.

103.    December 2001, the Defendants were aware of what appeared to be a check-fraud scheme. The Defendants were also aware of highly suspicious activity in the 703 Account, including: large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and the suspicious activity between the 703 Account and clients of the Private Bank. No later than January 2007, the Defendants' automated transaction monitoring system alerted the Defendants to this unusual activity.

104.    The Defendants were aware since at least 2004 that Madoff and/or BLMIS submitted false information to the SEC. The FOCUS Reports Madoff and/or BLMIS provided to the SEC and Defendants contained glaring inaccuracies. The Defendants reviewed and thus knew that the information in the FOCUS Reports dramatically misstated BLMIS' cash on hand and omitted loans, and that the reports showed no evidence of any customer accounts.

105.    After performing minimal due diligence on Madoff and/or BLMIS, the Defendants knew Madoff and/or BLMIS were engaging in fraud, or consciously avoided such knowledge. Since at least 2006, the Defendants knew, among other things, that: BLMIS' returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding BLMIS, including that BLMIS feeder funds would not give the Defendants access to their account agreements with BLMIS; and BLMIS' auditor was unregistered and was not subject to peer review.

106.    Since at least 2007, the Defendants knew, among other things, that: Madoff did not want anyone to perform due diligence on BLMIS; Madoff would not tell the BLMIS feeder

EC.46995.1

funds the names of the counterparties to the options transactions BLMIS was purportedly entering into on their behalf; there was no independent verification of the trades BLMIS was supposedly executing for its customers; there was no verification that any of BLMIS' customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operations of BLMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BLMIS feeder funds in response to their questions about BLMIS. No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

107. Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that: certain BLMIS feeder funds refused to answer the Defendants' questions about Madoff and BLMIS; there were similarities between Madoff's operations of BLMIS and the Petters fraud; and Madoff's family members had critical roles at BLMIS. No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity relating to a BLMIS feeder fund.

108. In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that Madoff and/or BLMIS were a fraud. It was this concern that led the Defendants to submit requests to redeem their interests in the BLMIS feeder funds in October 2008. After Madoff's arrest, employees of the Defendants admitted that they were not surprised to hear Madoff and/or BLMIS were operating a Ponzi scheme.

109. The Defendants knew Madoff and/or BLMIS were breaching a fiduciary duty to BLMIS' customers. At a minimum, the Defendants were repeatedly faced with evidence that

31

there was a high probability Madoff and/or BLMIS were breaching a fiduciary duty, and made a conscious decision not to confirm that fact.

110.    The Defendants participated in, and provided substantial assistance to, Madoff's and/or BLMIS' breach of fiduciary duty by, among other things: funneling approximately $250 million into BLMIS by way of the Defendants' investments in BLMIS feeder funds; lending Madoff, and/or BLMIS, over one hundred million dollars without which the Ponzi scheme could not have continued; lending Levy, one of BLMIS' largest customers, over one hundred million dollars that Levy then invested with BLMIS; allowing Madoff and/or BLMIS to use the 703 Account to run the Ponzi scheme; executing transfers at Madoff's and/or BLMIS' behest and honoring hand written checks for tens of millions of dollars that were necessary for the operation of the Ponzi scheme; providing short-term investment vehicles that generated revenue necessary for the continuation of the Ponzi scheme; choosing not to execute its AML policy, which it touted to its customers, by effectively failing to provide an account sponsor to the 703 Account; ignoring over ninety instances of irregular activity in the 703 Account, and dismissing the one alert that was issued in January 2007; providing unsupervised Private Bank accounts to some of BLMIS' biggest customers; and ignoring false statements made by Madoff and/or BLMIS in regulatory filings.

111.    The Defendants' assistance was a proximate cause of the breach.  Without the Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme for over two decades.

112.    As a result of the Defendants' aiding and abetting this breach of fiduciary duty, customers, creditors, and/or BLMIS lost billions of dollars.  At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.  As a direct and proximate result of

32

Defendants' activities, Plaintiff and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT IV

### Breach Of Fiduciary Duty

113.    Plaintiff incorporates by reference and re-alleges the allegations contained in the foregoing paragraphs 1 through 112 as if set forth fully herein.

