

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL SHAPIRO, on behalf of himself as an individual, and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>       v.<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES, LTD.,<br><br>               Defendants. | Case No.:11-CV-8331 (CM)(MHD)<br>ECF CASE<br><br><br>__CLASS ACTION__<br><br><br><br>Demand for Jury Trial |
| STEPHEN and LEYLA HILL, on behalf of themselves as individuals, and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>       v.<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES, LTD.,<br><br>               Defendants. | Case No. 11-CV-7961 (CM)<br>ECF CASE |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page(s)**

I.      NATURE OF ACTION ................................................................1

II.     JURISDICTION AND VENUE ................................................9

III.    PARTIES ...............................................................................9

IV.     GENERAL ALLEGATIONS ...............................................13

        A.      Madoff's Criminal Enterprise ................................13

        B.      The Players............................................................20

                1.      Relevant JPMC Business Segments.............20

                2.      Relevant JPMC Divisions and Employees .............21

                3.      Relevant JPMC Committees ................24

                4.      BMIS Feeder Funds .............................24

                5.      Relevant BMIS/JPMC Customers ............25

                6.      Other Relevant Entities ........................26

        C.      Ignoring the Evidence of Madoff's Ponzi Scheme, JPMC Invests in
                and Structures Products on BMIS Feeder Funds ..................27

                1.      JPMC's Note Program .........................27

        D.      JPMC Starts Structuring and Issuing Products on BMIS Feeder
                Funds....................................................................28

        E.      JPMC's Limited Due Diligence Led to Unanswered, Disturbing
                Questions About Madoff and His Investment Strategy .........29

        F.      Undeterred by Evidence of a Ponzi Scheme, Equity Exotics Requests
                Approval from the Hedge Fund Underwriting Committee to Issue
                Approximately $1 Billion in BMIS-Related Products............33

        G.      The Investment Bank Continues to Ignore Clear Evidence of the
                Ponzi Scheme ........................................................35

        H.      Faced Again with Numerous Indications of Madoff's Ponzi Scheme,
                JPMC Quietly Removes All of Its Assets from the BMIS Feeder
                Funds.....................................................................42

I. After the Scam Was Revealed, JPMC Admitted Knowledge That Madoff Was a Thief ................................................................................44

J. JPMC's "Lessons Learned" ...............................................................47

K. Lessons Not Learned..........................................................................49

L. JPMC'S View of Madoff as Seen from Account Activity ...................52

 1. Madoff Finds a Banker to Assist Him in His Ponzi Scheme .........................................................................................52

 2. The Establishment of Madoff's Account...................................54

 3. JPMC Had a Duty to Know Its Customer and to Monitor Its Customers' Account Activity ...................................................56

 4. Another Financial Institution Warned JPMC More Than Ten Years Before The Ponzi/Embezzling Scheme Collapsed .........................59

 5. JPMC Had a Duty to Know What Type Of Business Madoff Was Operating ...........................................................60

 6. JPMC Knew of Inconsistencies Between BMIS's Financial Statements, the Activity in the 703 Account, and BMIS's Purported Business........................................................................60

 7. JPMC Had A Duty to Investigate BMIS's Account Activity Which Was Facially Inconsistent With Any Legitimate Business Purpose ........................................................................68

 8. JPMC Was Aware of Anomalous Account Activity that Was Inconsistent With BMIS's Purported Business..........................70

 9. JPMC Had A Duty to Take Action .............................................74

M. JPMC'S View of Madoff Through Loan Activity...................................74

 1. JPMC's Loans to Levy for BMIS Investments...........................74

 2. JPMC Fueled the Scam With Loans to BMIS in 2005 and 2006..................................................................................................75

N. JPMC Allowed the Ponzi/Embezzling Scheme to Continue ................78

V. CLASS ACTION ALLEGATIONS ..........................................................79

VI. CLAIMS FOR RELIEF ...........................................................................81

COUNT ONE  KNOWING PARTICIPATION IN A BREACH OF TRUST.............................81

COUNT TWO  AIDING AND ABETTING EMBEZZLEMENT.................................................85

COUNT THREE  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY..................89

COUNT FOUR  CONVERSION .................................................................................................93

COUNT FIVE  AIDING AND ABETTING CONVERSION ........................................................94

COUNT SIX  UNJUST ENRICHMENT ......................................................................................98

COUNT SEVEN  BREACH OF FIDUCIARY DUTY..............................................................100

COUNT EIGHT  COMMERCIAL BAD FAITH ......................................................................100

COUNT NINE  GROSS NEGLIGENCE ...................................................................................101

PRAYER FOR RELIEF ............................................................................................................101

Plaintiffs Stephen and Leyla Hill and Paul Shapiro ("Plaintiffs") file this consolidated amended class action complaint against JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMC" or "Defendants").  Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys, and based upon the Trustee investigation set forth in the Amended Complaint (Redacted) filed in Case No. 1:11-cv-00913 (CM) (MHO). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF ACTION

1.      On June 24, 2011, Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ( "BMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the estate of Bernard L. Madoff, by and through its counsel, filed an Amended Complaint (Redacted) in Case No. 1:11-cv-00913 (CM) (MHO) against JPMC.  On November 1, 2011, the Court dismissed the common law counts 21-28, brought by the Trustee for lack of standing, holding that those claims belong to the customers of BMIS.  By this complaint, Plaintiffs, on behalf of themselves, and on behalf of those customers of BMIS similarly situated, bring their own claims for JPMC's actual knowledge of and participation in a breach of trust, aiding and abetting embezzlement, aiding and abetting breach of fiduciary duty, breach of fiduciary duty, conversion, aiding and abetting conversion, and unjust enrichment.

2.      Bernard L. Madoff, though BMIS, committed one of the largest, if not the largest, Ponzi scheme in United States history.  Not a single penny of customers' money was invested in any securities.  Rather, Madoff stole customer money to support his, his family, and associates'

extravagant life styles, while he used other customer money to sustain his Ponzi and embezzling scheme by paying other existing customers as they requested to cash in their accounts.

3.      While numerous financial institutions enabled Madoff's fraud, JPMC was at the very center of that scheme and thoroughly complicit.  JPMC had actual knowledge of the Ponzi scheme - it had before it the very nuts and bolts of the Ponzi scheme: the money customers deposited into BMIS' main account was not used to purchase securities, but instead was merely transferred to other customers in patterns that could serve no legitimate business purpose. Millions of dollars routinely bounced back and forth between Madoff and one of JPMC's most important customers, Norman Levy.  JPMC could see that Madoff's regulatory filings were materially inconsistent with BMIS' actual finances.  Rather than put a stop to it, JPMC chose to continue to participate in Madoff's thievery, not just through the various ways it participated in his activity, but by helping to cover Madoff's naked theft with the imprimatur of a globally recognized financial institution.

4.      JPMC could not ignore the evidence of Madoff's scheme.  JPMC was Madoff and BMIS' primary banker for over 20 years and was responsible for knowing the business of its customers – in this case, very large customers.  From 1986 on, *all* of the money that Madoff stole from his customers passed through BMIS' account at JPMC, the so-called "703 Account." JPMC had everything it needed to unmask and stop the fraud– it had unique information from which it could have reached only one plausible conclusion: Madoff was a thief.

5.      Madoff cultivated a strong business relationship with JPMC and, from at least 1992, Madoff had all money received in the investment advisory business deposited into accounts he held at what was then the Chase Manhattan Bank ("Chase") in Manhattan and in a Chase Bank branch in Delaware.  As Madoff's business and reputation grew, and as the scope of

his enormous Ponzi and embezzling scheme expanded, the deposits in the JPMC accounts

swelled.  By 2006, Madoff had billions of dollars in cash on deposit at JPMC.  These were

demand deposits, meaning that JPMC had full use of the funds until Madoff withdrew them.

6.      Each victim that opened an account with BMIS received an account number.

Madoff only accepted cash investments, which were directed to Account # XXXXX1703 at

Chase Bank in Manhattan (the "703 Account").  The 703 Account belonged to BMIS, although

deposits were almost invariably sent to the benefit of "Bernard L. Madoff."  BMIS victims

deposited cash in two ways, either through wire transfer or by check.  Wire transfers were sent

directly to the 703 Account at JPMC with an advice that the funds were to be credited to Bernard

L. Madoff for the benefit to the account of a particular victim.  Checks were deposited into the

703 Account with the appropriate customer account number indicated on the face of the check.

Either way, the fact that the monies were not Madoff's or BMIS', but rather belonged to the

victim and were being received by BMIS as a fiduciary was plain on the face of the deposits.

7.      BMIS' victims included individuals, trusts, pensions, not-for-profit corporations

and IRA custodians.  JPMC permitted all funds from putative investors to be commingled in a

single account and permitted Madoff to withdraw the funds as he saw fit, without limitation.

8.      Upon information and belief, between 2006 and the middle of 2008, the 703

Account had an average balance of several billion dollars.  As the financial markets began to

sharply decline in 2008, however, the cash balance in the 703 Account began to drop

precipitously.  From September 2008 until December 11, 2008, the 703 Account balance often

dropped nearly to zero.  In November 2008, the balance dropped close to zero several times,

forcing Madoff to transfer at least $164 million from Madoff Securities International's accounts

in London to the 703 Account.  For the month of November 2008, $300 million was deposited by victims to the 703 Account and Madoff withdrew $320 million.

9.      Indeed, while billions of dollars flowed through the 703 Account, none of it was used to buy or sell any securities as it should have been had BMIS been legitimate. Instead, emblematic of a Ponzi and embezzling scheme, the money in the 703 Account merely flowed back and forth between Madoff and his customers, while Madoff syphoned off hundreds of millions of dollars for himself and family members.  JPMC knew that Madoff was engaging in thievery based on the obvious fact that the account activity reflected no legitimate business purpose.  JPMC allowed Madoff to funnel billions of dollars through the 703 Account by ignoring clearly illicit transaction activity within that account – including billions of dollars in suspicious transactions with its own private banking customers – and disregarding its own anti-money laundering policies. Rather than put a stop to the crime that it knew was taking place, JPMC continued to participate in the crime as JPMC's drive for fees and profits became a substitute for common sense, ethics and legal obligations.

10.      Not only was JPMC aware that the 703 Account was being used in connection with a Ponzi scheme, but it reviewed Financial and Operational Combined Uniform Single Reports ("FOCUS Reports") that Madoff filed with the Securities and Exchange Commission ("SEC").  The FOCUS Reports contained glaring irregularities that JPMC should have probed. For example, not only did BMIS fail to report its loans from JPMC, it also failed to report any commission revenue.  JPMC ignored these material omissions in BMIS' FOCUS Reports.  By its silence, JPMC lent legitimacy and cover to BMIS' operations.  JPMC's failure to do anything to stop the crime in progress was no accident - JPMC collected hundreds of millions of dollars in fees and profits in connection with Madoff and BMIS.

11.     JPMC had yet further knowledge that Madoff engaged in banking activities with no legitimate business purpose.  According to two former employees of another financial institution, in or about 1997, that institution observed and investigated Madoff's nearly daily circular transactions between an account Madoff controlled at that financial institution and a Madoff account at Chase.  On virtually a daily basis, a Madoff employee would physically deposit a check drawn on Madoff's account at the other financial institution into his account at JPMC.  The next day, funds in or near the same amount– generally at least $1 million but less than $10 million– would be wired back from Madoff's JPMC account to the account at the other financial institution.  According to the investigator at the other financial institution, now a former employee, as well as a second former employee, the investigator and others at the financial institution questioned Madoff's employees about the transactions, and, having failed to receive a satisfactory explanation for the suspicious account activity, that financial institution closed Madoffs' account.  Not only should the suspicious activity have been as apparent to JPMC as it was to the other financial institution, but following normal operating procedures, the financial institution's investigator would have contacted his counterpart at JPMC regarding the suspicious transactions on two occasions: (i) in the course of his inquiry; and (ii) at the conclusion of the inquiry, to report that the other financial institution was closing the account.  The circular transactions in which JPMC participated at this time presaged the same sort of circular transactions in which Madoff and Levy would engage later within JPMC -- transactions JPMC permitted to occur despite their evident lack of legitimacy.

12.     In addition to being Madoff's and BMIS' banker, JPMC also profited from the Ponzi scheme by selling structured products related to BMIS feeder funds to its clients.  In the course of structuring these products, JPMC performed due diligence on BMIS beginning in

2006, using information it obtained from those responsible at JPMC for the 703 Account, as well as information provided by various BMIS feeder funds.  At some point between 2006 and the Fall of 2008, if not before, JPMC unquestionably knew that: BMIS' returns were consistently too good -- even in a down market – to be true; Madoff would not allow transparency into his strategy; JPMC, one of the world's leading and most knowledgeable derivatives dealers, could not identify, and Madoff refused to provide information on, his purported over-the-counter ("OTC") counterparties; BMIS' auditor was a small, unknown firm; Madoff and/or BMIS had a conflict of interest by acting as the clearing broker, sub-custodian and sub-investment adviser; feeder-fund administrators could not reconcile the daily position numbers they got from Madoff with any third-party source to confirm their accuracy; and there was public speculation that Madoff operated a Ponzi scheme, or was engaged in other illegal activity, such as front running.

13.     JPMC's due diligence yet again revealed thievery at BMIS.  But JPMC was not concerned with the devastating effect on investors or its legal and moral obligations.  It was concerned only with its own bottom line, and did nothing but a cost-benefit analysis in deciding to become part of Madoff's scheme:  "Based on overall estimated size of BLM strategy, it would take [a] ... fraud in the order of $3bn or more ... for JPMC to be affected."  JPMC also relied on the Securities Investor Protection Corporation ("SIPC") to protect its profits: "JPMorgan's investment in BLM ... is treated as customer money ... and therefore [is] covered by SIPC."  By the fall of 2008, in the midst of a worldwide economic downturn, the cost-benefit analysis had changed.  JPMC, no longer comfortable with the risk of fraud, decided to redeem its $276 million in investments in BMIS feeder funds.  JPMC also received an additional transfer of $145 million from BMIS in June 2006.

14.     This was not the first time JPMC ignored evidence of fraud in order to garner revenue and accommodate important bank clients.  In 2003, JPMC had been accused of the same sort of conduct in connection with the Enron fraud.  As the SEC alleged in its complaint, JPMC aided and abetted Enron's manipulation of its financials through a series of complex financial transactions called "prepays."  JPMC "was willing to engage in [these] transactions because [it] generated substantial fees and as an accommodation to an important client."  Moreover, JPMC was recently sued in relation to its alleged participation in a Ponzi scheme operated by Minnesota businessman Tom Petters.

15.     Indeed, JPMC's due-diligence team was further concerned about thievery at BMIS in the wake of the Petters scheme.  Some of these concerns centered on BMIS' small, unknown auditor, Friehling & Horowitz ("Friehling"):

> The "DO" [due diligence] done by all counterparties seems suspect. Given the scale and duration of the Petters fraud it cannot be sufficient that there's simply trust in an individual and there's been a long operating history.... Let's go see Friehling and Horowitz the next time we're in NY ... to see that the address isn't a car wash at least.

16.     In or about September 2008, as JPMC was reevaluating its hedge fund investments in the midst of the worldwide financial crisis, Alain Krueger, of JPMC's London office, had a telephone call with individuals at Aurelia Finance, S.A. ("Aurelia Finance"), a Swiss company that purchased and distributed JPMC's structured products.  During the course of that call, the individuals at Aurelia Finance made ominous references to "Colombian friends" and insisted that JPMC maintain its BMIS-related hedge.  That conversation triggered a concern that Colombian drug money was somehow involved in the BMIS-Aurelia Finance relationship, which led to an internal investigation at JPMC of BMIS and Aurelia Finance for money laundering.  Significantly, it was only when its own money was at stake that JPMC decided to report BMIS to a government authority.

17.     As reported in the French press, by the end of October 2008, JPMC admitted in a filing of suspicious activity made to the United Kingdom's Serious Organised Crime Agency ("SOCA") that it *knew* that Madoff was "too good to be true," and was likely stealing from his customers:

> (1) … [T]he investment performance achieved by [BMIS')] funds … is so consistently and significantly ahead of its peers year-on-year, even in the prevailing market conditions, as to appear too good to be true-meaning that it probably is; and
>
> (2) the lack of transparency around Madoff Securities trading techniques, the implementation of its investment strategy and the identity of its OTC option counterparties; and
>
> (3) its unwillingness to provide helpful information.

18.     None of this information was new to JPMC – it had known it for years.  It was only in an effort to protect its own investments that JPMC finally decided to inform a government authority about BMIS.  JPMC further sought permission from SOCA to redeem its Aurelia Finance-related investments and admitted that "as a result [of these issues with BMIS] JPMC[] has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds."

19.     Even when it admitted knowing that Madoff had to be a Ponzi scheme in October 2008, JPMC still did nothing to stop it.  It did not even restrict activity on the 703 Account.  JPMC made at least half a billion dollars in revenue from Madoff's victims as well as in excess of $400 million in transfers.  Plaintiffs seek recovery of these funds as well as at least $19 billion in damages suffered by BMIS customers for JPMC's role in allowing Madoff's embezzling and Ponzi scheme to continue unabated for years, with an exact amount to be determined at trial.

## II.    JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332 and the principles of pendent and supplemental jurisdiction.

21.    This Court also has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Complaint emanates from this state, at least some of the Defendants are based in this state, and all Defendants appear to be authorized to do business here, have sufficient minimum contacts with this state, so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.    Venue in this Court is proper under 28 U.S.C. §1391 because many of the transactions, acts and practices described herein occurred within the jurisdiction of this district.

## III.    PARTIES

23.    Plaintiffs Stephen and Leyla Hill are individuals residing in California.  Plaintiffs were customers of BMIS, and incurred losses and/or damages as a result of the activities alleged herein.  Plaintiffs and/or their property and/or estate were injured as a result of the conduct alleged herein. JPMC received Plaintiffs' property as cash received, acquired or held by or for the account of BMIS from or for the accounts of Plaintiffs, and the proceeds of any such property transferred by BMIS, including property unlawfully converted ("Customer Property").  Plaintiffs have suffered injury-in-fact for which Plaintiffs are entitled to seek monetary damages or equitable relief.

24.    Plaintiff Paul Shapiro is an individual residing in New York.  Plaintiff was a customer of BMIS and incurred losses and/or damages as a result of the activities alleged herein.  Plaintiff Shapiro and/or his property and/or estate was injured as a result of the conduct alleged herein. JPMC received Plaintiff Shapiro's property as cash received, acquired or held by or for the account of BMIS from or for the accounts of Plaintiff Shapiro, and the proceeds of any such

property transferred by BMIS, including property unlawfully converted ("Customer Property"). Plaintiff Shapiro has suffered injury-in-fact for which he is entitled to seek monetary damages or equitable relief.

25.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a financial holding company incorporated under Delaware law with its principal place of business at 270 Park Avenue, New York, New York 10017.  JPMorgan Chase is one of the largest banking institutions in the United States, with approximately $2.0 trillion in assets and $165.4 billion in stockholders' equity as of December 31, 2009.

26.     JPMorgan Chase played a role in the Defendants' relationship with BMIS. JPMorgan Chase created and implemented anti-money-laundering policies that governed how the Defendants monitored the activity in the 703 Account.  Further, JPMorgan Chase was involved in the products the Defendants structured and issued relating to BMIS and was repeatedly referenced in the term sheets for those products.

27.     Defendant JPMorgan Chase Bank, N.A. ("Chase Bank") is one of JPMorgan Chase's main bank subsidiaries and is organized under the laws of the United States with its principal place of business at 111 Polaris Parkway, Columbus, Ohio 43240.  Chase Bank is a national banking association in the United States with locations in 23 states, including a location in New York, New York.  Before November 2004, JPMorgan Chase Bank was a New York state chartered bank, regulated by the New York State Banking Department.  On July 9, 2004, JPMorgan Chase Bank requested approval to convert to a national banking association.  This request was approved by the Office of the Comptroller of the Currency ("OCC") on October l3, 2004.  At that time, the bank's name was changed to JPMorgan Chase Bank, N.A.