114.    As a result of Defendants' conduct above, and responsibilities with respect to the 703 Account, Defendants owed fiduciary duties to the Plaintiff and the Class, and breached those duties.

115.    As a result of the Defendants' breach of fiduciary duty, customers, creditors, and/or BLMIS lost billions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion. As a direct and proximate result of Defendants' activities, Plaintiff and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT V

### Conversion

116.    Plaintiff incorporates by reference and re-alleges the allegations contained in the foregoing paragraphs 1 through 115 as if set forth fully herein.

117.    JPMC debited in excess of $145 million from the 703 Account to satisfy a debt purportedly owed to it by BLMIS. In doing so, JPMC exercised unauthorized dominion and control over funds that it knew BLMIS held as a fiduciary on behalf of customers--specifically identifiable Customer Property--in derogation of BLMIS customers' rights.

EC.46995.1

118.    BLMIS customers have a possessory right and interest in the billions of dollars they invested with BLMIS, which were ultimately deposited at JPMC into the 703 Account.

119.    These investment funds constitute Customer Property and are recoverable by the Plaintiff.

120.    At the time JPMC debited the $145 million from the 703 Account, JPMC was on notice that the account was comprised of investor funds. Thus, JPMC's debit from the 703 Account has resulted in the wrongful conversion of Customer Property. JPMC is therefore liable for having wrongfully converted these monies and is now obligated to return all such monies to Plaintiff and the Class.

## COUNT VI

### Aiding And Abetting Conversion

121.    Plaintiff incorporates by reference and re-alleges the allegations contained in the foregoing paragraphs 1 through 120 as if set forth fully herein.

122.    Madoff and/or BLMIS converted billions of dollars of Customer Property.

123.    Plaintiff and the Class, as BLMIS customers, have a legal right and interest in the billions of dollars they personally invested with BLMIS. Madoff and/or BLMIS exercised unauthorized dominion and control over this Customer Property in derogation of BLMIS customers' rights by failing to invest Customer Property pursuant to the SSC Strategy. Instead, Madoff and/or BLMIS used BLMIS customers' money to make payments to friends and family and to fund redemptions of other investors. Madoff's and/or BLMIS' unauthorized use of Customer Property resulted in the wrongful conversion of BLMIS customers' specifically identifiable funds.

34

124.    JPMC had actual knowledge of the conversion and lent substantial assistance to Madoff and/or BLMIS in converting these monies.  At a minimum, JPMC consciously avoided knowledge of the conversion.  JPMC suspected, and even realized there was a high probability, that Madoff and/or BLMIS were converting BLMIS customers' money, but refrained from confirming its suspicions in order later to deny knowledge of the conversion.  JPMC's actions proximately caused the conversion that resulted in billions of dollars in damages to customers, creditors, and/or BLMIS.

125.    JPMC was aware that Madoff and/or BLMIS were a broker-dealer and an investment adviser, and had reviewed account agreements in which Madoff and/or BLMIS agreed to invest BLMIS customers' money pursuant to specific terms.

126.    Madoff and/or BLMIS converted billions of dollars of BLMIS customers' money.  Madoff and/or BLMIS told BLMIS customers that he would invest their money but instead stole that money and did not invest any of the funds as he claimed.

127.    JPMC also knew, or at least consciously avoided knowing, that Madoff and/or BLMIS did not invest their money, but instead stole BLMIS customers' money.  JPMC knew since at least the 1990s that the inexplicable transactions taking place in the 703 Account did not coincide with any legitimate investment, and thus could only be explained by fraud.  In December 2001, JPMC was aware of what appeared to be a check-fraud scheme.  JPMC was also aware of highly suspicious activity in the 703 Account, including:  large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and suspicious activity between the 703 Account and clients of the Private Bank.  No later than

35

January 2007, JPMC's automated transaction monitoring system alerted it to this unusual

activity.

128.    JPMC was aware since at least 2004 that Madoff and/or BLMIS submitted false

information to the SEC. The FOCUS Reports Madoff and/or BLMIS provided to the SEC and

JPMC contained glaring inaccuracies. JPMC reviewed and thus knew that the information in the

FOCUS Reports dramatically misstated Madoff's and/or BLMIS' cash on hand and that the

reports showed no evidence of any customer accounts.