28.     Upon information and belief, the Risk Management Division of the Investment Bank operates at least in part under the legal entity Chase Bank. Chase Bank also acted as guarantor and common depository for products JPMC structured and issued related to the BMIS.

29.     Defendant J.P. Morgan Securities LLC ("JPM Securities (US)") is the principal non-bank subsidiary of JPMorgan Chase and is organized under the laws of Delaware.  JPM Securities (US)'s operations are conducted in JPMorgan Chase's New York, New York offices. JPM Securities (US) is JPMorgan Chase's United States Investment Banking arm through which it conducts securities underwriting, dealing and brokerage activities in the United States.  JPM Securities (US) is an SEC-registered broker-dealer and investment adviser, and a member of the Financial Industry Regulatory Authority ("FINRA").

30.     Upon information and belief, JPMorgan Chase's Financial Institutions Group and Broker/Dealer Group operate at least in part under the legal entity JPM Securities (US).

31.     Defendant J.P. Morgan Securities Ltd. ("JPM Securities (UK)") is organized under the laws of England with its registered office at 125 London Wall, London, EC2Y SAJ. JPM Securities (UK) is JPMorgan Chase's United Kingdom Investment Banking arm, through which it conducts securities underwriting, securities dealing and brokerage activities.  JPM Securities (UK) is an indirect subsidiary of Chase Bank.  JPM Securities (UK) routinely conducts business in New York, New York and its employees regularly work with JPMorgan Chase employees in the New York, New York offices and attend meetings at those offices.

32.     Upon information and belief, JPMorgan Chase's Equity Exotics & Hybrids Desk and the Equity Derivatives Group operate at least in part under the legal entity JPM Securities (UK).  JPM Securities (UK) also played an integral role in structuring and issuing products related to the BMIS.

33.     This Court has personal jurisdiction over all of the Defendants captioned herein. All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.

34.     The Defendants have: (a) intentionally taken full advantage of the rights, benefits and privileges of conducting business and/or transactions in the State of New York; (b) purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and by receiving customer property to their benefit; (c) derived significant revenue from New York; (d) maintained minimum contacts and/or general business contacts with New York in connection with the claims alleged herein; and (e) committed tortious acts both within and without New York, causing injury in New York, and (i) regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in New York, or (ii) expect or should reasonably expect the acts to have consequences in New York and derive substantial revenue from interstate and international commerce.

35.     JPMorgan Chase operates six business segments: Investment Banking, Commercial Banking, Treasury & Security Services, Asset Management, Retail Financial Services and Card Services.  Within or alongside these various business segments, JPMorgan Chase's activities are further divided among numerous divisions and groups.

36.     JPMorgan Chase does not operate its various business segments, divisions and groups within the confines of separate legal entities.  Rather, the firm operates through many legal entities under the enormous umbrella that is the financial holding company, JPMorgan Chase.

37.     Matt Zames, who heads Interest Rate Trading, Global Foreign Exchange, Public Finance, Global Mortgages, Tax-Oriented Investments and Global Fixed Income, explained the significance of JPMorgan Chase's legal entities as "not relevant to how we run our business." Zames used himself as an example:  "I guess I'm still an employee of [JPM Securities (US)]. Having said that, people that report to me are under [Chase Bank] as well."

38.     Plaintiffs bring this action against all Defendants because, upon information and belief, each Defendant, individually, participated in, promoted, aided and abetted the fraud.  In addition, all of the Defendants operated as a single indivisible entity.  Therefore, each of the Defendants is liable for the actions of the other Defendants.

## IV.     GENERAL ALLEGATIONS

### A.     Madoff's Criminal Enterprise

39.     Madoff is a former Chairman of the Board of Directors of the NASDAQ stock exchange. He controlled the investment adviser services and finances at BMIS, and he is the sole owner of BMIS, a company which he appears to have founded in the 1960s.

40.     Until his arrest, and for the preceding 40 years, Madoff owned and operated a broker-dealer business based in Manhattan.  Until 2000, Madoff operated under the name Bernard L. Madoff Investment Securities, a sole proprietorship owned by Madoff.  On or about December 4, 2000, Madoff formed BMIS, a New York limited liability company with offices at 855 Third Avenue, New York, New York, which took over all of Madoff's broker-dealer activities. Between December 2000 and December 11, 2008, Madoff was the sole member and manager of BMIS.  Madoff also opened a branch of his broker-dealer business in London, England which was incorporated under the name Madoff Securities International ("MSIL"), which he principally owned and controlled.

41.     From its formation, BMIS was a broker-dealer registered with the Securities and Exchange Commission as a securities broker-dealer under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).  By that registration, BMIS became a member of SIPC.  BMIS had three business units: market making, proprietary trading and investment advisory services ("IA Business"). The IA Business was the locus of the Ponzi and embezzling scheme perpetrated by Madoff through BMIS.  All of this activity was conducted from Madoff's offices in Manhattan. By December 2008, BMIS employed nearly 70 people.

42.     A market-maker is a dealer who, with respect to a particular security: (i) regularly publishes *bona fide*, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes *bona fide* competitive bid and offer quotations on request; and (iii) is ready, willing and able to effect transactions in reasonable quantities at its quoted prices with other brokers or dealers.

43.     BMIS was a self-clearing broker, meaning that it, itself, held title to shares of stock it purchased as opposed to using a primary broker to hold its stock certificates.  As a self-clearing broker, BMIS was able to execute trades with institutional counter-parties.  For the most part, those trades were cleared through the National Securities Clearing Corporation ("NSCC").[1]

44.     BMIS engaged in the market making business and actively traded with various institutional counterparties, including Bear Stearns & Co. ("Bear Stearns").  Madoff was close friends with Aldo Parcesepe, a senior managing director and the head of Over-the-Counter and NASDAQ market maker trading at Bear Stearns.  Parcesepe's trading desk regularly traded with BMIS.  Between approximately 2005 and October 2008, Parcesepe served on the Board of the

---

[1]     When two parties trade stock, a middleman assists by insuring that the money for the sale is properly exchanged and the new stock ownership is properly recorded within three business days.  This is called "clearing" a trade.  NSCC, a subsidiary of The Depository Trust & Clearing Corporation, is one of the leading clearing houses for North American stock trading.

National Stock Exchange, Inc. ("NSX"), an electronic stock exchange for equities, futures, options and foreign exchanges.  Peter Madoff, Madoff's brother and BMIS' Chief Compliance Officer, served together with Parcesepe on NSX's Board.  Madoff, either directly or through BMIS, owned 10% of NSX.  Upon information and belief, BMIS' and Bear Stearns' market-making business regularly traded through NSX.

45.     Under Parcesepe's guidance, Bear Stearns built a close business relationship with Madoff.  Brokers who traded at Bear Stearns used the firm's automated equity order system to buy and sell stocks. The broker entered the stock symbol and the amount of shares he wanted to trade and the system was supposed to find the best counterparty trade from among the many market maker broker-dealers that traded with Bear Stearns.  For every trade for a NASDAQ stock, however, the system automatically defaulted to BMIS as the market maker.  This was an unusual accommodation, and upon information and belief, Madoff paid Bear Stearns substantial fees for the default placement on the equity order system.

46.     From 2000 to 2008, Bear Stearns' approximately 400 brokers and traders all used this same system and all their trades defaulted to BMIS for securities listed on the NASDAQ. This provided a huge source of revenue to BMIS, and upon information and belief, Bear Stearns was BMIS' largest counter-party for market making trades.  Upon information and belief, this system remained in place at Bear Stearns after Chase acquired it in March 2008, and continued until BMIS' demise on December 11, 2008.

47.     Between 2000 and 2008, BMIS's market-making business produced steady revenues of approximately $50 million a year.  Over 25 traders worked for the market-making operations on the 19th Floor of BMIS' offices.  The business had sufficient capital to support its trading activity and banked at the Bank of New York. Although, upon information and belief, the

BMIS market-making traders were unaware of Madoff's Ponzi and embezzling scheme, they were unwittingly used by Madoff to support his criminal enterprise.  As explained below, Madoff used the legitimate market-making trading volume to disguise the lack of any trading on behalf of Madoff's investment advisor "clients."

48.     Further, the market-making business was often the backdrop to meetings Madoff held with potential victims.  From his conference room on the 19th Floor, Madoff met with potential "investors" and established "customers" who would view the activity on the trading floor and gain confidence that Madoff's operations were legitimate and could support the steady positive returns he reported.

49.     In addition to market making, BMIS purported to provide investment-advisory services.  Madoff operated his criminal IA Business in the same BMIS offices from which he operated the market-making and proprietary-trading businesses.  BMIS functioned both as an investment adviser to its customers and a custodian of their securities.  Its annual audits were purportedly performed by Friehling, an accounting firm of three employees, one of whom was semi-retired, with offices located in a strip mall in Rockland County, New York.  The precise date on which BMIS began offering investment advisory services has not been established, but it appears that BMIS was offering such services as far back as the 1960s.  But BMIS' investment advisory business was entirely fictional from its inception.

50.     Madoff solicited billions of dollars from investors for his phony IA Business. The final customer statements issued by BMIS for the month ending on November 30, 2008, falsely reflected that BMIS customers had nearly $65 billion of net investments and related fictitious gains from those investments.

51.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication.  The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious.  At his plea hearing, Madoff admitted that he never purchased *any* of the securities he claimed to have purchased for the IA Business's customer accounts.  Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients, there is no record of BMIS having cleared any purchase or sale of securities for customers of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BMIS could have reasonably traded securities.

52.     Madoff generally assured customers and regulators that he purchased and sold the put and call options OTC rather than through an exchange.  Yet, like the underlying securities, the Trustee has not uncovered any evidence that Madoff ever purchased or sold any of the options described in customer statements.  The Options Clearing Corporation, which clears all exchange-traded option contracts based upon the stock of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of the IA Business customers.

53.     To bolster that lie, Madoff periodically wired hundreds of millions of dollars from the 703 Account to BM1S's affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity substantially owned by Madoff and his family.  MSIL wired those hundreds of

millions of dollars back into the bank accounts of BMIS's proprietary trading and market-making businesses in an attempt to create a record of revenues.

54.     For all periods relevant hereto, the IA Business was operated as a Ponzi and embezzling scheme and Madoff concealed the ongoing scheme in an effort to hinder and delay other current and prospective customers of BMIS from discovering it.  The money received from investors was overwhelmingly used to make the distributions to – or payments on behalf of – other investors, and to make other transfers to Madoff.  The money sent to BMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates, his family, and others, including JPMC, until such time as the requests for withdrawals in December 2008 overwhelmed the flow of new investments and caused the Ponzi scheme's inevitable collapse.

55.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts that were nothing more than fictitious profits. Other investors, from time to time, redeemed or closed their accounts, or removed portions of the purportedly available funds, and were paid amounts consistent with the statements they had been receiving. Some of those investors later re-invested part or all of those withdrawn payments through BMIS. The payments were necessary to validate the false account statements, and were made to avoid detection of the scheme, to retain existing investors, and to lure other investors into the Ponzi scheme.

56.     Madoff purported to keep meticulous records of his victims' fictional investments.  Every month, each victim would receive a detailed account statement showing the victims' supposed stock and option trades during the month together with a summary of the annual return on his or her "investment."  Madoff employed over a dozen people who assisted

him in creating these statements and in dealing with customer cash deposits and withdrawals.

Frank DiPascali was one of Madoff's long-time employees who had regular contact with

investors concerning their BMIS accounts and who knowingly assisted Madoff in creating the

false monthly account statements.  All of this work was generated from the 17th floor at BMIS'

Manhattan offices.

57.     The falsified monthly account statements reported that the accounts of IA

Business customers had made substantial gains, but in reality, because it was a Ponzi scheme,

BMIS did not have those gains to pay investors.  BMIS was only able to survive for as long as it

did by using the stolen principal invested by some customers to pay other customers.

58.     In an effort to hinder, delay or defraud authorities from detecting the Ponzi and

embezzling scheme, Madoff did not register BMIS as an Investment Adviser, pursuant to 15

U.S.C. § 80b-3, until August 2006.  This allowed Madoff to avoid SEC scrutiny that may have

uncovered his true dealings, exposing the billions of dollars that flowed into BMIS that Madoff

used as his personal piggy bank.

59.     In or about January 2008, BMIS filed with the SEC an Amended Uniform

Application for Investment Adviser Registration.  The application represented, among other

things, that BMIS had 23 customer accounts and assets under management of approximately

$17.1 billion.  In actuality, in January 2008, BMIS had 4900 active customer accounts and

purported assets under management of approximately $65 billion.

60.     There were more than 8000 customer accounts at BMIS over the life of the Ponzi

scheme.  In early December 2008, BMIS generated account statements for its approximately 4900

open customer accounts.  In total, these statements showed that BMIS customers had

approximately $65 billion invested through BMIS.  In reality, BMIS had assets on hand worth a

fraction of that amount, most of which JPMC held in the 703 Account.  Customer accounts had not accrued any real profits because no investments were ever made.  By the time the Ponzi scheme came to light on December 11, 2008, investors had lost nearly $19 billion in principal.

61.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff,* Case No. 09-CR-213 (DC), Madoff pled guilty to an 11count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BMIS]." (Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff,* No. 09-CR213 (DC) (S.D.N.Y. March 12, 2009) (Dkt. No. 50).  Additionally, Madoff asserted: "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed *criminal." (Id.)*  Madoff was sentenced on June 29, 2009, to 150 years in prison.

62.     On August 11, 2009, a former BMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case, entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. DiPascali admitted, among other things, that Madoff had been operating a Ponzi scheme since at least the 1980s. (Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (KIS) (S.D.N.Y. Aug. 11, 2009) (Dkt. No. 11)).

## B.     The Players

### 1.     Relevant JPMC Business Segments

63.     JPMorgan Chase operates six business segments: Investment Banking, Commercial Banking, Treasury & Security Services, Asset Management, Retail Financial Services and Card Services.  At least two of these six business segments, Investment Banking and Asset Management, played a role in JPMC's relationship with Madoff and BMIS.

64. *Investment Banking.* JPMC's Investment Bank services corporations, financial institutions, governments and institutional investors in the areas of corporate strategy and structuring, capital-raising, risk management, market making, prime brokerage and research.

65. The Investment Bank was integral to fostering the relationship between JPMC and BMIS. Multiple divisions within the Investment Bank were responsible for servicing and maintaining the 703 Account, structuring and issuing products related to BMIS feeder funds, and assessing both the market and credit risks associated with BMIS and BMIS feeder funds.

66. *Asset Management.* Asset Management provides wealth management services to institutions, high net worth individuals and retail investors. JPMC's Private Bank operates through the Asset Management business segment. The Private Bank decided not to conduct business with BMIS or BMIS feeder funds after performing due diligence.

**2.    Relevant JPMC Divisions and Employees**

67. *Equity Exotics & Hybrids Desk.* The Equity Exotics & Hybrids Desk ("Equity Exotics") is the division within JPMC's Investment Bank that was primarily responsible for structuring and issuing products related to BMIS feeder funds. An "exotic" is any investment that is more complicated than simply buying a basket of stocks. Upon information and belief, Equity Exotics operates primarily out of JPMC's London office, and its members are employed by JPM Securities (UK).

68. Jonathan "Bobby" Magee ran Equity Exotics during 2007 and 2008, when the group was structuring and issuing products related to BMIS feeder funds. Andrea De Zordo, Neil McCormick and Dimitrios Nikolakopoulos all worked at Equity Exotics under Magee's leadership. While JPMC no longer employs McCormick and Magee, De Zordo and Nikolakopoulos continue to work for JPMC.

69.     *Financial Institutions Group and Broker/Dealer Group.*  JPMC's Financial Institutions Group ("FIG") is a division of the Investment Bank responsible for servicing banks, insurance companies, financial companies and broker-dealers.  The Broker/Dealer Group is a sub-division of FIG that works out of JPMC's New York, New York offices, and is responsible for managing the Investment Bank's relationship with clients that are broker-dealers.  The Broker/Dealer Group was responsible for managing the 703 Account and for providing credit to BMIS.

70.     Jane Buyers-Russo was head of the Broker/Dealer Group until her departure from JPMC in 2010.  Richard Cassa, also a former employee, was the Client Relationship Manager in the Broker/Dealer Group responsible for BMIS's accounts and credit requests.  He also fielded requests from other divisions of JPMC to set up meetings with Madoff.

71.     *Equity Derivatives Group.*  JPMC's Equity Derivatives Group ("EDG") provides equity financing and structured financing for its investors, including loans, exchange-traded funds, swaps, synthetic futures and OTC options.  EDG is part of the Investment Bank.

72.     Luke Dixon, a former JPMC employee, was an Executive Director in EDG and worked out of JPMC's London office.  Scott Palmer worked alongside Dixon in EDG in London.  Dixon and Palmer conducted due diligence on the BMIS feeder funds in 2008.

73.     *Risk Management Division.*  The Risk Management Division consists of approximately 940 individuals that manage both market risk and credit risk at the Investment Bank.  The market risk sub-division assesses the riskiness of certain fund strategies, financial products and securities, and assures that JPMC's financial exposures stay within internal risk guidelines.  Credit risk manages the creditworthiness of transaction counterparties.

74.     John Hogan is the current Chief Risk Officer at JPMC's Investment Bank. He works primarily out of the New York offices.

75.     Brian Sankey is Chief Credit Officer and Deputy Chief Risk Officer and is currently responsible for all Credit Risk Management activities.  Sankey reports directly to Hogan.  Marco Bischof and James Coffman also work in Credit Risk Management.  Andrew Cox works out of London in Global Credit Risk and Client Operations for Europe, the Middle East and Africa.

76.     Richard Wise and Chen Yang work in Market Risk Management in New York, New York.  Wise is the Head of Market Risk in the Equity Division, and Yang reports to Wise.

77.     These teams from credit risk and market risk, along with Hogan, reviewed and approved JPMC's structured products related to the BMIS feeder funds.

78.     *Other Relevant Players.* Other key individuals include Matt Zames, who heads Interest Rate Trading, Global Foreign Exchange, Public Finance, Global Mortgages, Tax-Oriented Investments and Global Fixed Income at JPMC's Investment Bank.  Zames works in JPMC's New York, New York offices.  Zames told Hogan in 2007 that Madoff was rumored to be operating a Ponzi scheme.

79.     Carlos Hernandez is the Head of Global Equities at JPMC's Investment Bank. Hernandez works in JPMC's New York, New York offices, but runs JPMC's equity divisions in a number of different countries.  Hernandez was involved in reviewing and approving the proposal regarding JPMC's structured products related to BMIS feeder funds.

80.     Alain Krueger worked in the Structured Investments Distribution Marketing division of JPMC's Investment Bank.  Krueger worked out of JPMC's London office.  He was

the JPMC representative who spoke to Aurelia Finance regarding JPMC's decision to redeem from the BMIS feeder funds.

81.     Michael Cembalest is a Chief Investment Officer at J.P. Morgan Global Wealth Management, which is part of the Private Bank.  Cembalest works out of JPMC's New York, New York offices.  Cembalest's group conducted due diligence on BMIS and, after seeing all of the red flags, chose not to invest with any BMIS feeder funds.

### 3.     Relevant JPMC Committees

82.     *Hedge Fund Underwriting Committee.*  The Hedge Fund Underwriting Committee ("HFUC") was a committee at JPMC comprised of senior business heads and bankers, including individuals such as the Chief Risk Officer and the Heads of Equities, Syndicated Leveraged Finance, Sales, and Hedge Funds.  The purpose of the HFUC was to ensure all senior partners who dealt with hedge funds were comfortable with proposals relating to hedge funds. The HFUC was presented with Equity Exotic's proposal to structure and issue products around the BMIS feeder funds.  The HFUC has since dissolved.