129.    After performing minimal due diligence on Madoff and/or BLMIS and the

BLMIS feeder funds, JPMC knew Madoff and/or BLMIS were engaging in fraud, or consciously

avoided such knowledge. Since at least 2006, JPMC knew, among other things, that: Madoff's

returns were "too good to be true" and could not be reconciled with market conditions; there was

a lack of transparency surrounding Madoff and/or BLMIS, including that BLMIS feeder funds

would not give JPMC access to their account agreements with BLMIS; and BLMIS' auditor was

unregistered and was not subject to peer review.

130.    Since at least 2007, JPMC knew, among other things, that: Madoff and/or BLMIS

did not want anyone to perform due diligence on BLMIS; Madoff and/or BLMIS would not tell

the BLMIS feeder funds the names of the counterparties to the options transactions BLMIS was

purportedly entering into on their behalf; there was no independent verification of the trades

BLMIS was supposedly executing for its customers; there was no verification that any of BLMIS

customers' assets existed; Madoff and/or BLMIS were rumored to be running a Ponzi scheme or

engaged in illegal front-running; there were similarities between Madoff's operations at BLMIS

and the Refco fraud; and JPMC was receiving inconsistent answers from the BLMIS feeder

funds in response to their questions about Madoff and/or BLMIS. No later than 2007, JPMC acknowledged there was a substantial risk that Madoff and/or BLMIS were a fraud.

131.    Since at least 2008, and prior to Madoff's arrest, JPMC knew, among other things, that: certain BLMIS feeder funds refused to answer JPMC's questions about BLMIS and Madoff; there were similarities between Madoff's operations at BLMIS and the Petters fraud; and Madoff's family members had critical roles at BLMIS. No later than September 2008, JPMC learned that Aurelia Finance, an entity linked to one of the BLMIS feeder funds in which JPMC had invested, was likely engaged in illegal activity relating to a BLMIS feeder fund.

132.    In October 2008, JPMC admitted that the information it learned no later than 2006 led it to believe that Madoff and/or BLMIS were running a fraud. It was this concern that led JPMC to submit requests to redeem its interests in the BLMIS feeder funds. After Madoff's arrest, individuals employed by JPMC admitted that they were not surprised to hear Madoff and/or BLMIS were operating a Ponzi scheme.

133.    JPMC substantially assisted Madoff and/or BLMIS in converting Customer Property. JPMC funneled approximately $250 million into BLMIS through its investments in BLMIS feeder funds; lent BLMIS and Madoff over one hundred million dollars without which the Ponzi scheme could not have continued; lent Levy, one of BLMIS' largest customers, over one hundred million dollars that Levy then invested with Madoff and/or BLMIS; allowed Madoff and/or BLMIS to use the 703 Account to run the Ponzi scheme; executed transfers at Madoff's and/or BLMIS' behest and honored hand-written checks for tens of millions of dollars that were necessary for the operation of the Ponzi scheme; provided short-term investment vehicles that generated revenue necessary for the continuation of the Ponzi scheme; chose not to execute its AML policy, which it touted to its customers, by effectively failing to provide an

account sponsor to the 703 Account; ignored over ninety instances of irregular activity in the 703 Account, dismissing the one alert that was issued in January 2007; provided unsupervised Private Bank accounts to some of Madoff's and/or BLMIS' biggest customers; and ignored false statements made by Madoff and/or BLMIS in regulatory filings.

134.    JPMC's assistance was a proximate cause of the conversion.  Without it, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme for over two decades.

135.    As a result of the Defendants' aiding and abetting Madoff's and/or BLMIS' conversion, customers, creditors, and/or BLMIS lost billions of dollars.  At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.  As a direct and proximate result of Defendants' activities, Plaintiff and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT VII

### Unjust Enrichment

136.    Plaintiff incorporates by reference and re-alleges the allegations contained in the foregoing paragraphs 1 through 135 as if set forth fully herein.

137.    JPMC has unjustly benefitted through its receipt of Customer Property--benefits that JPMC acquired only as a result of perpetuating and participating in Madoffs and/or BLMIS' Ponzi scheme.