83.     *Investment Bank Risk Committee.*  JPMC's Investment Bank Risk Committee ("IBRC") meets weekly to discuss the universe of risk within the Investment Bank.  The IBRC discusses activity in the markets, policy issues, operational issues, legal issues, and the Investment Bank's reputation.  IBRC also received and reviewed the proposal by Equity Exotics.

### 4.     BMIS Feeder Funds

84.     *Fairfield Sentry and Fairfield Sigma.*  Both Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma") are funds run by the Fairfield Greenwich Group ("FGG"). Fairfield Sentry was among BMIS's largest feeder funds.   Fairfield Sigma invested all of its funds in Fairfield Sentry.  JPMC invested in both of these funds in

hedging its structured product exposure, and redeemed its interest in both funds the month before Madoff was arrested.

85.     *Herald.*  Herald Fund s.p.c. ("Herald") was a BMIS feeder fund managed by Herald Asset Management.  Day-to-day management was delegated under a service agreement to Bank Medici AG ("Bank Medici").  The founder and majority shareholder of Bank Medici was Sonja Kohn, who was not only a longtime friend of Madoff but also herself played a key role in Madoff's Ponzi scheme.  JPMC purchased an interest in Herald as part of its hedging strategy and redeemed that interest before Madoff's arrest.

86.     *Lagoon.*  Lagoon Trust Limited ("Lagoon") was another fund that fed money to BMIS.  Hermes Asset Management Limited ("Hermes") managed Lagoon.  JPMC also invested in Lagoon to hedge its exposure to the fund's returns.

87.     *Rye Funds.*  Rye Select Broad Market Portfolio Limited and Rye Select Broad Market Fund ("Rye Funds") were two funds that fed money to BMIS and were managed by Rye Investment Management, a division of Tremont Partners Inc. ("Tremont").  Equity Exotics requested approval for issuing hundreds of millions of dollars' worth of products structured around the Rye Funds.  That transaction was never approved.

88.     *Thema.*  Thema International Fund plc ("Thema") was a BMIS feeder fund managed by Bank Medici.  Equity Exotics's proposal included an investment in Thema, but the investment was not approved.

**5.     Relevant BMIS/JPMC Customers**

89.     *Norman Levy.*  Levy was an extremely important, preferred top-tier client of JPMC's Private Bank, whose relationship with JPMC and its predecessor firms spanned more than 64 years.  Levy had close business relationships with senior executives at JPMC's predecessor banks, as well as at JPMC.  These individuals included John McGillicuddy, former

Chairman and Chief Executive Officer of Manufacturers Hanover and Chemical Bank, Walter

Shipley, Chief Executive Officer from 1996 to 1999, and his successor, William Harrison

(succeeded by Jamie Dimon).  Levy was even provided an office at the Private Bank, which

JPMC maintained for Levy even after the Private Bank had relocated.  Levy also was a

longtime customer of BMIS.  JPMC accordingly had unique visibility into both sides of Levy's

transactions with Madoff.

90.     *Sterling Equities.*  Sterling Equities Funding Co. and its related entities ("Sterling

Equities") were founded by Fred Wilpon and Saul Katz in the 1970s as a vehicle to develop and

invest in real estate.  Sterling Equities had a longstanding relationship with JPMC, and both Fred

Wilpon and Sterling Equities were customers of JPMC's Private Bank.  Sterling Equities was

also a longtime customer of BMIS and its cash infusions of hundreds of millions of dollars

helped keep the Ponzi and embezzling scheme afloat.  JPMC accordingly had unique visibility

into both sides of Sterling Equities' transactions with Madoff.

### 6.      Other Relevant Entities

91.     *Aurelia and Aurelia Finance.*  Aurelia Fund Management Limited ("Aurelia"), a

company incorporated in Bermuda, owned 25% of Hermes and provided Hermes with necessary

office facilities, equipment and personnel to enable Hermes to carry out its investment

management function.  Aurelia Finance, the Swiss company that purchased and distributed

JPMC's structured products, is the parent company of Aurelia.

92.     *Rafale Partners.*  Rafale Partners Inc. ("Rafale Partners") was a fund that invested

in two BMIS feeder funds.  Stated differently, Rafale Partners was a sub-feeder fund into BMIS.

Equity Exotics's proposal included an investment in Rafale Partners, but that investment was

never approved.

**C.      Ignoring the Evidence of Madoff's Ponzi Scheme, JPMC Invests in and Structures Products on BMIS Feeder Funds**

      **1.      JPMC's Note Program**

93.      In or about 2006, JPMC began considering various BMIS feeder funds for the purpose of structuring and issuing its own financial products based on those funds.

94.      JPMC started by gathering information on Fairfield Sentry and Lagoon.  By February of 2006, JPMC had already visited FGG in connection with due diligence.  After the visit, Yang wrote:

> I do have a few concerns and questions: 1) All trades are generated by Madoff's black box trading model and executed by Madoff, It's not clear whether [FGG] has any discretion or control over the autopilot trading program…. 2) Is it possible to get some clarification as to how the fund made money during times of market distress?... how did they manage to get better than 3M T-Bill returns?... For example, from April to September 2002, the S&P 100 Index is down 30%, cash yielded 1%, and the Fund was able to generate over 6% returns.

95.      Yang was told during the same due diligence visit that FGG would not provide a copy of Fairfield Sentry's trading agreement with BMIS.  Yang therefore relied solely on a verbal description of the investment guidelines and restrictions FGG had agreed upon contractually with BMIS.

96.      De Zordo and Bischof noted similar concerns with respect to Lagoon, Hermes and Aurelia.  Bischof was surprised by the absence of a proper legal relationship between BMIS and Hermes, and wrote to De Zordo on November 11, 2006: "What continues to surprise me is the fact that after their 14 years in the business and $1.5bn AUM, we seem to be the first 'investor' spotting this lack of documentation around Lagoon and it's [*sic*] upstream/downstream relationships."  De Zordo responded that the key question was whether JPMC as a firm should even be doing business with Hermes and Aurelia.

97.     About a week later, Bischof followed up with De Zordo after a call with Aurelia. He wrote: "They have position level transparency once a month with 1 week delay, but don't run risk analysis and don't have the know-how of how to do this….It doesn't look pretty."

98.     JPMC already knew the identity of BMIS's auditor, Friehling, and had known the identity of the auditor for years. But, upon information and belief, it was not until early 2006 that JPMC performed even minimal due diligence on Friehling.  Coffman noted that "a quick check found that they [Friehling] are not registered [*sic*] with the Public Company Accounting Oversight Board, nor are they subject to peer reviews from the American Institute of Certified Public Accountants.  Additionally, they have no website to provide background on their organization."

99.     Despite their suspicions, by early 2007, JPMC was exploring deals with other BMIS feeder funds – the Rye Funds and Thema.

100.     JPMC was eager to begin issuing structured products on BMIS feeder funds.  After conducting only preliminary due diligence on these funds, and documenting concerns and red flags related to BMIS and these feeder funds, JPMC started structuring and issuing products tied to these feeder funds' returns.

**D.     JPMC Starts Structuring and Issuing Products on BMIS Feeder Funds**

101.     By February 2007, JPMC already had over $65 million in BMIS-related products in the pipeline.  These products included a €5 million trade on Fairfield Sigma, two $25 million trades tied to Fairfield Sentry, and a $10 million trade on Thema.

102.     These products were developed by Equity Exotics.  The majority of these products were structured to allow investors to collect returns tied to the returns of the BMIS feeder funds. Investors typically leveraged their investments to reap greater rewards from a smaller investment. For example, in February 2007, JPMC was in the process of structuring a three-times leveraged

certificate on Fairfield Sigma that would use borrowed funds to increase the amount invested. An investor who purchased a three-times leveraged certificate would effectively invest $100, and then JPMC would lend an additional $200 and invest the entire $300 in the agreed-upon BMIS feeder fund. This allowed the individual investors to earn returns as if they had actually invested $300, despite only providing $100 of their own money.

103. JPMC continued to structure additional BMIS-related products during the Spring of 2007. In March 2007, JPMC personnel were determining terms for deals on Fairfield Sentry, Fairfield Sigma, Herald, the Rye Funds and Thema.

104. On March 9, 2007, the BMIS deals JPMC had in its pipeline totaled almost $100 million. And by March 19, 2007, JPMC was considering another deal with the Rye Funds that would have increased the value of JPMC's BMIS-related products by $200 - $300 million.

**E. JPMC's Limited Due Diligence Led to Unanswered, Disturbing Questions About Madoff and His Investment Strategy**

105. In 2007, with hundreds of millions of dollars in deals ready to close, JPMC needed to get more comfortable with its exposure to Madoff. JPMC needed to conduct additional due diligence on each of these BMIS feeder funds and, most importantly, on BMIS directly. On February 15, 2007, Coffman wrote, "I would classify [BMIS feeder funds] as a single fund, and therefore assume it falls under the $100mm limit …. Without actually getting to do due diligence on Madoff, I don't think we should consider going above that limit."

106. Equity Exotics started by looking within its own company. Madoff and his family had maintained numerous accounts at JPMC or its predecessors since as far back as 1986. As Equity Exotics was in the midst of structuring hundreds of millions of dollars of BMIS-related products, it contacted BMIS's Client Relationship Manager in the Broker/Dealer Group, Cassa. Cassa offered

to arrange a conference call between representatives of the Investment Bank and Madoff.  On March 30, 2007, Cassa and members of JPMC's Risk Management Division spoke with Madoff.

107.    Even though the products JPMC was structuring would have led to increased investments in the BMIS feeder funds, and therefore increased investments through BMIS, Madoff explained that he disliked banks structuring products on his strategy.  In particular, he made clear that he was not willing to engage in "full due diligence."  Despite the potential benefit for BMIS of growing its customer base, Madoff could not risk allowing serious due-diligence inquiries as that would reveal his Ponzi scheme.

108.    Having learned relatively little from speaking to Madoff, Equity Exotics reached out to the BMIS feeder funds themselves to obtain additional information about the funds and BMIS.

109.    JPMC began its investigation with Tremont.  On April 11, 2007, representatives of JPMC met with Tremont's Chief Executive Officer, Bob Schulman, to discuss the Rye Funds and BMIS.  Shortly after the meeting, JPMC sent Tremont a list of additional questions regarding BMIS.  A number of these questions related to the counterparties to BMIS's OTC options trading. JPMC asked whether BMIS entered into the trading agreements on behalf of Tremont or in BMIS's own name, and whether Tremont knew who the counterparties were. JPMC received a response that required more due diligence.  Tremont responded that, even though Tremont was the party entering into these agreements with the options counterparties, it did not know who the counterparties were.  Upon information and belief, JPMC never verified any of Tremont's responses with third parties, or questioned the source of Tremont's information about the counterparties.

110.    Based on the limited due diligence JPMC performed on BMIS through Tremont, Equity Exotics put together a "Transaction Approval Package."  In addition to seeking approval for a number of different transactions involving the Rye Funds, the proposal summarized JPMC's due diligence.  "We will be receiving full transparency on the program via trade statements from BLM, albeit on a delayed basis, and will be able to verify our risk analysis on an ongoing basis," Equity Exotics claimed, and "[t]he liquidity of the underlying portfolio, even assuming close to $15 billion in 'AUM' [assets under management] at Madoff, should be adequate to fully unwind the program without catastrophic slippage."  The risk involved was noted and quickly dismissed based on nothing more than Madoff s reputation:

> Although SIPC, SEC and NASD [National Association of Securities Dealers] regulation on segregated customer accounts should protect us from financial distress at BLM, it would not necessarily protect us from wholesale malfeasance or fraud. That said, BLM has had a successful operating history for nearly 50 years and Bernie Madoff is [a] well regarded figure in this industry.

111.    JPMC received similar responses to questions posed to Herald regarding counterparties: (i) the trades were between the fund and the counterparty, not between BMIS and the counterparty; (ii) the fund received collateral from all counterparties "except from very few high quality parties"; and (iii) "the fund trades with say 10+names at any moment in time," but Madoff was not willing to disclose the actual names of the counterparties.

112.    Tremont and Herald's responses were particularly alarming given Madoff was purportedly entering into OTC agreements with the options counterparties on behalf of the funds. Tremont and Herald, and, upon information and belief, all of the other BMIS feeder funds, thus were supposedly entering into contracts with third parties whom they could not even identify, much less assess counterparty creditworthiness.

113.    Again, despite alarming answers from Herald, Equity Exotics put together another "Transaction Approval Package" entitled "Bank Medici AG – an access provider into the Bernie Madoff strategy."  As key transaction strengths, Equity Exotics listed: "multiple layers of oversight – although relying solely on Madoff for position level information, independent weekly and monthly valuations are carried out by Bank Medici and the third party Administrator," and "[p]ersonal relationship with Sonja Kohn," "[a]ccess to as secretive a business as Madoff's, and the loyalty he presumably he [*sic*] feels towards her adds significant comfort."  Key transaction weaknesses included that "investors, sub-Custodians, auditors etc. rely solely on Madoff produced statements and have no real way of verifying positions at Madoff itself," and "[f]raud – given the significant reliance on BLM for verification of assets held, and no real way to confirm those valuations, fraud presents a material risk."

114.    JPMC representatives also visited Rafale Partners and Bank Medici, and were able to review BMIS feeder funds' customer, option and trading agreements.  Through that review, JPMC learned that only certain feeder funds had agreements that explained BMIS's trading strategy.  JPMC suggested that the BMIS feeder funds may be hesitant to press for more details because they did "not want to upset the relationship with Madoff."

115.    JPMC did not put its securities activities on hold to conduct due diligence on the funds.  Rather, at the same time it was conducting these investigations, Equity Exotics was structuring additional BMIS-related products with little to no regard for the disturbing information learned through its due diligence.

116.    Furthermore, despite these indicia of a Ponzi scheme, embezzling or other sordid conduct, in June 2007, JPMC proceeded to prepare a $600 million proposal for additional investments in the Rye Funds and a $225 million proposal for investments in Herald.

117.    Following these proposals, Coffman was anticipating "a major head on collision with the business that wants to do an infinite amount of this activity with much less oversight." A full "collision" did not seem to occur.  Concerns about potential misconduct at BMIS tempered only the *amount* that JPMC was willing to risk with BMIS feeder funds, but not the underlying decision to invest in those funds.

**F.    Undeterred by Evidence of a Ponzi Scheme, Equity Exotics Requests Approval from the Hedge Fund Underwriting Committee to Issue Approximately $1 Billion in BMIS-Related Products**

118.    Undeterred by the results of its cursory due diligence inquiries, in June of 2007, Equity Exotics presented a proposal to the HFUC requesting approval of "an overall BLM Strategy risk limit" that would carry a maximum potential exposure of $1.32 billion.  This proposal included products ranging from $33 million to $667 million with eight different BMIS feeder funds and sub-feeder funds, including the Rye Funds, Thema, Herald, Fairfield Sentry, Fairfield Sigma, Lagoon, and Rafale Partners.  The majority of the products were anticipated to come from transactions associated with the Rye Funds.  Despite asking to structure $667 million worth of products around the Rye Funds, Equity Exotics explained in the proposal that Tremont had "no internal risk system in place to aggregate positions daily."  Equity Exotics also stated, "we were unable to validate how this manual process [of checking trades] is performed, but feel reasonably confident that it is effective in terms of capturing major discrepancies."

119.    To be clear, Equity Exotics was not seeking approval to begin issuing products on BMIS feeder funds.  Equity Exotics was asking for permission to continue issuing these products in ever larger amounts.  By the time Equity Exotics submitted this proposal, it had already executed over $130 million in trades based on Fairfield Sentry, Fairfield Sigma, and Lagoon.  With the June 2007 proposal, Equity Exotics was requesting approval to issue an additional billion dollars of structured products, an amount the group acknowledged was in

"significant excess of both individual as well as aggregate single manager limits" for hedge fund investments at JPMC.

120.     The proposal was submitted with a certain sense of urgency.  At the time it was submitted, Equity Exotics had already arranged for $540 million worth of transactions to close at the end of June.

121.     On June 15, 2007, the HFUC met to consider the proposal.  On the very same day, Hogan shared with his colleagues what he had learned from Zames, that it was well-known that Madoff was operating a Ponzi scheme: "For whatever its worth, I am sitting at lunch with Matt Zames who just told me that *there is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a Ponzi scheme–* he said if we Google the guy we can see the articles for ourselves – Pls do that and let us know what you find." (Emphasis added).

122.     Hogan warned, "you will recall that Refco was also regulated by the same crowd [SEC, NYSE, NASD] and there was noise about them for years before it was discovered to be rotten to the core.  Hopefully this is not the case here but given Matt's view, I think we owe it to ourselves to investigate further."

123.     Nevertheless, Equity Exotics seemed eager to receive approval, and the further research on Madoff appears to have been limited to a Google search with no follow-up.  Buyers-Russo asked one of her colleagues to "please have one of the juniors look into this rumor about Madoff that Hogan refers to below."  The analyst forwarded an article about a proposed change in SEC regulations that would eliminate a loophole in the regulations governing broker-dealers.  He speculated the loophole allowed broker-dealers to run "a '[P]onzi' scheme of sorts."  But Zames told Hernandez that he believed his recollection was of a *Wall Street Journal* article from 2002

and therefore eliminated the possibility that the analyst's explanation based on a recently-proposed regulatory change was correct.

124.    Again, Hogan cautioned, "Mr. Madoff will not allow us to conduct any due diligence on him directly and we are forced to rely on the diligence of third parties…. I told Bobby [Magee] and Neil [McCormick] we don't do $1 bio 'trust me' deals and we need to do our own due diligence on Madoff or this wasn't going to happen."  But the only further "diligence" that appears to have been done was a phone call between Hogan and Madoff, which reassured Hogan enough to permit $250 million worth of "trust me" deals.

125.    When asked how he made the decision to approve $250 million of exposure to BMIS, Hogan explained that, in essence, he simply closed his eyes and guessed:

> [T]here's no math or magic around it – you know, a lot of what we do is more art than science, so I would like to tell you that I have prepared a model that told me 250 is the optimum number, but – you know, that's not the way it works in reality, and so I just use my best judgment to come up with that number.

## G.    The Investment Bank Continues to Ignore Clear Evidence of the Ponzi Scheme

126.    For the remainder of 2007, Equity Exotics's enthusiasm for BMIS-related transactions remained strong despite uncovering additional evidence about Madoff, BMIS, and BMIS feeder funds.

127.    In August 2007, while analyzing information provided by Herald, De Zordo noted that despite T-bills rallying, "the move does not justify the magnitude of the gain that Bank Medici is claiming."

128.    Equity Exotics also expressed skepticism about the information provided by Fairfield, Lagoon, and Herald.  In November 2007, De Zordo and Nikolakopoulos were organizing quarterly calls to funds to which JPMC had substantial exposure.  These funds included Fairfield, Lagoon, and Herald.  When arranging meetings with these funds' managers,

Nikolakopoulos emphasized that they needed to meet with managers from all three funds in order to "assess what the returns where [sic] driven from and ensure we get a consistent answer from all three."

129.    Despite these concerns, JPMC remained committed to doing business with Madoff –the potential upside reward for investing through Madoff was simply too good to pass up despite JPMC's concerns of a Ponzi scheme and other misconduct.

130.    In March of 2008, JPMC acquired The Bear Stearns Companies Inc. ("Bear Stearns").  Bear Stearns's share price began to precipitously drop and the company began suffering from an extreme liquidity crunch in early March 2008.  Unable to borrow enough funds to save itself, Bear Stearns started looking for outside options.  On March 13, 2008, Bear Stearns' CEO contacted Jamie Dimon.  By March 16, JPMC had entered into an agreement to purchase Bear Stearns.  JPMC started integrating the two businesses almost immediately.