138.    Since 2002, JPMC received approximately $149 million from BLMIS-approximately $4 million in the form of fee and interest payments and $145 million in repayment of loans.  JPMC also benefitted from Customer Property by receiving deposits of this property

38

into the 703 Account. JPMC kept the 703 Account open until Madoff's arrest in December 2008 and used the balance in the 703 Account to earn an estimated $500 million in fees and profits.

139.    JPMC earned these benefits at the expense of BLMIS customers, and cannot justly retain them. Faced with the prospect of losing fees and profits, JPMC chose to ignore compelling evidence of Madoff's and/or BLMIS' fraud. For example, JPMC was privy to the abnormal activity in the 703 Account, suspicious and inadequate information received from BLMIS feeder funds while conducting due diligence in anticipation of structuring and issuing products, and a plethora of other evidence of fraud, as detailed above.

140.    JPMC helped perpetuate Madoff's and/or BLMIS' fraud by ignoring the evidence of fraud, and continuing to use the Customer Property in the 703 Account for its own enrichment.

141.    Equity and good conscience require full restitution of the monies received by JPMC, directly and indirectly, from BLMIS. This includes not only the Customer Property JPMC received directly from BLMIS, but also any profits made from its use of this money. Additionally, any profits and fees JPMC earned through its use of the Customer Property deposited in the 703 Account is recoverable by the Plaintiff and the Class as restitution.

142.    Likewise, JPMC proximately caused the loss to the BLMIS customers. When JPMC finally decided to inform regulators that Madoff was a fraud, it concurrently attempted to redeem all of its interests in BLMIS and Madoff related investments. JPMC knew that exposing the fraud to regulators would lead to the collapse of BLMIS. By its own action, in attempting to redeem its investment, JPMC acknowledged that its failure to report information to regulators would result in massive losses to BLMIS customers.

EC.46995.1

143.    As a result of the Defendants' fraud upon federal and state regulators, Plaintiff and the Class lost billions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion. As a direct and proximate result of Defendants' activities, Plaintiff and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory and/or consequential damages, and as permitted by law, exemplary and punitive damages, in favor of Plaintiff, and on behalf of all other Class members, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in specific amounts of compensatory, exemplary and punitive damages to be determined at trial, including interest and any enhanced damages thereon;

C.    Awarding Plaintiff and the Class disgorgement of profits and fees received by JPMC in connection with the conduct alleged herein;

D.    Awarding Plaintiff and the Class restitution of monies JPMC received from Madoff and/or BLMIS and any profits earned through JPMC's use of these monies;

E.    Establishment of a constructive trust over the proceeds of the unjust enrichment of JPMC in favor of the Plaintiff and the Class;

F.    On all claims for relief, an accounting of all interest, fees, profits, and any other financial benefit received by JPMC in connection with the 703 Account from the time of its inception;

G.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

H.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  November 17, 2011

ENTWISTLE & CAPPUCCI LLP

By: _____
VINCENT R. CAPPUCCI

ANDREW J. ENTWISTLE, ESQ.
ARTHUR V. NEALON, ESQ.
ROBERT N. CAPPUCCI, ESQ.
280 Park Avenue, 26th Floor West
New York, NY 10017
Tel. (212) 894-7200
Fax (212) 894-7272
vcappucci@entwistle-law.com
aentwistle@entwistle-law.com
anealon@entwistle-law.com
rcappucci@entwistle-law.com

JASON A. ZWEIG, ESQ.
HAGENS BERMAN SOBOL SHAPIRO LLP
One Penn Plaza, 36th Floor
New York, NY 10119
Tel. (212) 752-5455
Fax (917) 210-3980
jasonz@hbsslaw.com

41

STEVE W. BERMAN, ESQ.
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Tel. (206) 623-7292
Fax (206) 623-0594

REED KATHREIN, ESQ.
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel. (510) 725-3000
Fax (501) 725-3001

LEE M. GORDON, ESQ.
HAGENS BERMAN SOBOL SHAPIRO LLP
700 South Flower Street, Suite 2940
Los Angeles, CA  90017-4101
Tel. (213) 330-7150
Fax (213) 330-7152

*Attorneys for Plaintiff and the Proposed Class*

EC.46995.1