131.    The integration involved combining business units and risk exposures across JPMC and Bear Stearns. In acquiring Bear Stearns, JPMC had significantly increased its hedge fund exposure.  In order to bring its hedge-fund exposure back within JPMC's internal limits, JPMC began to review its exposure and look for places to make cuts.  This reduction process prompted JPMC to revisit and reconsider certain hedge-fund transactions, including its transactions involving BMIS feeder funds.

132.    By June of 2008, JPMC had approximately $150 million invested in Herald. These were direct investments by JPMC in the fund, presumably to hedge the bank's exposure on its structured products tied to Herald's returns.  When JPMC learned that its main contact at Bank Medici, Andreas Pirkner, was departing, JPMC scheduled a meeting with Pirkner, his replacement, Andreas Schindler, and a handful of other individuals from Bank Medici.  This

meeting was crucial given JPMC's ongoing struggle to get information from Bank Medici even with an established contact. The JPMC team, which included Palmer and Dixon, was sent to Vienna on July 7, 2008, to perform a "very thorough refresh" of its initial due diligence.

133.    Following this meeting, JPMC downgraded Herald's risk rating to the lowest rating of "5-E." Palmer noticed aspects of Herald's operation that caused him to direct JPMC to verify that Herald's assets actually existed at BMIS. In hopes of gaining more transparency on Bank Medici and BMIS, JPMC scheduled a follow-up meeting with Kohn for July 10, 2008.

134.    The meeting with Kohn proved to be equally disappointing for JPMC. Following this meeting, JPMC affirmed Herald's recently downgraded due diligence rating of 5-E. JPMC found that Kohn did not provide credible responses to a number of questions related to the managed accounts Bank Medici had with BMIS. Given that Kohn was the only person at Bank Medici to have "any relationship of substance" with Madoff or BMIS, it was incredibly troubling and telling that even she could not provide adequate responses to JPMC's questions.

135.    The lack of credible responses JPMC received from BMIS feeder funds in 2008 was reminiscent of the answers JPMC received in 2007. The only difference between JPMC's due-diligence efforts in 2007 and 2008 was that, in 2008, JPMC continued to investigate. But as it had the previous year, JPMC kept its findings a secret.

136.    In September and October of 2008, in light of its increased hedge-fund exposure in the wake of its acquisition of Bear Steams and in view of the deteriorating economy, JPMC commenced an "exposure health check." This health check required JPMC to conduct broad due diligence on all BMIS feeder funds in which it had invested or on which it had structured products. Palmer's team contacted the managers of Lagoon, Hermes, Fairfield Sentry, Fairfield Sigma, and Herald, as well as a number of fund custodians.

137.     Despite its previous investments in BMIS-related funds, JPMC now urgently requested the following information: (i) each BMIS feeder fund's net asset value, both at the end of the first quarter and as of the date of the request; (ii) any visible redemptions currently in the pipeline; (iii) whether the fund's liquidity profile experienced any changes; (iv) whether the fund's service providers experienced any changes or events, specifically at BMIS; (v) whether BMIS experienced any changes or events; (vi) whether the account documents between BMIS and its feeder funds had been modified in any way; and (vii) the percentage of fund assets represented by structured products.  Upon information and belief, anticipating that a number of the BMIS feeder funds would be less than forthcoming with information, JPMC requested the BMIS feeder funds' availability for follow-up questions.

138.     JPMC was asking many of the same questions it had asked more than a year before.  And as before, JPMC received incomplete answers.  The BMIS feeder funds repeatedly found creative ways to dodge questions about their knowledge of Madoff and BMIS.

139.     FGG evaded answering questions about counterparties by stating that the funds were currently in T-bills, so there were not (at that particular point in time) any counterparties.

140.     When JPMC asked Bank Medici to provide risk reports in or around April 2008, Kohn agreed to share the reports.  Nearly four months later, however, Kohn had not provided the reports and claimed that the parties needed to sign a confidentiality agreement first.  A confidentiality agreement was unnecessary, given that information from the risk reports would be communicated via JPMC's "Measure Risk."  Measure Risk, a leading risk-and-quantitative-analytics provider to institutional hedge-fund investors, maintained confidentiality by only providing JPMC with summary exposure and risk statistics.  The confidentiality attained by the

use of Measure Risk was explained to Bank Medici when it initially agreed to provide risk reports.

141.    Instead of continuing to be blinded by the potential reward of investing with BMIS, this time, the JPMC due-diligence team sought additional answers.  The team met with Kohn and Amit Vijayvergiya, the Head of Risk Management at FGG, in October 2008. Following those meetings, Palmer circulated notes to his colleagues summarizing his findings.

142.    Palmer acknowledged: "Fairfield claims to have seen the I9th floor [where Madoff executed his proprietary trading strategy] but judging from the lack of thoroughness of some of their other due diligence I am not entirely convinced that Madoff allowed them to actually enter the trading area."  When Palmer asked Vijayvergiya how BMIS's trade information was put into the order entry system, Vijayvergiya told Palmer that "he did not know and did not ask."  These answers by Vijayvergiya revealed that BMIS feeder funds knew very little about Madoff s operations and were extremely reluctant to push Madoff for answers.

143.    This meeting also forced JPMC to again acknowledge the fact that none of the funds knew who the counterparties were to their own options contracts.  They relied solely on Madoff's oral assertions that he dealt with 15-25 counterparties, that he strictly monitored the risk level of each counterparty, and that the counterparties posted collateral for the put options. Indeed, Vijayvergiya openly admitted that "Madoff refused to disclose the list of counterparties." Vijayvergiya explained, "Madoff claimed that they did not want to disclose the list of counterparties because they are worried that if the list gets into the market that the counterparties would group together and either steal Madoff's strategy or otherwise somehow work against Madoff."  Kohn on the other hand, conceded that she had never even thought to ask Madoff who the counterparties were, and she was reluctant to ask him about it now.

144.    JPMC was also reminded that BMIS's auditor was Friehling – information it had had for years as Madoff's and BMIS's banker.  Palmer noted that this was an "odd choice" and questioned whether such a small firm was even competent to conduct an audit of an investment firm with "$650m in shareholder capital."  Despite Palmer's surprise, this was not the first time that JPMC had access to such information.  In as early as 2006, for example, Coffman conducted due diligence on Friehling and, in October 2007, one of JPMC's own investors had inquired about the identity of BMIS's auditor.  JPMC conducted no investigation beyond learning the names of BMIS's auditor.  Had JPMC looked further, it would have learned that Friehling was actually a three-person shop (and one of the three was retired or semi-retired) in a strip mall in Rockland County, New York – a truly odd choice for a multi-billion dollar investment enterprise and an indication of intentional misconduct.

145.    Had JPMC followed up on these simple facts sooner and expressed its concerns to regulators, the Ponzi and embezzling scheme would have been stopped sooner.

146.    JPMC was again told that there was no independent process for confirming that the trades were executed or that the assets existed.  BMIS acted as the sub-advisor, sub-custodian, and broker-dealer to the BMIS feeder funds.  The "reconciliation" process that occurred between the funds' actual custodians, the funds' administrators, and the funds themselves could be described as follows: "Effectively all three parties receive a faxed confirmation from Madoff of the day's positions/trades and enter them into their system.  The reconciliation is thus effectively one of data entry integrity as there is no reconciliation of source data to third parties."

147.    Palmer summarized his observations: "It's almost a cult [Madoff] seems to have fostered."  Neither Kohn nor Vijayvergiya had been concerned by the lack of information

Madoff provided. Rather, "they seem[ed] very defensive and almost scared of Madoff. They seem[ed] unwilling to ask him any difficult questions and seem[ed] to be considering his 'interests' before those of the investors."

148.    JPMC's findings were especially troubling, given earlier that month, in October 2008, Tom Petters had been arrested under suspicion of operating a $3.5 billion Ponzi scheme. Dixon, in response to Palmer's notes summarizing his meeting with Kohn and Vijayvergiya, drew parallels between Petters and Madoff. He pointed out that they could not just rely on a long history and trust in an investment adviser, a mistake that investors with Petters were now regretting. In the face of the Petters fraud, Dixon suggested, "Let's go see Friehling and Horowitz the next time we're in NY … to see that the address isn't a car wash at least."

149.    JPMC knew the critical questions to ask to avoid a situation like the Petters Ponzi scheme. In fact, JPMC had asked such questions in 2007 and 2008. Unfortunately, it was not until late 2008 that JPMC was willing to admit that "[t]he 'DD' done by all counterparties seems suspect."

150.    Further, JPMC's own due diligence in 2008 revealed: (i) lack of transparency; (ii) resistance on Madoffs part to provide meaningful disclosure; (iii) involvement of Madoff's family throughout BMIS; (iv) lack of effective due diligence and monitoring by the BMIS feeder funds; (v) fear of Madoff, which prevented investors from asking any serious questions as long as performance was strong; (vi) lack of an independent and competent auditor; and (vii) unanswered questions regarding BMIS's trading, as no one outside of Madoff understood how it was done.

151.    These red flags were the same red flags JPMC discovered when it conducted its first round of due diligence more than a year before. JPMC chose then to ignore the red flags,

and instead continue to structure and issue products that facilitated an investment of approximately $250 million in BMIS feeder funds.

152.    Again faced with this overwhelming evidence of a scam, Palmer belatedly suggested that it was a mistake for JPMC to "rely[] on Madoff's integrity (or Fairfield and Medici's belief in Madoff's integrity) and the quality of the due diligence work (initial and on-going) done by the custodians … to ensure that the assets actually exist and are properly custodied."  In an effort to provide some level of comfort to himself and fellow JPMC employees, Palmer noted that "if some[thing] were to happen with the funds, our recourse would be to the custodians and whether they had been negligent or grossly negligent."

**H.     Faced Again with Numerous Indications of Madoff's Ponzi Scheme, JPMC Quietly Removes All of Its Assets from the BMIS Feeder Funds**

153.    In or about September 2008, a troubling conversation took place between Krueger and representatives of Aurelia Finance.  JPMC had sold its structured products to Aurelia Finance, who in turn had sold the products to its clients.  During the call, Krueger explained that JPMC was going to be redeeming from Lagoon.  The Aurelia Finance representatives repeatedly opposed JPMC's plan.  At two points in the conversation, the Aurelia Finance representatives threatened Krueger, referring to "Colombian friends" who could "cause havoc" and telling Krueger "we know where to find you."

154.    As a result of this conversation, JPMC sent a document to the United Kingdom's Serious Organised Crime Agency ("SOCA") conveying the substance of the threats.  This document also explained why JPMC had chosen to redeem its interests in BMIS feeder funds. JPMC knew Madoff was not operating a legitimate business.

155.    In a letter to SOCA, JPMC's Vice President for the United Kingdom, Rebecca Smith, wrote:

Ultimately, the bank reached the same conclusion it had reached during its initial due diligence efforts in 2006 and 2007; JPMorgan was unable to obtain look through transparency at the Feeder Fund level, did not have access to the identities of the counterparties to Madoff's OTC options, did not fully understand the relationship between the broker-dealer and the investment advisor, and noted the fact that the custodians did not actually hold the assets.

156.    JPMC sent a Suspicious Activity Report ("SAR") to SOCA.  The document, dated October 28, 2008, reads:

JPMCB's [an acronym for "JPMorgan Chase Bank"] concerns around Madoff Securities are based (1) on the *investment performance* achieved by its funds which is so *consistently and significantly ahead of its peers*, year-on-year, even in the prevailing market conditions, as to appear too good to be true – meaning that it probably is; and (2) the *lack of transparency* around Madoff Securities' trading techniques, the *implementation of its investment strategy*, and the *identity of its OTC option counterparties*; and (3) its unwillingness to provide helpful information.  *As a result, JPMCB has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds*.  [Emphasis added.]

157.    On or about October 10, 2008, JPMC submitted requests to redeem approximately $13 million from Fairfield Sentry and €15 million from Fairfield Sigma.  Later that month, JPMC requested redemptions totaling $154 million from Herald and an additional £72 million from Fairfield Sigma.

158.    JPMC also repeatedly rejected requests from clients to structure additional products tied to BMIS during the Fall of 2008, each time relying on the fact that the funds at issue were invested with BMIS.

159.    Following these redemptions, JPMC was careful not to discuss with third parties its redemptions from BMIS-related products or its decision to cease any new involvement with BMIS.  Instead, when approached by clients that had an interest in BMIS-related products,

"[w]ithout disclosing too much, [JPMC] got rid of all the Madoff feeder[s]" from clients' lists of potential investments.

160.    In November 2008, Dixon stated, "only limited information has been historically available on anything related to Madoff.  We have done some work but this served only to reinforce the fact that we don't have enough access to Madoff to render independent judgment." As a result, JPMC was attempting to divest itself of all of its BMIS-related investments.

161.    JPMC's exit strategy was successful.  By the time Madoff was arrested, JPMC had managed to redeem all but $35 million of its BMIS feeder fund investments, due in large part to the fact that its request to redeem its shares of Lagoon in late November had not yet been satisfied.

162.    In redeeming its investments in the BMIS-related funds, JPMC left itself fully exposed with regard to its structured products.  JPMC was still required to pay its investors based on the returns generated by the BMIS feeder funds, which were generating positive returns while the market was down. But for JPMC's evidence about Madoff's scam, this move would have been counterintuitive.

163.    JPMC knew Madoff was a thief/embezzler and quietly pulled out its money.

**I.    After the Scam Was Revealed, JPMC Admitted Knowledge That Madoff Was a Thief**

164.    In the immediate aftermath of Madoff's confession, JPMC made a number of comments demonstrating their knowledge of Madoff's embezzlement.  Palmer admitted Madoff's  "[r]eturn seems a little too good to be true." The day of Madoff's arrest, McCormick stated,

> We've got a lot wrong this year but we got this one right at least –
> I said it looked too good to be true on that call with you in Sep.
> Despite suspecting it was dodgy I am still shocked to see this

> happen so suddenly. I guess it's true that when the tide goes out
> you see who is swimming naked.

McCormick's criticisms of Madoff were in stark contrast to comments he had made in June 2007

following Hogan's decision to execute $250 million of business across products referencing

BMIS.  Upset that the amount approved was not higher, McCormick complained that "it

sometimes feels very hard to make money."

165.    The comments continued as various individuals at JPMC stated matter-of-factly

that it was "statistically impossible" for BMIS to have generated 1.25% returns every month for

years.

166.    Dixon admitted that he was not surprised to learn Madoff was a crook.

Additionally, Palmer admitted that the Madoff Ponzi scheme "wasn't completely unexpected but

the scale of it is still a shock."

167.    Even Hogan was relieved, noting that "Bobby F-ing Magee wanted to do $1bio of

[BMIS-related products] and we made it $200mio – thank God."

168.    Cox acknowledged that JPMC's limited documentation on Aurelia violated basic

know your customer ("KYC") concepts:

> This document[ation] alone, irrespective of what's happen [*sic*], is
> probably a fireable offence based on my own KYC training.
>
> Marco told me last night he objected to dealing with Aurelia as
> there was no transparency, which maybe [*sic*] the reason for the
> statement in the document. I looked at Aurelia's website
> www.aurelia.com and they are prohibited from dealing with
> customers from US, UK, Switzerland and Bermuda. Now that's a
> red flag!

169.    Sankey best summarized JPMC's knowledge of the scam and fear that JPMC's

knowledge would be revealed following Madoff's arrest when he stated, in reference to the June

15, 2007 meeting agenda for the HFUC where Equity Exotics requested approval to increase

JPMC's risk limit for BMIS-related transactions to over $1 billion: "Perhaps best this never sees the light of day again!!"

170.    Despite having knowledge of Madoff's scam, JPMC chose to keep its knowledge private.  JPMC approached BMIS feeder funds and asked for them to keep JPMC's redemptions quiet.  On December 17, 2008, Nikolakopoulos emailed FGG's Vijayvergiya to set up a call to discuss "[c]onfidentiality in relation to investments or disinvestments by JPMorgan and any of its affiliates in the two funds ([FOG] Sentry and Sigma)."

171.    JPMC took yet another self-congratulatory lap when it stated that while many of its Private Bank customers had invested with BMIS, "luckily we didn't place any there."

172.    Indeed, JPMC's Private Bank had made a conscious and informed decision to avoid doing business with Madoff.  Following exposure of Madoff's scheme, JPMC's Cembalest distributed an e-mail to Private Bank clients that commented on the Madoff situation.  Cembalest told investors the Private Bank chose not to invest with any BMIS feeder funds because it had "never been able to reverse engineer how they made money" and BMIS "did not satisfy [their] requirement for administrative oversight."

173.    Cembalest provided a lengthy list of red flags that had informed the Private Bank's decision not to invest.  These red flags included: (i) Madoff served as his own prime broker, custodian, *and* investment adviser; (ii) Madoff utilized a three-person accounting firm in Rockland County, which was "almost unheard of for a fund of that size;" (iii) while the Madoff feeder funds were audited by large, well-known accounting firms, those audits did not cover BMIS; (iv) the Private Bank's due-diligence team was not allowed to meet Madoff; (v) Madoff did not charge fees for his money management services (essentially leaving billions of dollars on the table); (vi) the volatility of Madoff's returns was only 2.5% over the preceding 17 years, a

period which included some of the most volatile capital markets in history; and (vii) Madoff's

fund "lost money in only 2 of 214 rolling quarterly periods since 1990."

174.    Cembalest also noted his suspicion after hearing Madoff speak at a conference in

October of 2007, where Madoff had stated: "In today's regulatory environment, it's virtually

impossible to violate rules." Cembalest concluded that this type of attitude was the reason "why

hedge-fund due-diligence is more than just looking at volatility and return patterns."

175.    Cembalest conceded that these "Oz-like signals … were too difficult to ignore."

True, and it was Cembalest's own company that allowed Madoff to launder billions of dollars for

decades, as alleged in detail below.

## J.    JPMC's "Lessons Learned"

176.    On December 19, 2008, JPMC's IBRC held a meeting at which Yang and Wise

presented a "postmortem of the Madoff transactions."

177.    Yang and Wise's presentation included a chronology of the events surrounding

JPMC's investments in BMIS.  They began by explaining how Equity Exotics had requested

approval from the HFUC to increase JPMC's risk limit for Madoff-related transactions to over

$1 billion – a request that "far exceeded the IBRC approved single HP limit of S100mm."  They

then recounted how a conference call with Madoff had been arranged in an attempt to gather

due-diligence information, but during the call Madoff "clearly expressed his dislike of doing

structured products on his strategy and would not accommodate any direct due diligence on his

firm."

178.    Both the positives and negatives of Equity Exotics's risk-limit request were

considered. The postmortem prepared by JPMC in December 2008 stated the following:

> Cons: *[T]he lack of ability to do a full due diligence on Madoff
>       itself*;

> *[T]he potential risk of fraud given the strategy was managed by Madoff in customer brokerage accounts.* This risk of fraud given the structure & set-up was correctly identified and flagged, but was considered at the time to be a remote likelihood given the Equity Exotics business sponsorship of the deal, sponsorship of Madoff by ICM and JPM's long standing (though limited) credit relationship with Madoff; and

> *Inability to reconcile Madoff's returns with ostensible strategy;* alpha generation dependent on "black box" timing mode]: Risk modeled the split strike conversion strategy, confirmed its benign market risk but could not replicate the fund returns and suspected that alpha may have been generated by front-running via the market-making. Risk consequently request a background check – but nothing showed up.  [Emphasis added.]

179.    JPMC nevertheless approved Madoff exposure in the amount of $250 million – despite the strong risk of fraud and suspicions that Madoff was engaged in illegal front-running. JPMC redeemed most of its Madoff-related investments before his arrest.  As of December 11, 2008, JPMC had only $35 million in risk exposure to Madoff feeder funds, having previously redeemed approximately $276 million.

180.    Yang's and Wise's presentation ended with a summary of lessons learned and red flags:

> <u>Lessons Learned:</u> *How much to bank on reputation and SEC regulation*: Reliance on Madoff's long standing reputation, 40yr of [*sic*] track record and good standing as a regulated entity. At what level of notional risk does the possibility of fraud at a private, unrated custodian outweigh the potential profitability of the transaction?

> Reliance on third party due diligence is insufficient and risky;

> More rigorous background check on Madoff could have revealed additional red flag such as the questionable auditor used by Madoff;

Fraud is possible even on an unprecedented scale and longevity; and

Having risk transparency, control over assets and liquidity via a managed account platform greatly mitigate fraud risk.

Red Flags:          *No Transparency*: No transparency on the blackbox timing model implemented by Madoff;

*Unexplainable Returns*: Consistently smooth returns and low volatility appear too good to be true…. Risk had concern on whether Madoff's prop trading activities were appropriated [*sic*] Chinese Walled from its market making business;

*Secrecy and Exclusivity***:** No direct due diligence and mystique of exclusive relationship with long standing clients only. Madoff's dislike of structured products;

*U[nu]sual Business Model***:** commission based revenue instead of fee based revenue despite of the consistent double digital [*sic*] returns year over year;

*Restricted Information Access*: JPM could only review sample trade tickets and trading agreements with Madoff during onsite visit with access funds, but was not able to obtain written copies of these documents; and

*PPM Risk Disclosures*: fund assets are exposed to credit risk of the sub custodian and primer [*sic*] brokers.

181.   The December 19, 2008 meeting minutes indicated that "[g]iven the red flags and lessons learned, the group agreed that going forward we should not do business with any client or counterparty – either directly or indirectly – who will not provide basic due diligence, without exception."

**K.    Lessons Not Learned**

182.   The "lessons" JPMC purportedly learned from its Madoff experience were lessons it was supposed to have learned from its experience with prior scams, including the Enron fraud.

In that fraud as well, JPMC participated in an illegal scheme, all for profit and to accommodate important customers.

183.    Enron was, until its bankruptcy filing in December 2001, number seven on the Fortune 500 list of largest corporations in the United States and a valuable JPMC customer. According to SEC allegations, between December 1997 and September 2001, JPMC loaned Enron a total of $2.6 billion in the form of seven disguised loans, called "prepay" transactions. The SEC, in its 2003 complaint against JPMC, alleged that these transactions were structured by JPMC in a way that was designed to disguise that Enron was in fact receiving loans.

184.    The New York District Attorney's Office ("DANY") concurred, finding that JPMC, along with another bank, had "knowingly structured the prepaid transactions with Enron in a way that allowed Enron to engage in fraudulent accounting and to make its financial statements less transparent."

185.    According to the SEC, JPMC "was willing to engage in the transactions because they generated substantial fees and as an accommodation to an important client."

186.    As a result of the investigations by the SEC, DANY, and others into JPMC's conduct with Enron, JPMC entered into a written agreement with the Federal Reserve Bank of New York and the New York State Banking Department on July 28, 2003.  The parties agreed their common goals were "that JPMC and its subsidiaries operate in compliance with applicable safety and soundness standards and federal and state laws, rules and regulations" and that "JPMC and its subsidiaries effectively manage their financial, operational, legal, reputational, and compliance risks."

187.    Under the written agreement, JPMC agreed to, among other things, revise its written credit-risk management program to: "ensure that the fundamental elements of the credit risk

management program, including due diligence, documentation, and exposure capture and reporting, are in place and implemented for all counterparties and transactions"; "ensure that credit decision-makers possess the necessary information concerning the counterparty's risk profile to effectively fulfill their responsibilities"; and "ensure that such information is appropriately detailed and transparent for review by other control functions."  JPMC further agreed to submit "an acceptable written legal and reputational risk management program" that would include policies and procedures designed, at a minimum, "to [r]equire that thorough assessments of legal and reputational risks be incorporated into JPMC's and its subsidiaries' transactional approval process as well as into ongoing customer relationship and transaction monitoring activities."

188.    In connection with the settlement, District Attorney Robert Morgenthau released copies of a statement from JPMC pledging reform, and a letter he had sent to federal and state bank regulators detailing the results of the investigation.  In that letter, Mr. Morgenthau noted that "[b]ankers – and the lawyers and accountants they employ – all *need to take off the blinders* and judge the appropriateness of interrelated transactions as a whole" rather than merely examine whether "each separate component of a set of interrelated transactions, viewed in isolation, falls within statutory and regulatory limits." (Emphasis added).

189.    Notably, at around the same time it was investigating JPMC's dealings with Enron, DANY investigated JPMC for enabling another customer, Beacon Hill Services Corporation ("Beacon Hill"), to operate a multi-billion dollar illegal money-transmitting business in New York from 1997 until authorities shut it down in 2003.  JPMC should have recognized several red flags raised by Beacon Hill's business activity.  For example, Beacon Hill conducted much of its business with offshore shell corporations and exchange houses in South America, and beneficiaries of wire transfers were often unidentified and unknowable, as they

were often identified only as "customer" or "valued customer."  JPMC's London office had shut

down Beacon Hill's accounts years earlier, in 1994, and JPMC knew that Beacon Hill did not

have a license to operate a money-transmitting business in New York.

190.    These and numerous other high-profile misdeeds involving JPMC alerted it to the

need to exercise careful oversight and control over its major accounts to avoid additional failures

and liabilities.

**L.      JPMC'S View of Madoff as Seen from Account Activity**

191.    JPMC was well positioned to see criminal activity because JPMC had access to

vast amounts of financial information about Madoff and BMIS.  It was apparent from the

transactions in the 703 Account that Madoff was not using the account to buy or sell securities,

which is virtually all BMIS was supposed to be doing through the IA Business.  Nor could

Madoff's market-making or proprietary-trading businesses serve as cover for this account

activity as these businesses would have also engaged in the purchase or sale of securities.  But

instead of investigating the glaring absence of securities activity in what was purported to be

BMIS's operating accounts, or in the JPMC accounts of BMIS's counterparties, JPMC moved

billions of dollars of stolen property for Madoff in and out of the 703 Account for well over a

decade.  At the same time, JPMC was collecting an estimated half a billion dollars in fees,

interest payments, and revenue from the ability to use BMIS customer funds on deposit.  JPMC

also profited from the use of funds on deposit of those other JPMC customers who were also

BMIS customers.

**1.      Madoff Finds a Banker to Assist Him in His Ponzi Scheme**

192.    In order to run his Ponzi and embezzling scheme, Madoff needed a bank account

to provide his customers with a sense that he was operating a legitimate investment-advisory

business.  Having a bank account would allow Madoff to receive customer investments and then transfer that money out of the account to perpetuate the scheme.

193.    But this account did not look like a normal broker-dealer account. Customer funds came in, but those funds were not segregated or transferred to separate sub-accounts.  In addition, the account would not show massive outflows to purchase securities or massive inflows when those securities were sold.

194.    Moreover, the account showed highly suspicious activity, including multi-million dollar transactions conducted by check, and inexplicable "roundtrip" patterns of multi-million dollar wire transfers between Madoff and certain of his customers.

195.    In its 2003 Annual Report to shareholders, JPMC reported that it "recognized the need to rebuild trust in financial institutions, including [its] own," that it "revised and enhanced [its] internal risk management processes and policies," and commenced a "multi-year initiative to reengineer specific components of the credit risk infrastructure."  JPMC's Board of Directors had reviewed and revised JPMC's corporate governance practices and restructured JPMC's credit risk organization.  JPMC's 2003 Report also noted that JPMC was in the process of assessing and improving operational risk processes and tools.

196.    In its 2004 Annual Report, JPMC reported that it had implemented an "internally-designed operational risk architecture model" that would, when fully implemented, allow JPMC to consolidate information relevant to risks arising from such issues as client service and selection; business practices; fraud, theft and malice; and other issues it considered to be operational risk events in a single web-based tool accessible across JPMC.

197.    The unusual activity that was conducted in the 703 Account was visible to JPMC, which had to approve the negotiation of these large checks and wire transfers. Such activity required further investigation under relevant law and prudent business practices. It should have triggered not only investigation by the banker in charge of the account, but should also have triggered the bank's anti-money-laundering ("AML") monitoring system. Long before the passage of the USA Patriot Act in 2001 ("Patriot Act"), and with greater force after Congress passed the Patriot Act, banks such as JPMC were required to monitor their customers' transactions to detect and prevent money laundering and other suspicious activities. The Patriot Act reinforced this obligation and underscored the importance of implementing robust detection systems.

198.    What Madoff needed was a bank that would be willing to overlook his suspicious activity and ignore the anomalous account activity as well as notifications from its AML monitoring system.

199.    Madoff found that bank. JPMC ignored decades of suspicious and inexplicable activity in the 703 Account, even when its monitoring system alerted JPMC to unusual activity. In return, JPMC earned hundreds of millions of dollars in revenue from its relationship with Madoff. JPMC's complicity protected its valued relationships with some of the largest BMIS customers, such as Levy, and allowed JPMC to collect revenue from these relationships. JPMC made money, Madoff made money, and the Ponzi/embezzling scheme's largest enablers made money, while BMIS's customers whose money was entrusted to JPMC lost billions of dollars.

## 2.    The Establishment of Madoff's Account

200.    Madoff opened the 703 Account at Chemical Bank in 1986. Chemical Bank went through a series of mergers and acquisitions, and ultimately became Chase Bank. As the bank went through these transitions, Madoff's accounts stayed with it.

201.    Madoff used the 703 Account to serve the purported IA Business at BMIS. Because BMIS initially operated as a sole proprietorship, the account was opened in Madoff's name.  In 2002, after BMIS became a limited liability company, the account was placed in the name of BMIS.  At all relevant times, JPMC knew that the 703 Account held the money of customers who had entrusted it to Madoff and BMIS's IA Business, was a fiduciary account in nature, holding funds impressed with a trust, and that Madoff and BMIS owed fiduciary obligations to the BMIS customers.  As alleged herein, JPMC knew that Madoff and BMIS were breaching their fiduciary obligations to their customers.  Upon information and belief, JPMC knew that virtually all of the money that Madoff commingled in the 703 Account was held for investment advisory clients that were beneficiaries of a relationship of high trust and confidence owed to them by Madoff directly, and many of them, trustees and fiduciaries in their own right, delegated their own duties to Madoff by entrusting money to him to manage in his full discretion.  Indeed, it was a matter of public record that Madoff served as a trustee for retirement accounts, pension plans and trusts. (*See* Internal Revenue Bulletin, 2005-37, List of Nonbank Trustees and Custodians, Sep. 12, 2004, *available* at http://www.irs.gov/irb/2005-37 IRB/ar15.html.)  Upon information and belief, JPMC knew that, in addition to his discretionary investment advisory business, one of Madoff's primary business activities, which he provided for expressly and at length in BMIS's operating agreement, was the exercise of fiduciary powers as a trustee or custodian for retirement plans, and that hundreds of trusts, retirement and pension plans, foundations, partnerships and estates entrusted their money to the 703 Account.

202.    Madoff and BMIS were assigned a relationship manager in the Broker/Dealer Group of the Investment Bank at JPMC.  In the mid-1990s, Cassa became their relationship manager.  He managed the Broker/Dealer Group's relationship with Madoff and BMIS, and was

in charge of their accounts, including the 703 Account.  When Cassa retired in March 2008, Mark Doctoroff took over as the Client Relationship Manager.

203.    Despite JPMC's own understanding about Madoff's activities, which culminated in a report to the British authorities, the 703 Account was still open and operating without any restrictions at the time of Madoff's arrest.

### 3.    JPMC Had a Duty to Know Its Customer and to Monitor Its Customers' Account Activity

204.    The Bank Secrecy Act, the Patriot Act, and New York laws and regulations required JPMC to file reports with appropriate regulators when it discovers suspicious activity by any of its customers.  Such activity includes, *inter alia*, transactions where the bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging.  As alleged in detail above, there were numerous suspicious transactions with Levy and Sterling Equities in the 703 Account, which should have triggered investigations and reports to regulators.  Nor did the 703 Account serve a legitimate business purpose, as money in that account was not used to purchase any securities. The only plausible explanation was that Madoff and/or BMIS were stealing from customers. Based on the investigation to date, Plaintiffs have no reason to believe that JPMC made reports to federal or state regulators concerning suspicious activity in the 703 Account. Although there was no legitimate business purpose for the activity in the 703 Account, the 703 Account was never closed, which would have been consistent with reports to regulators for such egregious conduct.

205.    The Bank Secrecy Act, the Patriot Act and New York laws and regulations also required JPMC to maintain rigorous anti-money-laundering policies and procedures.  Because of

its participation in the Enron fraud, JPMC was required to be more vigilant in overseeing and reporting suspicious activity in the 703 Account.  If it had followed its purported improved procedures, the regulators would have had information that would have led to the uncovering of the Ponzi/embezzling scheme as the only plausible explanation for Madoff and BMIS's suspicious activities.

206.    Indeed, federal legislation and regulations have long required banks to have an AML program.  One element of these programs is monitoring customer account activity in order to detect possible fraud, money laundering, or other improper activity.  These requirements were first established by the Bank Secrecy Act ("BSA") and federal banking regulations.  31 U.S.C. § 5311; 12 C.F.R. § 208.63.  All of the federal banking agencies have substantially identical requirements.  Those parts of JPMC under the supervision of the OCC would thus have the same obligations.  The Patriot Act reinforced these obligations and underscored the importance of implementing robust detection systems to ensure that money launderers and terrorists would not be able to use the United States financial system to further their crimes.

207.    One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts.  The legislation and regulations also provide guidance to banks and other financial institutions regarding how to best achieve that goal, and what actions to take once suspicious activity is identified.

208.    Section 352 of the Patriot Act and the banking regulations require financial institutions to institute an AML program that includes four pillars: (i) designating an individual or individuals responsible for managing BSA compliance; (ii) a system of policies, procedures,

and internal controls to ensure ongoing compliance; (iii) training for appropriate personnel; and (iv) independent testing of compliance. 12 C.F.R. § 208.63.

209.     Financial institutions must also fully understand the business in which their customers are engaged.  This duty, referred to as the responsibility to "know your customer" ("KYC"), is critical to determining what activity was suspicious.  12 C.F.R. § 208.62.  Institutions viewing account activity need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest an illegal enterprise. The KYC duty also pre-dated the Patriot Act.  Not only was it suggested by such guidelines as the Federal Reserve's BSA Examination Manual of 1995 and Supervisory Letter on Private Banking Activities, SR 97-19 (SUP), but it was standard industry practice.

210.     This regulatory guidance directed financial institutions like JPMC to perform on-site visits to their clients, obtain and review financial statements to corroborate the sources of the clients' wealth, and to review media reports regarding their clients.

211.     It was also standard industry practice for financial institutions to perform KYC on their clients.  Many financial institutions have entire departments devoted to this one task and to making sure KYC is performed thoroughly and is constantly monitored and recorded.  JPMC has a KYC department for each of its lines of business.

212.     Having been caught before for participating in a fraud in order to profit and accommodate an important customer (Enron), and having warranted to regulators that it had improved its oversight protection, JPMC knew better than to rely on a customer's public reputation in place of diligence.

213.     While JPMC may have created AML and KYC programs that facially met the requirements of the Patriot Act and related regulations, JPMC did not effectively execute those

programs and never submitted to the appropriate banking regulators as mandated by statute and regulation any reports of Madoff's suspicious activities.

### 4.    Another Financial Institution Warned JPMC More Than Ten Years Before The Ponzi/Embezzling Scheme Collapsed

214.    JPMC had yet further knowledge that Madoff engaged in banking activities with no legitimate business purpose.  According to two former employees of another financial institution, in or about 1997, that institution observed and investigated Madoff's nearly daily circular transactions between an account Madoff controlled at that financial institution and a Madoff account at JPMC (then, the Chase Manhattan Bank ("Chase")).  On nearly a daily basis, a Madoff employee would physically deposit a check drawn on Madoff's account at the other financial institution into his account at Chase.  The next day, funds in or near the same amount – generally at least $1 million but less than $10 million – would be wired back from Madoff's Chase account to the account at the other financial institution.  According to the investigator at the other financial institution, now a former employee, as well as another former employee, the investigator and others at the financial institution questioned Madoff's employees about the transactions, and, having failed to receive a satisfactory explanation for the suspicious account activity, that financial institution closed Madoff's account.  Not only was the suspicious activity as apparent to Chase as it was to the other financial institution, but following normal operating procedures, the financial institution's investigator would have contacted his counterpart at Chase regarding the suspicious transactions on two occasions: (i) in the course of his inquiry; and (ii) at the conclusion of the inquiry, to report that the other financial institution was closing the account.  The circular transactions in which Chase participated at this time presaged the same sort of circular transactions in which Madoff and

Levy would engage later within JPMC – transactions JPMC permitted to occur despite their evident lack of legitimacy.

### 5. JPMC Had a Duty to Know What Type Of Business Madoff Was Operating

215.    The first step in identifying suspicious activity is for a bank to determine what its clients' normal business activities would look like.  Federal Financial Institutions Examination Council BSA/AML Examination Manual of June 2005.  This step can be accomplished in many ways, including by meeting with the client and learning about the client's business, conducting on-site due diligence visits to review the client's business operations, and reviewing the client's financial statements.

216.    One of the ways in which JPMC purportedly discharges its KYC duty is by assigning a sponsor to each account.  The sponsor becomes the person in charge of ensuring the bank has sufficient information about the client and the client's business to identify suspicious activity.

217.    Cassa was JPMC's sponsor for the 703 Account through early 2008.   In that role Cassa received financial statements from BMIS on a regular basis.  These statements included Financial and Operational Combined Uniform Single Reports ("FOCUS Reports"), as described below.   According to Cassa, JPMC reviewed these FOCUS Reports.   As detailed within, the FOCUS Reports contained glaring irregularities.

### 6. JPMC Knew of Inconsistencies Between BMIS's Financial Statements, the Activity in the 703 Account, and BMIS's Purported Business

218.    JPMC possessed at least 15 regulatory filings of BMIS that revealed numerous inconsistencies and falsehoods.  These reports included two annual audited financial statements ("Annual Audited Reports") and 13 quarterly FOCUS Reports, which report on periods between November 1, 2004 and September 30, 2008.  Upon information and belief, Cassa began

receiving quarterly FOCUS Reports from BMIS as early as October 2001, at the time the Patriot Act was passed.

219.     As a broker-dealer operating through 2008, BMIS was required under SEC Rule 17a-5 to file FOCUS Reports with the SEC.  These reports are basic financial and operational reports that set forth, among other information, assets, liabilities, revenues, and expenses of the company.

220.     In addition, under SEC Rule 17a-5(d), BMIS was required to file Annual Audited Reports.  These Annual Audited Reports must contain information about income, cash flows, changes in stockholders', partners', or sole proprietors' equity, and changes in liabilities.  These reports are public, except where the statement of financial condition is bound separately from the balance of the Annual Audited Reports, in which case the balance is deemed confidential.

221.     Furthermore, when Equity Exotics began working with Cassa and the Broker/Dealer Group to conduct due diligence on Madoff and BMIS feeder funds in 2006 and 2007, Equity Exotics requested BMIS FOCUS Reports as part of the due diligence it conducted.

222.     Coffman specifically suggested that his team review the FOCUS Reports, stating in February 2006 that JPMC "should assess quality and detail of regulatory FOCUS Reports from the firm. They are not necessarily audited, but we derive comfort knowing that regulatory reports are presented to and reviewed by SEC and exchanges, and firms can be penalized significantly if statements prove to be fraudulent or inaccurate."

223.     In March 2006, Coffman stated again that JPMC should scan the FOCUS Reports to ensure that BMIS was not "another possible Refco."  The FOCUS Reports contained numerous discrepancies and fraudulent statements suggesting that BMIS was operating a Ponzi scheme.

224.     On January 25, 2007, Cassa acknowledged receipt of the FOCUS Report for the period of October 1, 2006 through December 31, 2006 ("December 2006 FOCUS Report"). The December 2006 FOCUS Report revealed numerous inconsistencies and irregularities that would have been readily apparent to JPMC as BMIS's banker and that should have prompted further investigation of Madoff and BMIS by JPMC.

### a.     The FOCUS Reports Misrepresented Cash at JPMC

225.     Both the FOCUS Reports and Annual Audited Reports require broker-dealers to list the amount of cash on hand at the broker-dealer, as well as all of its other assets and liabilities. BMIS's FOCUS Reports often did not show assets and liabilities that JPMC knew should have been reported, including: (i) cash held in JPMC accounts; (ii) loans provided to BMIS by JPMC; and (iii) related collateral on the loans JPMC extended to BMIS.

226.     BMIS consistently underreported the amount of cash it held on its FOCUS Reports – a fact that JPMC knew by virtue of its maintenance of the 703 Account.  On an almost nightly basis, JPMC swept funds from the 703 Account into overnight deposits. Upon information and belief, for reporting purposes, the funds in the 703 Account and the overnight deposits are considered "cash" and were visible to JPMC.  JPMC knew that the cash in the 703 Account and the overnight deposits often exceeded the "cash" reported by BMIS in its FOCUS Reports and Annual Audited Reports.

227.     For example, the December 2006 FOCUS Report listed $4,882,332 as the amount of cash on hand.  As of December 31, 2006, the ending balance of the 703 Account was $394,700 and the amount in overnight deposits was $295 million, totaling $295,394,700 of cash on hand.  From JPMC's view, there was thus a $290,512,368 difference between the amount of cash BMIS purported to have and the cash balances known to JPMC.  It thus was readily apparent to JPMC that BMIS was not reporting the full amount of cash it had on hand.

JPMC was uniquely positioned to discover and investigate this false statement by BMIS because it had access to the precise dollar amounts held in the 703 Account and overnight deposits.

228.    BMIS's underreporting of its cash position was not isolated to the December 2006 FOCUS Report.  In nearly every reporting period since December 31, 2006, BMIS's FOCUS Reports and Annual Audited Reports significantly underreported the amount of cash BMIS purported to hold, as compared to the amount BMIS actually held in the 703 Account and in overnight deposits. JPMC was in possession of at least eight FOCUS Reports and two Audited Annual Reports between December 2006 and September 2008, providing it with numerous opportunities to discover that Madoff was underreporting BMIS's cash position and making fraudulent statements to the SEC.

### b.    The FOCUS Reports Do Not Show JPMC's Loans to BMIS

229.    Nor were irregularities and inconsistencies limited to the reporting of BMIS's cash position.  An entity filing a FOCUS Report must report "Bank loans payable."  JPMC made a loan to BMIS of $95 million in November 2005 that was not repaid until June 2006.  Yet the FOCUS Report for the period ending December 2005 ("December 2005 FOCUS Report") – a report in JPMC's possession – reported that BMIS had no bank-loan obligations outstanding. Based on its own information, JPMC knew this was false.

### c.    The FOCUS Reports Underreport Loan Collateral

230.    Madoff underreported BMIS's loan collateral, a fact also visible and known to JPMC.  The FOCUS Report must include "Securities and spot commodities owned at market value – U.S. and Canadian government obligations" and "encumbered securities."  JPMC's November 2005 $95 million loan to BMIS was collateralized by a $100 million Federal Home Loan Bank Bond.  Madoff should have reported the bond as "Securities and spot commodities

owned at market value – U.S. and Canadian government obligations."  The amount reported on the December 2005 FOCUS Report, $72,232,950, was less than the $100 million of the value of the bond that JPMC knew BMIS to be holding.  Moreover, the December 2005 FOCUS Report should have listed the bond under "encumbered securities," which was left blank.  Again, on the basis of its own information, JPMC could determine that Madoff was falsely reporting BMIS's financial information.

### d.    The FOCUS Reports Reveal Obvious Inconsistencies In BMIS's Purported Business

231.    The FOCUS Reports and Annual Audited Reports revealed glaring inconsistencies with the business in which BMIS was purportedly engaged – a business that JPMC was required to know as part of its KYC obligations.  As the broker to its investment adviser accounts, BMIS was expected to report commission revenue.  Before September 2006, Madoff did not record any commission revenue on the FOCUS Report "Commissions" revenue line.  Nor did Madoff report commission revenue on BMIS's Annual Audited Reports before October 2006.   JPMC possessed at least seven FOCUS Reports and Annual Audited Reports filed before September 30, 2006, none of which listed any commission revenue.  Even a cursory review of the FOCUS Reports and Annual Audited Reports should have prompted an investigation by JPMC.

232.    BMIS registered with the SEC as an Investment Adviser in August 2006.  The FOCUS Reports and Annual Audited Reports filed by BMIS after that time included amounts listed for "Commissions."  JPMC possessed at least nine FOCUS Reports and Annual Audited Reports filed for periods including or after September 2006.  Comparing the revenue reported in the Annual Audited Reports for the fiscal years immediately before and after BMIS registered as an investment adviser demonstrates the significance of the newly reported commission revenue.

For the fiscal year ended 2005, Madoff reported no commission revenue at all.  By contrast, for the fiscal year ended 2007, Madoff reported $103,174,848 of commission revenue, which represented over 60% of total BMIS revenues for the year.  The sudden shift by Madoff to begin reporting commission revenue should have raised questions as to the change in the business and prompted further investigation by JPMC as part of its ongoing KYC duties.  Instead, JPMC ignored blatant misrepresentations in the FOCUS Reports in violation of its duties to monitor and understand the business of its customers.

233.    In the December 2006 FOCUS Report, Madoff reported $23,921,497 as the amount of commissions on transactions in exchange-listed securities executed on an exchange. Other than commissions on transactions in exchange-listed securities, Madoff disclosed no other commission revenue on the December 2006 FOCUS Report.  Specifically, Madoff reported no commission revenue for: (i) "Commissions on transactions in exchange listed equity securities executed over-the-counter," (ii) "Commissions on listed options transactions," and (iii) "All other securities commissions."  Because BMIS's well-known trading strategy – of which JPMC was familiar based on the 2006 investigation by Equity Exotics – consisted of trading S&P 100 equities and options, JPMC should have expected Madoff to report commissions relating to options (whether they were listed or OTC), which he did not.

234.    The FOCUS Reports and Annual Audited Reports that JPMC possessed did not reflect the activity that would be expected of a broker to its investment adviser accounts. BMIS's FOCUS Reports and Annual Audited Reports did not include: (i) customer receivables, such as margin accounts; (ii) customer payables, such as positive cash balances held by BMIS on behalf of customers; or (iii) a computation for reserve requirements for customer activity as required by the SEC under Rule 15c3-3, all of which would be reported by a broker-dealer with

managed investment accounts.  The fact that BMIS's financial reporting was entirely inconsistent with the business in which it was purportedly engaging was readily apparent to JPMC as a result of the FOCUS Reports, and JPMC should have reviewed and investigated this inconsistency as part of its ongoing KYC duties.

235.    For example, the December 2005 FOCUS Report had no amounts recorded under the captions "Receivables from customers" and "Payable to customers."  In addition, the credit and debit balance amounts in customer security accounts that form the basis for the computation for the Rule 15c3-3 reserve requirement were left blank.

236.    The failure to report financial information demonstrating customer activity was not isolated to the December 2005 FOCUS Report.  None of the FOCUS Reports and Annual Audited Reports in JPMC's possession – at least 15 in total – included customer receivables or customer payables, and none included customer account balances in their computations for 15c3-3 reserve requirements.

237.    For all of the above reasons, the FOCUS Reports were glaringly misleading, which was obvious to others who reviewed them.  For example, shortly after Madoff's arrest, Robert Rosenkranz of Acorn partners, a fund-of-funds manager and an investment adviser to high net-worth individuals, reflected in an email that Acorn had performed due diligence on Madoff and concluded "that fraudulent activity was highly likely."  Specifically, the email stated that Acorn "reviewed the [BMIS] audit report … which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivables from customers."

238.    Acorn succinctly described the indicia of fraud that led it to conclude years prior that Madoff was a thief:

We had considered investing in a Madoff managed account, and decided to pass for reasons that give a useful insight into our due diligence process.

First, we ascertained that the description of the strategy (purchase of large cap stocks versus sale of out of the money calls) appeared to be inconsistent with the pattern of returns in the track record, which showed no monthly losses.

Second, we persuaded a Madoff investor to share with us several months of his account statements with Madoff. These revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve. Moreover, the trading volumes reflected in the account (projected to reflect his account's share [of] Madoff's purported assets under management at the time) were vastly in excess of actually reported trading volumes.

Third, we noted that Madoff operated through managed accounts, rather than by setting up a hedge fund of his own. That was suspicious in as much as hedge fund fees are typically much higher than the brokerage commissions Madoff was meant to be charging. We suspected the requirement for annual hedge fund audits was the reason he wanted to avoid that approach. We knew that when his clients are audited, their auditors simply look at the account statements and transaction reports generated by the brokerage firm; they don't investigate the books of the brokerage firm itself.

Fourth, although brokerage firms are required to provide annual audit reports, the investor appeared not to have received any. With considerable perseverance, we obtained audit reports filed with the SEC, which were prepared by an utterly obscure accounting firm located in Rockland County New York.

Fifth, we reviewed the audit report itself, which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivable from customers. They appeared to be the reports of a market maker, not of a firm that at the time was meant to have some $20 billion of customer accounts.

Taken together, these were not merely warning lights, but a smoking gun. The only plausible explanation we could conceive was that the account statements and trade confirmations were not bona fide but were generated as part of some sort of fraudulent or improper activity.

239.     All of the information flagged by Acorn through proper, independent, and reasonable due diligence, was information that was known by JPMC.  JPMC *was* in possession of the FOCUS Reports and Annual Audited Reports that it reviewed as part of its KYC and AML duties, as well as part of its due-diligence process for its own investments linked to BMIS.  Moreover, it had access to information not known to those such as Acorn – which accurately concluded that fraud was "the only plausible explanation" based on far less information than was available to JPMC – as a result of JPMC's visibility into the 703 Account and its knowledge regarding its own lending activity with BMIS.

240.     JPMC was in a unique position to uncover the many inconsistencies contained in the FOCUS Reports and Annual Audited Reports.  But it ignored falsehoods that were plain on the face of the FOCUS Reports and Annual Audited Reports, and in doing so, substantially assisted the Ponzi/embezzling scheme.

### 7.     JPMC Had A Duty to Investigate BMIS's Account Activity Which Was Facially Inconsistent With Any Legitimate Business Purpose

241.     Not only did JPMC fail to "know" Madoff or BMIS, but it also failed to investigate activity that was suspicious regardless of whether JPMC thought Madoff and BMIS were using the 703 Account to operate a market-making business, an investment-advisory business, or any other legitimate enterprise.

242.     JPMC knew that the transaction activity in the 703 Account could not have been linked to a legitimate business purpose, and this fact should have been flagged by both JPMC personnel and its automated monitoring system.  JPMC was aware that Madoff and BMIS were operating at least two businesses: a market-making business and the IA Business.  But the activity in the 703 Account did not match up with either of these enterprises.

243.    If JPMC had believed Madoff was using the 703 Account for market making, the bank would have likely seen regular transactions in the account with other brokerage firms with which BMIS was trading.  If Madoff had been using the 703 Account for the IA Business, JPMC would have seen billions of dollars leaving the 703 Account and going to purchase stocks and equities, and corresponding multi-billion dollar inflows as BMIS sold those securities.  In the interim, JPMC should have seen tens of billions of dollars – nearly all of the IA Business's assets under management – moved into T-bills, as that was part of Madoff's purported investment strategy.

244.    Instead, what JPMC saw was massive outflows of money that were in no way linked to customer accounts or stock and options trading.  Money would flow into the 703 Account as customers invested additional funds with Madoff.  A majority of funds would then exit the account to customers in the form of redemptions.  Any balance that remained in the 703 Account was invested in short-term securities such as overnight sweeps, commercial paper, and certificates of deposit.

245.    JPMC was therefore aware that Madoff was not using the money in the 703 Account to buy or sell securities.

246.    JPMC also faced regular account activity that would have been suspicious regardless of the type of business JPMC thought Madoff was running.  The Office of the Comptroller of the Currency's 2000 BSA/AML Handbook identified numerous "red flags" that financial institutions needed to consider as part of their transaction monitoring procedures.  These red flags included: (i) unexplained repetitive or unusual patterns of activity; (ii) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (iii) spikes in customer activity with little or no explanation; and (iv) wire activity

with offshore banking centers or financial secrecy havens.  The 703 Account exhibited all of these types of transactions, and exhibited them repeatedly.

247.    In addition, much of this account activity occurred between Madoff and other JPMC customers.  Most notably, the party transacting with Madoff most often and in the largest dollar amount, receiving almost $76 billion in payments from the 703 Account between December 1998 and September 2005, was JPMC's long-time Private Bank customer and IA Business customer, Norman Levy.

### 8.    JPMC Was Aware of Anomalous Account Activity that Was Inconsistent With BMIS's Purported Business

248.    The activity in the 703 Account was not only inconsistent with BMIS' stated business, but it would have been suspicious in *any* context.

249.    The 703 Account repeatedly exhibited textbook "red flags" and high risk activity including:

*a.*    *Repetitive Transactions:* Madoff frequently engaged in repeated transactions with the same parties, often on the same days, with no obvious purpose.

*b.*    *Large Dollar Transactions:* The 703 Account reflected a pattern of large dollar transactions.  Between 1998 and 2008, Madoff transferred nearly $84 billion out of the 703 Account to just four customers.  These transactions represented over 75% of the wires and checks that flowed out of the 703 Account to BMIS customers.  It also was typical for Madoff, through the 703 Account, to enter into individual transactions with the BMIS feeder funds for hundreds of millions of dollars.

*c.*    *Spikes in Activity:* The 703 Account showed occasional spikes in overall activity, which should have prompted further investigation by JPMC.  Shortly before the beginning of the credit crisis, over the period beginning in the first quarter of 2006 and ending in the first

quarter of 2007, there was a significant increase in the total dollar amount transacted in the 703 Account. This increase in activity included a significant increase not only in third-party wires but also in book-transfer activity. During this period, the average dollar amount of each transaction increased by over $60 million, from $17 million to $78 million.

        *d.*    *Wire Activity with Offshore Entities:* Through the 703 Account, Madoff frequently engaged in transactions with high risk, offshore entities. For example, between 2004and 2008, the 703 Account's international wire transfers with high and medium risk jurisdictions accounted for 83% of the total dollar value of international wire transfers.

        *e.*    *Check Activity:* In addition, many transactions in the 703 Account involved hand-written checks totaling hundreds of millions of dollars in a single day. This is not only unusual on its face, but it is particularly unusual given that BMIS would issue multiple checks on the same day to the same customer. At the very least, this activity *should* have prompted a check-fraud investigation, which would have revealed more suspicious behavior.

        *f.*    *Private Banking:* The counterparties to many of these transactions were both BMIS customers and JPMC private banking customers. Private banking has long been considered a high-risk activity. That is because private bank accounts generate lucrative fees, which provide an incentive for private bankers to ignore client activity that is illegal or violates internal bank policy. Private banking has frequently served as a vehicle for money laundering, and particularly money laundering involving cross-border wire transfers. Thus, when JPMC saw billions of dollars of transfers between the 703 Account and accounts held at JPMC's Private Bank, it should have been highly suspicious. Moreover, given that those accounts were held by JPMC, the bank had visibility into both sides of the transactions. It had only to review its internal account records to determine whether there was a legitimate explanation for the transaction history.

250.    Madoff's transactions with two of BMIS's biggest customers – Levy and Sterling Equities – illustrate these irregularities.  Of the top 15 counterparties to transactions with the 703 Account, 12 were feeder funds.  Two of the remaining counterparties were Levy and Sterling Equities, both of which enabled Madoff's Ponzi scheme.  Notably, both Levy and Sterling Equities were also JPMC private-banking customers, rendering both sides of their transactions with Madoff visible to JPMC.  These transactions were highly unusual and inconsistent with BMIS's purported business, and should have prompted investigation by JPMC.

251.    For example, during 2002, Madoff initiated outgoing transactions to Levy in the precise amount of $986,301 hundreds of times – 318 separate times, to be exact.  These highly unusual transactions often occurred multiple times on a single day.

252.    As another example, from December 2001 to March 2003, the total monthly dollar amounts coming into the 703 Account from Levy were almost always equal to the total monthly dollar amounts going out of the 703 Account to Levy.  There was no clear economic purpose for such repetitive transactions that had no net impact on Levy's account at BMIS.

253.    There was a huge spike in activity between Levy and the 703 Account in December 2001.  In that month alone, Madoff engaged in approximately $6.8 billion worth of transactions with Levy.  Shortly thereafter, Levy's activity with the 703 Account decreased dramatically.

254.    In addition, the majority of Levy's transactions with the 703 Account were conducted by check.  For example, in December 2001, the 703 Account received checks from Levy, each in the amount of $90 million, on a daily basis – a pattern of activity with no identifiable business purpose.

255.     JPMC was acutely aware of Levy's close relationship with Madoff, identifying Madoff as "Levy's close friend and trader" who had helped increase Levy's wealth from $180 million in 1986 to $1.5 billion in 1998.

256.     Upon information and belief, JPMC never meaningfully investigated the connection between Madoff and Levy.  The activity in Levy's account confirmed that there was no legitimate explanation for the suspicious transactions in the 703 Account.

257.     Rather than investigating these transactions, JPMC was primarily concerned about maintaining a relationship with Levy and Madoff and maintaining a role in the Levy family's finances after Levy's death in 2005.  JPMC and Madoff were both designated executors of Levy's estate.  As alleged herein, JPMC prioritized its relationships with Levy and Madoff over its compliance with regulations that required banks to monitor customer accounts.

258.     Also unusual were significant transactions between Madoff and Sterling Equities, another JPMC private banking customer.  Sterling Equities transacted more than $1 billion with the 703 Account.  Like Levy, Sterling Equities engaged in multi-million dollar transactions with Madoff using checks, including depositing two $10 million checks with Madoff that both cleared the same day in 2005, each one coded by JPMC as "teller."

259.     JPMC profited not only from having the 703 Account, but also from its relationships with Levy and Sterling Equities, including the revenue it realized on their private banking accounts with JPMC.  No matter how inexplicable the transaction – hundreds of millions of dollars being punted between a private banking account and the 703 Account with no apparent economic purpose for either party, and multi-million-dollar transactions being conducted via a series of handwritten "teller" checks rather than a single wire transfer – JPMC

executed the transactions, charged fees, reviewed the FOCUS Reports it knew to be false, and otherwise disregarded its obligations.

### 9.    JPMC Had A Duty to Take Action

260.    Knowing that the activity in the 703 Account was not consistent with the purported business purpose of the account, and faced with evidence that illegal activity was occurring, JPMC had a duty to take action, not to participate in a breach of fiduciary duty, and to prevent the further theft of fiduciary assets.  As another financial institution did when confronted with similar activity, JPMC should at a minimum have questioned Madoff and/or BMIS and, when it failed to receive a credible explanation for the bizarre activity, closed the account.

261.    Instead, JPMC took no action.  The 703 Account was still operating without any restrictions when Madoff was arrested on December 11, 2008.  JPMC did not convey its concerns to authorities or regulators other than British authorities in 2008 when it essentially admitted to having knowledge of Madoff's Ponzi scheme.

### M.    JPMC'S View of Madoff Through Loan Activity

### 1.    JPMC's Loans to Levy for BMIS Investments

262.    In addition to the activity in the 703 Account, there were a series of blatantly suspicious loan transactions which further demonstrate that JPMC knew of Madoff's illegal activity, but decided to ignore it.  These loans, which involved Levy and another longtime friend of Madoff, BMIS investor, and JPMC private-banking accountholder, Carl Shapiro, were characteristic of illegal activity.

263.    From at least 1996 through 2005, Levy and his children obtained credit facilities through JPMC and other banks, using funds borrowed under these credit lines to leverage investments with Madoff.

264.    In 1996, for example, the same year Chemical Bank acquired Chase, Levy had $188 million in outstanding loans, which he used to fund Madoff investments.

265.    JPMC appropriately referred to these investments as "special deals."  Indeed, these deals were special for all involved: (i) Levy enjoyed Madoff's inflated return rates of up to 40% on the money he invested with Madoff; (ii) Madoff enjoyed the benefits of large amounts of cash to perpetuate his fraud without being subject to JPMC's due diligence processes; and (iii) JPMC earned fees on the loan amounts and watched the "special deals" from afar, escaping responsibility for any due diligence on Madoff s operation.

266.    On the one hand, JPMC endorsed and helped fuel Levy's "special deals" with Madoff, continuously extending loans to Levy to finance these deals.  On the other hand, JPMC advised the rest of its private-bank customers not to invest with Madoff – a fact made known to JPMC's private-banking customers after Madoff's arrest.

### 2.    JPMC Fueled the Scam With Loans to BMIS in 2005 and 2006

267.    Shortly after Levy's death, JPMC began lending money directly to BMIS, using Federal Home Loan Bank Bonds extended to Madoff from Shapiro as collateral.  JPMC conducted an inadequate credit review before extending the loans, deciding instead to immediately begin earning interest,

268.    In November 2005, JPMC requested approval for a fully collateralized $100 million broker loan to BMIS.  Shortly thereafter, BMIS borrowed $95 million from JPMC, which as previously described, BMIS and Madoff did not report in BMIS's FOCUS Reports.

269.    Enrica Cotellessa-Pitz, a Controller for BMIS, requested the initial $95 million on BMIS's behalf in a letter sent to JPMC on November 14, 2005.  Before receiving the letter, Daniel Bonventre, BMIS's Head of Operations, had spoken with Evadney Sandiford in JPMC's Broker/Dealer Group regarding BMIS's large loan request.

270.    Cotellessa-Pitz requested that JPMC credit the 703 Account with the $95 million, and use a bond in another account that Madoff held with JPMC as collateral – account number xx3414 ("Geoserve Account").

271.    The Geoserve Account contained a Federal Home Loan Bank Bond in the principal amount of $100 million, due April 8, 2009.  According to JPMC's records, the $100 million bond was "receive[d] free" from Shapiro on November 4, 2005.

272.    Madoff credited the value of the bond to a number of IA Business accounts held by Shapiro's family members, and, in addition, Madoff paid Shapiro approximately 30% interest on the bond.  Madoff paid the interest quarterly, depositing the payments into various accounts at JPMC held by Shapiro's family members.

273.    JPMC credited $95 million to the 703 Account on November 14, 2005 – the same day Cotellessa-Pitz requested the funds.  JPMC immediately began to earn money off of the loan, collecting $198,081.60 in interest for November 2005, and $374,062.50 in interest for December 2005.

274.    Quickly thereafter, Bonventre, on BMIS's behalf, requested an additional $50 million in a letter addressed to JPMC, dated January 18, 2006.  Similar to BMIS's prior loan request, Bonventre directed JPMC to credit the 703 Account with the funds, using the bonds held in the Geoserve Account as collateral.

275.    That same day, on January 18, 2006, Bonventre sent an additional letter requesting JPMC to accept two more Federal Home Loan Bank Bonds into the Geoserve Account.  One bond was worth $9 million and the other was worth $45 million, together totaling $54 million.  As before, JPMC's records indicate that BMIS received these bonds "free" from Shapiro, yet Madoff paid an annual interest rate of approximately 30% on the securities to

various Shapiro family customer accounts at JPMC.  In response to Bonventre's requests, JPMC credited the 703 Account with $50 million on January 23, 2006.

276.    With the loan to BMIS now increased by $50 million, JPMC reaped the benefits of that arrangement, collecting even greater amounts in interest.  JPMC collected substantial interest in connection with these transactions with Madoff: $443,689.23 for January 2006; $552,057.30 for February 2006; $620,781.25 for March 2006; $625,564.23 for April 2006; and $668,862.85 for May 2006.

277.    Having collected over $3.4 million in interest since BMIS's initial loan request on November 14, 2005, JPMC stopped accumulating profits on June 1, 2006.  On that date, Madoff sent a letter to JPMC requesting a decrease in BMIS's loan amount to zero, and authorizing JPMC to debit the $145 million principal amount of the loan from the 703 Account.  JPMC did as Madoff requested, and debited $145 million from the 703 Account that same day.

278.    As with most of JPMC's due diligence – or lack thereof – regarding Madoff, JPMC made no effort to determine the solvency or financial condition of BMIS before extending these loans.

279.    For instance, in a November 2005 credit memo that JPMC prepared requesting approval for a fully collateralized $100 million broker loan for BMIS, JPMC relied solely on BMIS's historical performance and Madoff's reputation in the community to find comfort in its exposure and conclude that BMIS would be able to repay the loan.

280.    Moreover, in summarizing BMIS's supposed financial stability in that memorandum, Raffale Cardone, a credit officer at JPMC, stated that BMIS's assets "are comprised primarily of broker-dealer receivables and securities inventory."

281.    Upon information and belief, JPMC again failed to conduct any independent investigation into BMIS's solvency or financial condition, relying exclusively on BMIS's unaudited financial statements in its April 2006 credit memo, stating: "As expected, [BMIS's] revenues were nearly entirely driven by trading income."

282.    Both credit memoranda's conclusions ran afoul of sound banking practices and JPMC's own policies, which mandate that financial analyses of the borrowing customer be based on audited financial statements.

283.    Furthermore, upon information and belief, JPMC's credit staff made no site visits to observe BMIS's operations.  Site visits are generally a required part of a sound credit review process, designed to ensure that the lending institution has an adequate understanding of the borrower's business operations.

284.    Once again, JPMC's failure to follow its internal policies and standard banking practices perpetuated Madoff's fraud at the expense of BMIS customers.

**N.    JPMC Allowed the Ponzi/Embezzling Scheme to Continue**

285.    Evidence of Madoff s Ponzi/embezzling scheme permeated every facet of JPMC. It ran from the Broker/Dealer Group, where Madoff and BMIS maintained a bank account that no one honestly could have believed was serving any legitimate purpose, to Equity Exotics, where JPMC learned of the red flags inherent in Madoff's investment strategy, to JPMC's London office, which learned that individuals might be laundering money through BMIS feeder funds, to the Private Bank, which maintained intimate relationships with one of Madoff's largest customers, to Treasury & Security Services, which was responsible for investing the balance of the 703 Account in short-term securities.

286.     The various divisions of JPMC that were involved with Madoff communicated with each other about Madoff.  When Equity Exotics wanted to set up a meeting with Madoff, and when the Risk Management Division needed to obtain BMIS's financial documents, they knew to contact Madoff's and BMIS's relationship manager in the Broker/Dealer Group.  The Broker/Dealer Group also communicated with the private bank when customers at the private bank were interested in investing with Madoff, and with Treasury & Security Services when the relationship manager was trying to find new products that he could market to Madoff.

287.     The various individuals and divisions of JPMC regularly interacted to gain additional information about business opportunities.  But those channels were only utilized for the purpose of increasing JPMC's fees and profits.  JPMC is liable for Madoff's crimes because it was uniquely positioned for 20 years to see it and put a stop to it.  The due diligence performed by JPMC was not reasonable, independent or adequate in light of the clear evidence of fraudulent activity at BMIS.  JPMC allowed the "procession" to continue, and the fraud to continue unabated.

288.     In light of the above information, JPMC's failure to fully and accurately report to regulators was intentional and is evidence of conscious misbehavior on the part of JPMC.  JPMC ignored its duty to monitor the 703 Account, various materials from Madoff and/or BMIS, its commitment to effectively manage risk following the SEC's enforcement action, and its internal policies and procedures aimed at detecting the numerous red flags surrounding BMIS's operations.

## V.     CLASS ACTION ALLEGATIONS

289.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed nationwide class consisting of all persons or entities who, directly, had capital invested with BMIS, as of December 12, 2008.  Excluded from

the proposed Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest, Bernard L. Madoff, any relatives of Bernard L. Madoff, and any employees of BMIS.

290.    The members of the proposed Class are so numerous that joinder of all members is impracticable.  Plaintiffs believe that there are several hundred, if not thousands, of members in the proposed Class.  Members of the proposed Class may be identified from records maintained by the Defendants.

291.    Plaintiffs' claims are typical of the claims of the members of the proposed Class as all members of the proposed Class are similarly affected by Defendants' wrongful conduct as alleged herein.

292.    Plaintiffs will fairly and adequately protect the interests of the members of the proposed Class and have retained counsel competent and experienced in complex class litigation.

293.    Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. Among the questions of law and fact common to the proposed Class are:

a.    Whether Defendants violated duties owed to Plaintiffs as alleged herein, including without limitation;

i.    knowing participation in a breach of trust;

ii.    aiding and abetting embezzlement;

iii.    aiding and abetting breach of fiduciary duty, and/or

iv.    unlawfully converting property of the class members.

b.    Whether Defendants aided and abetted in BMIS's theft from Plaintiffs; and

c.      To what extent the members of the Class have sustained damages, and the proper

measure of damages.

294.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joining all members is impracticable, and this action will

be manageable as a class action.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE

### KNOWING PARTICIPATION IN A BREACH OF TRUST

295.    The preceding paragraphs are realleged and incorporated by reference as if set

forth fully herein.

296.    In purporting to act as investment advisors, Madoff and/or BMIS had fiduciary

duties to BMIS customers.  Madoff and/or BMIS were in a position of superior knowledge and

expertise to BMIS customers, who reposed their trust and confidence in Madoff and/or BMIS.

This created a relationship of high trust and confidence whereby Madoff and/or BMIS were

entrusted with the funds BMIS customers deposited into the 703 Account.

297.    The Defendants knew that Madoff and/or BMIS were operating an investment

advisory business or, at a minimum, were operating as broker-dealers with authority over

discretionary accounts, and in that capacity were using the 703 Account as a fiduciary account.

For example, since the 1990s, the Defendants knew that Madoff and/or BMIS had discretionary

control over Levy's money, managing to increase Levy's wealth from $180 million to $l.5

billion.

298.    In addition, since at least 2006, the Defendants knew, among other things, that

Madoff and/or BMIS were registered investment advisers, as evinced by public filings, and that

Madoff and/or BMIS were exercising discretion over their customer accounts.

299.    Moreover, since at least 2007, the Defendants knew that Madoff and/or BMIS were implementing a discretionary strategy, as indicated in Equity Exotics' proposal.  The Defendants were also told by BMIS customers that Madoff and/or BMIS had discretion to choose the counterparties to all of their customers' options trades, and that BMIS customers showed JPMC copies of the customer, option, and trading agreements between BMIS and its customers. Indeed, no later than 2007, the Defendants were structuring products based on BMIS feeder funds and investing directly in those feeder funds.

300.    JPMC further knew that many BMIS customers were fiduciaries and trustees in their own right who had delegated their fiduciary duties to Madoff and that Madoff exercised fiduciary powers as a trustee or custodian for retirement plans.

301.    Madoff and/or BMIS breached this trust by embezzling the BMIS customer funds in the 703 Account.

302.    The Defendants knew that Madoff and/or BMIS were breaching their fiduciary duties by embezzling the customer funds in the 703 Account.  At a minimum, the Defendants knew of suspicious transactions in the 703 Account that would have led a reasonably prudent person to suspect that Madoff and/or BMIS were embezzling the funds of IA Business customers, and the Defendants failed to inquire whether Madoff and/or BMIS were embezzling those funds.  Reasonable inquiry would have revealed that the only plausible explanation for the suspicious transactions was that Madoff and/or BMIS were embezzling customer funds in breach of their fiduciary duties.

303.    The Defendants knew since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only plausibly be explained by embezzlement.  For example, in December 2001, the Defendants were aware of

what appeared to be a check-fraud scheme between Madoff and/or BMIS and Levy.  The

Defendants were also aware of highly suspicious activity in the 703 Account, including: the utter

absence of investment activity with customer funds and the distribution of such funds to other

BMIS customers instead; large, repetitive transactions; up and down spikes in the value and

volume of transactions; frequent transactions with offshore entities; the regular use of hand-

written checks for millions of dollars; and the suspicious activity between the 703 Account and

clients of the Private Bank, including Levy.  No later than January 2007, the Defendants'

automated transaction monitoring system alerted the Defendants to this unusual activity.

304.    The Defendants were aware since at least 2004 that Madoff and/or BMIS

submitted false information to the SEC.  The FOCUS Reports Madoff provided to the SEC and

Defendants contained glaring inaccuracies.  The Defendants reviewed and thus knew that the

information in the FOCUS Reports dramatically misstated BMIS' cash on hand and omitted

loans, and that the reports showed no evidence of any BMIS customer accounts.

305.    After performing minimal due diligence on Madoff and BMIS and the BMIS

feeder funds, the Defendants knew Madoff was engaging in embezzlement.  Since at least 2006,

the Defendants knew, among other things, that: Madoff's and/or BMIS' returns were "too good

to be true" and could not be reconciled with market conditions; there was a lack of transparency

surrounding Madoff and/or BMIS, including that BMIS feeder funds would not give the

Defendants access to their account agreements with Madoff and/or BMIS; and Madoffs' and/or

BMIS' auditor was unregistered and was not subject to peer review.

306.    Since at least 2007, the Defendants knew, among other things, that: Madoff did

not want anyone to perform due diligence on BMIS; Madoff would not tell the BMIS feeder

funds the names of the counterparties to the options transactions BMIS was purportedly entering

into on their behalf; there was no independent verification of the trades Madoff was supposedly executing for his customers; there was no verification that any of BMIS customers' assets existed; Madoff and/or BMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoffs' operation of BMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BMIS feeder funds in response to their questions about Madoff and/or BMIS.  No later than 2007, the Defendants acknowledged the fact that Madoff and/or BMIS were likely embezzling customer funds.

307.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that: certain BMIS feeder funds refused to answer the Defendants' questions about Madoff and BMIS; there were similarities between Madoff 's operations of BMIS and the Petters fraud; and Madoff's family members had critical roles at BMIS.  No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BMIS feeder funds in which the Defendants had invested was likely engaged in illegal activity relating to a BMIS feeder fund.

308.    In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that Madoff and/or BMIS were embezzling customer funds. It was this concern that led the Defendants to submit requests to redeem their interests in the BMIS feeder funds in October 2008.  After Madoff's arrest, employees of the Defendants admitted that they were not surprised to hear Madoff was operating a Ponzi and embezzling scheme.

309.    Despite this knowledge, the Defendants moved billions of dollars in and out of the 703 Account at Madoffs' behest and allowed BMIS customers' funds to be used to make payments to Madoff, as well as to his friends and family, and to fund redemptions from other

investors, rather than to make investments on behalf of customers.  The Defendants allowed

Madoff and/or BMIS to misappropriate billions of dollars from the 703 Account, in breach of

Madoffs' and/or BMIS' duties as fiduciaries.

310.     The Defendants are therefore liable for all funds Madoff and/or BMIS

misappropriated from the 703 Account after the point at which the Defendants knew or through

reasonable inquiry would have known that Madoff and/or BMIS were embezzling those funds.

311.     As a result of the Defendants' knowing participation in this breach of trust,

Plaintiffs and the Class lost billions of dollars.  At a minimum, the Defendants' actions resulted

in a loss of approximately $19 billion.

312.     As a direct and proximate result of Defendants' knowing participation in breach

of trust, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven

at trial.

**COUNT TWO**

**AIDING AND ABETTING EMBEZZLEMENT**

313.     The preceding paragraphs are realleged and incorporated by reference as if set

forth fully herein.

314.     Madoff committed a massive embezzling scheme through BMIS.  The Defendants

had actual knowledge of the scheme and provided substantial assistance to Madoff and/or BMIS

in committing the scheme.  At a minimum, the Defendants consciously avoided knowledge of

the scheme.  The Defendants suspected an embezzlement scheme and realized there was a high

probability of such, but refrained from confirming it, in order to later deny knowledge of the

scheme.  The Defendants' actions proximately caused the scheme that resulted in billions of

dollars in damages to customers, creditors, and/or BMIS.

315.    Plaintiffs bring this claim against all Defendants because, upon information and belief, each Defendant, individually, aided and abetted the embezzlement scheme.  In addition, all of the Defendants operated as a single, indivisible entity.  Therefore, each of the Defendants is liable for the actions of the other Defendants.

316.    Madoff committed the largest Ponzi scheme in history through BMIS.  Madoff told customers that their money would be invested pursuant to the SSC Strategy, but instead stole that money and did not invest *any* of the customer funds as he claimed.  The Ponzi scheme has resulted in billions of dollars in losses to customers of BMIS.

317.    The Defendants knew, or at least consciously avoided knowledge of the embezzling scheme.  The Defendants knew since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only be plausibly explained by embezzlement.  In December 2001, the Defendants were aware of what appeared to be a check-fraud scheme between Madoff through BMIS and Levy, involving BMIS' sending checks to Levy in the same amount daily.  The Defendants were also aware of highly suspicious activity in the 703 Account, including: large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand written checks for millions of dollars; and suspicious activity between the 703 Account and clients of the Private Bank, including Levy.  No later than January 2007, the Defendants' automated transaction monitoring system alerted the Defendants as to this unusual activity.

318.    The Defendants were aware since at least 2004 that Madoff, through BMIS, submitted false information to the SEC.  The FOCUS Reports that Madoff, through BMIS, provided to the SEC and Defendants contained glaring inaccuracies.  The Defendants reviewed

and thus knew that the information in the FOCUS Reports dramatically misstated BMIS' cash on hand, omitted loans, and that the reports showed no evidence of any customer accounts.

319.   After performing minimal due diligence on Madoff and BMIS, the Defendants knew Madoff through BMIS was embezzling customers' monies.  Since at least 2006, the Defendants knew, among other things, that: BMIS' returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BMIS; and BMIS' auditor was unregistered and was not subject to peer review.

320.   Since at least 2007, the Defendants knew, among other things, that: Madoff did not want anyone to perform due diligence on BMIS; Madoff would not tell the BMIS feeder funds the names of the counterparties to the options transactions BMIS was purportedly entering into on their behalf; there was no independent verification of the trades BMIS was supposedly executing for its customers; there was no verification that any of BMIS' customers' assets existed; Madoff and/or BMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operations at BMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BMIS feeder funds in response to their questions about BMIS.  No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BMIS were embezzling.

321.   Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that: certain BMIS feeder funds refused to answer the Defendants' questions about Madoff and BMIS; there were similarities between Madoff's operations at BMIS and the Petters fraud; and Madoff's family members had critical roles at BMIS.  No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BMIS feeder funds in

which the Defendants had invested, was likely engaged in illegal activity relating to a BMIS feeder fund.

322.    In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that Madoff and/or BMIS were embezzling.  It was this concern that led the Defendants to submit requests to redeem their interests in the BMIS feeder funds in October 2008.  After Madoff's arrest, employees of the Defendants admitted that they were not surprised to hear Madoff was operating a Ponzi scheme.

323.    The Defendants knew Madoff was embezzling.  At a minimum, the Defendants were repeatedly faced with evidence that there was a high probability of embezzling, and made a conscious decision not to confirm that fact.

324.    The Defendants substantially assisted Madoff through BMIS in committing embezzlement by, among other things: funneling approximately $250 million into BMIS by way of the Defendants' investments in BMIS feeder funds; lending Madoff, through BMIS, over $100 million dollars without which the Ponzi scheme could not have continued; lending Levy, one of BMIS' largest customers, over $100 million that Levy then invested with BMIS; allowing Madoff through BMIS to use the 703 Account to run the Ponzi scheme; executing transfers at Madoff and/or BMIS' behest and honoring hand-written checks for tens of millions of dollars that were necessary for the operation of the Ponzi and embezzling scheme; providing short-term investment vehicles that generated revenue necessary for the continuation of the scheme; choosing not to execute its AML policy, which it touted to its customers, by effectively  failing to provide an account sponsor to the 703 Account; ignoring over 90 instances of irregular activity in the 703 Account, and dismissing the one alert that was issued in January 2007;

providing unsupervised Private Bank accounts to some of BMIS' biggest customers; and ignoring false statements made by Madoff through BMIS in regulatory filings.

325.    The Defendants' assistance was a proximate cause of the Ponzi/embezzlement scheme. Without the Defendants' assistance, Madoff and/or BMIS would not have been able to continue to operate the scheme for over two decades.

326.    As a result of the Defendants' aiding and abetting Madoff's and/or BMIS' embezzling, customers, creditors, and/or BMIS lost billions of dollars.  At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.  As a direct and proximate result of Defendants' activities, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven at trial.

**COUNT THREE**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

327.    The preceding paragraphs are realleged and incorporated by reference as if set forth fully herein.

328.    Madoff and/or BMIS owed a fiduciary duty to BMIS customers.  Madoff and/or BMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme through which they embezzled hundreds of millions of dollars from BMIS customers.  JPMC knowingly participated in the breach, causing harm to customers, creditors, and/or BMIS.  At a minimum, the Defendants consciously avoided knowledge of the breach.  The Defendants suspected Madoff and/or BMIS were breaching a fiduciary duty and realized there was a high probability Madoff and/or BMIS were breaching a fiduciary duty, but refrained from continuing it, in order to later deny knowledge of the breach.

329.    Plaintiffs bring this claim against all Defendants because, upon information and belief, each Defendant, individually, aided and abetted the breach of fiduciary duty by Madoff

and/or BMIS. In addition, all of the Defendants operated as a single, indivisible entity. Therefore, each of the Defendants is liable for the actions of the other Defendants.

330. Madoff and/or BMIS were in a fiduciary relationship with BMIS' customers. Madoff and/or BMIS were in a superior position over BMIS' customers, which required those customers to repose trust and confidence in Madoff and/or BMIS. In addition, pursuant to various account agreements BMIS' customers executed, Madoff and/or BMIS, agreed to take BMIS' customers' money and invest it pursuant to the SSC Strategy. Instead, Madoff and/or BMIS embezzled from BMIS customers by taking their money and using it to benefit Madoff and others close to him. Madoff and/or BMIS never made *any* trades, or invested any of the money, they received from their customers.

331. The Defendants knew Madoff and/or BMIS had a fiduciary duty to BMIS' customers and that Madoff and/or BMIS breached that duty. The Defendants were aware that BMIS was a broker-dealer and an investment adviser, and had reviewed account agreements in which BMIS agreed to invest customers' money pursuant to specific terms.

332. The Defendants also knew, or at least consciously avoided the knowledge that, Madoff and/or BMIS breached that fiduciary duty by engaging in embezzlement. The Defendants knew since at least the 1990s that the transactions taking place in the 703 Account did not coincide with any legitimate enterprise, and thus could only plausibly be explained by embezzlement.

333. By December 2001, the Defendants were aware of what appeared to be a check-fraud scheme between Madoff and/or BMIS and Levy, involving BMIS' sending checks to Levy in the same amount daily. The Defendants were also aware of highly suspicious activity in the 703 Account, including: large, repetitive transactions; up and down spikes in the value and

volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and the suspicious activity between the 703 Account and clients of the Private Bank, including Levy.  No later than January 2007, the Defendants' automated transaction monitoring system alerted the Defendants to this unusual activity.

334.    The Defendants were aware since at least 2004 that Madoff and/or BMIS submitted false information to the SEC.  The FOCUS Reports Madoff and/or BMIS provided to the SEC and Defendants contained glaring inaccuracies.  The Defendants reviewed and thus knew that the information in the FOCUS Reports dramatically misstated BMIS' cash on hand and omitted loans, and that the reports showed no evidence of any customer accounts.

335.    After performing minimal due diligence on Madoff and/or BMIS, the Defendants knew Madoff and/or BMIS were engaging in embezzlement.  Since at least 2006, the Defendants knew, among other things, that: BMIS' returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding BMIS, including that BMIS feeder funds would not give the Defendants access to their account agreements with BMIS; and BMIS' auditor was unregistered and was not subject to peer review.

336.    Since at least 2007, the Defendants knew, among other things, that: Madoff did not want anyone to perform due diligence on BMIS; Madoff would not tell the BMIS feeder funds the names of the counterparties to the options transactions BMIS was purportedly entering into on their behalf; there was no independent verification of the trades BMIS was supposedly executing for its customers; there was no verification that any of BMIS' customers' assets existed; Madoff and/or BMIS were rumored to be running a Ponzi scheme or engaging in illegal front-running; there were similarities between Madoff's operations of BMIS and the Refco fraud; and the Defendants were receiving inconsistent answers from the BMIS feeder funds in response

to their questions about BMIS. No later than 2007, the Defendants acknowledged there was a substantial risk that Madoff and/or BMIS were embezzling customers' monies.

337.    Since at least 2008, and prior to Madoff's arrest, the Defendants knew, among other things, that: certain BMIS feeder funds refused to answer the Defendants' questions about Madoff and BMIS; there were similarities between Madoff's operations of BMIS and the Petters fraud; and Madoffs' family members had critical roles at BMIS.  No later than September 2008, the Defendants learned that Aurelia Finance, an entity linked to one of the BMIS feeder funds in which the Defendants had invested, was likely engaged in illegal activity relating to a BMIS feeder fund.

338.    In October 2008, the Defendants admitted that the information they learned no later than 2006 led them to believe that Madoff and/or BMIS was running a Ponzi scheme.  It was this concern that led the Defendants to submit requests to redeem their interests in the BMIS feeder funds in October 2008.  After Madoff's arrest, employees of the Defendants admitted that they were not surprised to hear Madoff and/or BMIS were operating a Ponzi scheme.

339.    The Defendants knew Madoff and/or BMIS were breaching a fiduciary duty to BMIS' customers.

340.    The Defendants participated in, and provided substantial assistance to, Madoff's and/or BMIS' breach of fiduciary duty by, among other things: funneling approximately $250 million into BMIS by way of the Defendants' investments in BMIS feeder funds; lending Madoff, and/or BMIS, over $100 million without which the Ponzi/embezzling scheme could not have continued; lending Levy, one of BMIS' largest customers, over one hundred million dollars that Levy then invested with BMIS; allowing Madoff and/or BMIS to use the 703Account to run the Ponzi/embezzling scheme; executing transfers at Madoff's and/or BMIS' behest and

honoring hand written checks for tens of millions of dollars that were necessary for operating the scheme; providing short-term investment vehicles that generated revenue necessary for continuing the scheme; choosing not to execute its AML policy, which it touted to its customers, by effectively failing to provide an account sponsor to the 703 Account; ignoring over 90 instances of irregular activity in the 703 Account, and dismissing the one alert that was issued in January 2007; providing unsupervised Private Bank accounts to some of BMIS' biggest customers; and ignoring false statements made by Madoff and/or BMIS in regulatory filings.

341.    The Defendants' assistance was a proximate cause of the breach. Without the Defendants' assistance, Madoff and/or BMIS would not have been able to continue to operate the Ponzi/embezzling scheme for over two decades.

342.    As a result of the Defendants' aiding and abetting this breach of fiduciary duty, customers, creditors, and/or BMIS lost billions of dollars. At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.  As a direct and proximate result of Defendants' activities, Plaintiffs and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT FOUR

## CONVERSION

343.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

344.    JPMC debited in excess of $145 million from the 703 Account to satisfy a debt purportedly owed to it by BMIS.  In doing so, JPMC exercised unauthorized dominion and control over funds that it knew BMIS held as a fiduciary on behalf of customers– specifically identifiable customer property– in derogation of BMIS customers' rights.

345.    BMIS customers have a possessory right and interest in the billions of dollars they invested with BMIS, which was ultimately deposited at JPMC into the 703 Account.

346.    These investment funds constitute customer property and are recoverable by the Plaintiffs.

347.    At the time JPMC debited the $145 million from the 703 Account, JPMC was on notice that the account was comprised of investor funds. Thus, JPMC's debit from the 703 Account has resulted in the wrongful conversion of Customer Property. JPMC is therefore liable for having wrongfully converted these monies and is now obligated to return all such monies to Plaintiffs and the Class.

**COUNT FIVE**

**AIDING AND ABETTING CONVERSION**

348.    Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

349.    Through the IA Business, Madoff and/or BMIS converted billions of dollars of Customer Property.

350.    Plaintiffs, as BMIS customers, have a legal right and interest in the billions of dollars they personally invested with BMIS. Madoff and/or BMIS exercised unauthorized dominion and control over this customer property in derogation of BMIS customer rights by failing to invest customer property pursuant to the SSC Strategy. Instead, Madoff and/or BMIS used BMIS customers' money to make payments to friends and family and to fund redemptions of other investors. Madoff and/or BMIS' unauthorized use of customer property resulted in the wrongful conversion of BMIS customers' specifically identifiable funds.

351.    JPMC had actual knowledge of the conversion and lent substantial assistance to Madoff and/or BMIS in converting these monies. JPMC suspected, and even realized there was

a high probability, that Madoff and/or BMIS were converting BMIS customers' money, but refrained from confirming its suspicions in order to later deny knowledge of the conversion. JPMC's actions proximately caused the conversion that resulted in billions of dollars in damages to customers, creditors, and/or BMIS.

352.    JPMC was aware that Madoff and/or BMIS were a broker-dealer and an investment adviser, and had reviewed account agreements in which Madoff and/or BMIS agreed to invest BMIS customers' money pursuant to specific terms.

353.    Madoff and/or BMIS converted billions of dollars of BMIS customers' money. Madoff and/or BMIS told BMIS customers that he would invest their money pursuant to the SSC Strategy, but instead embezzled that money and did not invest any of the funds as he claimed.

354.    JPMC also knew that Madoff and/or BMIS did not invest their money pursuant to the SSC Strategy but instead embezzled BMIS customers' money.  JPMC knew since at least the 1990s that the inexplicable transactions taking place in the 703 Account did not coincide with any legitimate investment, and thus could only be explained by embezzlement.  In December 2001, JPMC was aware of what appeared to be a check-fraud scheme between Madoff and/or BMIS and Levy.  JPMC was also aware of highly suspicious activity in the 703 Account, including: large, repetitive transactions; up and down spikes in the value and volume of transactions; frequent transactions with offshore entities; the regular use of hand-written checks for millions of dollars; and suspicious activity between the 703 Account and clients of the Private Bank, including Levy.  No later than January 2007, JPMC's automated transaction monitoring system alerted it to this unusual activity.

355.    JPMC was aware since at least 2004 that Madoff and/or BMIS submitted false information to the SEC.  The FOCUS Reports Madoff and/or BMIS provided to the SEC and

JPMC contained glaring inaccuracies. JPMC reviewed and thus knew that the information in the FOCUS Reports dramatically misstated Madoff's and/or BMIS' cash on hand and that the reports showed no evidence of any customer accounts.

356.     After performing minimal due diligence on Madoff and/or BMIS and the BMIS feeder funds, JPMC knew Madoff and/or BMIS were engaging in embezzlement, or consciously avoided such knowledge. Since at least 2006, JPMC knew, among other things, that: Madoff's returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BMIS, including that BMIS feeder funds would not give JPMC access to their account agreements with BMIS; and BMIS' auditor was unregistered and was not subject to peer review.

357.     Since at least 2007, JPMC knew, among other things, that: Madoff and/or BMIS did not want anyone to perform due diligence on BMIS; Madoff and/or BMIS would not tell the BMIS feeder funds the names of the counterparties to the options transactions BMIS was purportedly entering into on their behalf; there was no independent verification of the trades BMIS was supposedly executing for its customers; there was no verification that any of BMIS customers' assets existed; Madoff and/or BMIS were rumored to be running a Ponzi scheme or engaged in illegal front-running; there were similarities between Madoff's operations at BMIS and the Refco fraud; and JPMC was receiving inconsistent answers from the BMIS feeder funds in response to their questions about Madoff and/or BMIS. No later than 2007, JPMC acknowledged there was a substantial risk that Madoff and/or BMIS were embezzling customer funds.

358.     Since at least 2008, and prior to Madoff's arrest, JPMC knew, among other things, that: certain BMIS feeder funds refused to answer JPMC's questions about BMIS and

Madoff; there were similarities between Madoff's operations at BMIS and the Petters fraud; and Madoff's family members had critical roles at BMIS.  No later than September 2008, JPMC learned that Aurelia Finance, an entity linked to one of the BMIS feeder funds in which JPMC had invested, was likely engaged in illegal activity relating to a BMIS feeder fund.

359.    In October 2008, JPMC admitted that the information it learned no later than 2006 led it to believe that Madoff and/or BMIS were running an embezzling scheme.  It was this concern that led JPMC to submit requests to redeem its interests in the BMIS feeder funds.  After Madoff's arrest, individuals employed by JPMC admitted that they were not surprised to hear Madoff and/or BMIS were operating a Ponzi scheme.

360.    JPMC substantially assisted Madoff and/or BMIS in converting customer property.  JPMC funneled approximately $250 million into BMIS through its investments in BMIS feeder funds; lent BMIS and Madoff over one hundred million dollars without which the Ponzi/embezzling scheme could not have continued; lent Levy, one of BMIS' largest customers, over $100 million that Levy then invested with Madoff and/or BMIS; allowed Madoff and/or BMIS to use the 703 Account to run the Ponzi/embezzling scheme; executed transfers at Madoff and/or BMIS' behest and honored hand-written checks for tens of millions of dollars that were necessary for the operation of the scheme; provided short-term investment vehicles that generated revenue necessary for continuing the Ponzi scheme; chose not to execute its AML policy, which it touted to its customers, by effectively failing to provide an account sponsor to the 703 Account; ignored over ninety instances of irregular activity in the 703 Account, dismissing the one alert that was issued in January 2007; provided unsupervised Private Bank accounts to some of Madoff's and/or BMIS' biggest customers; and ignored false statements made by Madoff and/or BMIS in regulatory filings.

361.     JPMC's assistance was a proximate cause of the conversion.  Without it, Madoff and/or BMIS would not have been able to continue to operate the Ponzi/embezzling scheme for over two decades.

362.     As a result of the Defendants' aiding and abetting Madoff's and/or BMIS' conversion, customers, creditors, and/or BMIS lost billions of dollars.  At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.  As a direct and proximate result of Defendants' activities, Plaintiffs and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT SIX

## UNJUST ENRICHMENT

363.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

364.     JPMC has unjustly benefitted through its receipt of customer property that JPMC acquired only as a result of perpetuating and participating in Madoff and/or BMIS' Ponzi/embezzling scheme.

365.     Since 2002, JPMC received approximately $149 million from BMIS - approximately $4 million in the form of fee and interest payments and $145 million in repayment of loans.  JPMC also benefitted from customer property by receiving deposits of this property into the 703 Account.  JPMC kept the 703 Account open until Madoff's arrest in December 2008 and used the balance in the 703 Account to earn an estimated $500 million in fees and profits.

366.     JPMC earned these benefits at the expense of BMIS customers, creditors, and/or BMIS, and cannot justly retain them.  Faced with the prospect of losing fees and profits, JPMC chose to ignore compelling evidence of Madoff and/or BMIS' embezzling scheme.  For example, JPMC was privy to the abnormal activity in the 703 Account, suspicious and inadequate

information received from BMIS feeder funds while conducting due diligence in anticipation of structuring and issuing products, and a plethora of other evidence of embezzling, as detailed above.

367.    JPMC helped perpetuate Madoff's and/or BMIS'embezzling by ignoring the evidence of embezzling and continuing to use the customer property in the 703 Account for its own enrichment.

368.    Equity and good conscience require full restitution of the monies received by JPMC, directly and indirectly, from BMIS.  This includes not only the customer property JPMC received directly from BMIS, but also any profits made from its use of this money.  Additionally, any profits and fees JPMC earned through its use of the customer property deposited in the 703 Account is recoverable by the Plaintiffs and the Class as restitution.

369.    Likewise, JPMC proximately caused the loss to customers, creditors, and/or BMIS.  When JPMC finally decided to inform regulators that Madoff was embezzling from customers, it concurrently attempted to redeem all of its interests in BMIS and Madoff related investments.  JPMC knew that exposing the scheme to regulators would lead to the collapse of BMIS.  By its own action, in attempting to redeem its investment, JPMC acknowledged that its failure to report information to regulators would result in massive losses to BMIS customers.

370.    As a result of the Defendants' fraud upon federal and state regulators, Plaintiffs and the Class lost billions of dollars.  At a minimum, the Defendants' actions resulted in a loss of approximately $19 billion.  As a direct and proximate result of Defendants' activities, Plaintiffs and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT SEVEN

## BREACH OF FIDUCIARY DUTY

371.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

372.     JPMC knew that the 703 Account held fiduciary funds entrusted by investors to BMIS.

373.     JPMC knew that fiduciary funds entrusted to BMIS in the 703 Account were being misappropriated by BMIS.

374.     JPMC benefited from the illegal scheme of BMIS.

375.     In the circumstances, JPMC owed a fiduciary duty to Plaintiffs to prevent further misappropriation of funds which JPMC knew had been entrusted to BMIS in the 703 Account.

376.     JPMC breached its fiduciary duty to Plaintiffs by failing to act to safeguard funds it knew had been entrusted to BMIS in its 703 Account after receiving clear evidence of misappropriation thereof by BMIS.

377.     As a direct and proximate result of Defendants' breach of  fiduciary duty, Plaintiffs lost their investment capital and suffered damages in an amount to be proven at trial.

## COUNT EIGHT

## COMMERCIAL BAD FAITH

378.     Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

379.     JPMC had actual knowledge of the facts and circumstances of the illegitimate scheme by Madoff and BMIS.

380.     JPMC acted in commercial bad faith by facilitating that scheme by continuing to provide banking services to BMIS without any meaningful investigation.

381.     As a direct and proximate result of Defendants' actions in commercial bad faith,

Plaintiffs lost their investment capital and suffered damages in an amount to be proven at trial.

## COUNT NINE

## GROSS NEGLIGENCE

382.     Plaintiffs incorporate by reference the allegations contained in the foregoing

paragraphs as if set forth fully herein.

383.     Based upon JPMC's actual knowledge of the facts and circumstances of Madoff's

and BMIS's illegal scheme, JPMC had a duty thoroughly to investigate BMIS under relevant law

and prudent business practices and, when it failed to receive credible explanations from BMIS,

JPMC should have closed the 703 Account.

384.     JPMC's failures thoroughly to investigate BMIS and to close the 703 Account

were, in the circumstances, grossly negligent.

385.     As a direct and proximate result of Defendants' gross negligence, Plaintiffs lost

their investment capital and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as class

representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as

Class Counsel;

B.     Awarding compensatory and/or consequential damages, and as permitted by law,

exemplary and punitive damages, in favor of Plaintiffs, and on behalf of all other Class members,

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in specific amounts of compensatory, exemplary and punitive damages to be

determined at trial, including interest and any enhanced damages thereon;

C. Awarding Plaintiffs and the Class restitution of monies JPMC received from Madoff and/or BMIS and any profits earned through JPMC's use of these monies;

D. Establishment of a constructive trust over the proceeds of the unjust enrichment of JPMC in favor of the Plaintiffs and the Class;

E. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: January 20, 2012

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
    Jason A. Zweig (JZ-8107)
One Penn Plaza, 36th Floor
New York, NY 10119
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
jasonz@hbsslaw.com

STEVE W. BERMAN
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone (206) 623-7292
Facsimile (206) 623-0594
steve@hbsslaw.com

REED KATHREIN
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (501) 725-3001

ANDREW J. ENTWISTLE
VINCENT R. CAPPUCCI
ATHUR V. NEALON
ROBERT N. CAPPUCCI
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue
26th Floor West
New York, New York 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

*Attorneys for Plaintiffs and the Proposed Class*

- 103 -