# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL SHAPIRO, on behalf of himself as an individual, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES, LTD.,<br><br>Defendants. | Case No.: 11-CV-8331 (CM)(MHD)<br><br>(ECF CASE) |
| STEPHEN and LEYLA HILL, on behalf of themselves as individuals, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES, LTD.,<br><br>Defendants. | Case No.: 11-CV-7961 (CM)<br><br>(ECF CASE) |

## OPENING BRIEF IN SUPPORT OF JPMORGAN'S
## MOTION TO DISMISS CLASS ACTION COMPLAINT

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., J.P. Morgan Securities*
*LLC and J.P. Morgan Securities Ltd.*

Dated: March 9, 2012

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ........................................................................................................3

ARGUMENT .............................................................................................................5

POINT I         SLUSA PRECLUDES THIS CLASS ACTION. ....................................5

      A.      By enacting SLUSA, Congress foreclosed securities class actions based on state law. ........................................................................6

      B.      The requirements for SLUSA preemption are all satisfied in this case..................8

             1.     This action is a covered class action. ..........................................8

             2.     This action is based on state law..................................................8

             3.     This action alleges the purchase and sale of covered securities. ......................................................................................9

             4.     This action alleges material misrepresentations and omissions in connection with purchases and sales. ...............10

POINT II       THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING MADOFF'S PONZI SCHEME (COUNTS I, II, III, AND V). ........13

      A.      Plaintiffs must plead the elements of aiding and abetting liability with particularity..................................................................13

      B.      The burden of pleading actual knowledge is a heavy one. ....................15

      C.      Plaintiffs have failed to allege facts showing that JPMorgan had actual knowledge of Madoff's fraud. ............................................18

             1.     Plaintiffs' allegations with respect to the 703 Account do not show actual knowledge of fraud. .................................19

             2.     Plaintiffs' allegations concerning JPMorgan's structured products due diligence do not show actual knowledge of fraud. ........................................................................................20

             3.     Plaintiffs' assertion that the 703 Account was a "fiduciary account" is irrelevant and baseless. ..........................................24

D.      Plaintiffs have failed to allege facts showing that JPMorgan substantially assisted Madoff's fraud...................................................................29

E.      Plaintiffs have failed to plead individual fraud claims. .........................................31

POINT III     THE COMPLAINT FAILS TO STATE A CLAIM FOR CONVERSION, UNJUST ENRICHMENT, OR COMMERCIAL BAD FAITH (COUNTS IV, VI, AND VIII)...................................................................................32

A.      The Complaint fails to state a claim for conversion. ............................................32

B.      The Complaint fails to state a claim for unjust enrichment. .................................33

C.      The Complaint fails to state a claim for commercial bad faith.............................35

POINT IV     THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY OR GROSS NEGLIGENCE (COUNTS VII AND IX) ....................................................................................36

CONCLUSION.....................................................................................................................38

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Albion Alliance Mezzanine Fund* v. *State St. Bank & Trust Co.*,
   8 Misc. 3d 264 (N.Y. Sup. Ct. N.Y. Co. 2003),
   *aff'd*, 2 A.D.3d 162 (1st Dep't 2003).............................................................18

*Amorosa* v. *Ernst & Young*,
   682 F. Supp. 2d 351 (S.D.N.Y. 2010), *aff'd sub nom.*
   *Amorosa* v. *AOL Time Warner*, 409 F. App'x 412 (2d Cir. 2011) ............................2

*Anwar* v. *Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010) .............................................................22 n.5

*Ashcroft* v. *Iqbal*,
   129 S. Ct. 1937 (2009).............................................................15

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) .............................................................15

*Barron* v. *Igolnikov*,
   2010 WL 882890 (S.D.N.Y. Mar. 10, 2010).............................................................10, 11

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007).............................................................15

*Berman* v. *Morgan Keegan & Co.*,
   2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011),
   *aff'd*, 2012 WL 147907 (2d Cir. Jan. 19, 2012).............................. 15, 16, 16-17, 30

*Carmona* v. *Spanish Broadcasting Sys., Inc.*,
   2009 WL 890054 (S.D.N.Y. Mar. 30, 2009).............................................................34

*Citadel Mgmt.* v. *Telesis Trust*,
   123 F. Supp. 2d 133 (S.D.N.Y. 2000) .............................................................33

*Cohain D.D.S.* v. *Klimley*,
   2011 WL 3896095 (S.D.N.Y. Aug. 31, 2011).............................................................14 n.3, 31

*Colavito* v. *N.Y. Organ Donor Network*,
   8 N.Y.3d 43 (2006).............................................................33

*Czech Beer Importers, Inc.* v. *C. Haven Imports, LLC*,
   2005 WL 1490097 (S.D.N.Y. June 23, 2005) .............................................................34

*Dabit* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  395 F.3d 25 (2d Cir. 2005) ...................................................7

*Daly* v. *Castro Llanes*,
  30 F. Supp. 2d 407 (S.D.N.Y. 1998) ...........................................33

*DeBlasio* v. *Merrill Lynch*,
  2009 WL 2242605 (S.D.N.Y. 2009)................................25, 35, 37

*Falkowski* v. *Imation Corp.*,
  309 F.3d 1123 (9th Cir. 2002), *amended by* 320 F.3d 905 (9th Cir. 2002) .............10

*First Union National Bank* v. *A.G. Edwards & Sons*,
  Index No. 601243/98 (Sup. Ct. N.Y. Co. Jan. 5, 1999),
  *aff'd*, 262 A.D.2d 106 (1st Dep't 1999)......................................34

*Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt., LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007) ......................................18 n.4

*Frutico S.A. de C.V.* v. *Bankers Trust Co.*,
  833 F. Supp. 288 (S.D.N.Y. 1993) .............................................36

*Gelb* v. *AT&T*,
  813 F. Supp. 1022 (S.D.N.Y. 1993) ...........................................32

*Harborview Value Masterfund* v. *Freeline Sports, Inc.*,
  2012 WL 612358 (S.D.N.Y. Feb. 23, 2012)................................13, 31

*In re Agape Litig.*,
  681 F. Supp. 2d 352 (E.D.N.Y. 2010) ..................................27, 29, 37

*In re Agape Litig.*,
  773 F. Supp. 2d 298 (E.D.N.Y. 2011), *aff'd sub nom. Weshnak* v.
  *Bank of America*, 2012 WL 233455 (2d Cir. Jan. 26, 2012) ................15, 17, 18 n.4, 24 n.6, 28

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 402 (S.D.N.Y. 2005) .........................................26

*In re Amaranth Natural Gas Commodities Litig.*,
  612 F. Supp. 2d 376 (S.D.N.Y. 2009) ........................................29

*In re American Bank Note Holographics, Inc. Sec. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) .......................................25 n.7

*In re Beacon Assocs. Litig.*,
  745 F. Supp. 2d 386 (S.D.N.Y. 2010) .......................................9, 10

*In re Herald, Primeo, and Thema Sec. Litig.*,
    2011 WL 5928952 (S.D.N.Y. Nov. 29, 2011)..................................................2, 8, 9, 10, 11, 12

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................. 2-3, 3, 8, 10, 12

*In re Jett*,
    Securities Act Rel. No. 8395, Exchange Act Rel. No. 49366,
    2004 SEC LEXIS 504 (Mar. 5, 2004) ...................................................................................10

*In re Kingate Mgmt. Ltd. Litig.*,
    2011 WL 1362106 (S.D.N.Y. Mar. 30, 2011) ...........................................................................7

*In re Merkin & BDO Seidman Sec. Litig.*,
    2011 WL 4435873 (S.D.N.Y. Sept. 23, 2011)....................................................................5 n.1

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ....................................................................................31

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    2008 WL 2594819 (S.D.N.Y. June 26, 2008) ........................................................................25

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008) ....................................................................................32

*In re Terrorist Attacks on September 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ....................................................................................37

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
    703 F. Supp. 2d 362 (S.D.N.Y. 2010) .............................................................................5 n.1, 22

*In re Tyco Int'l, Ltd.*,
    2007 WL 1703023 (D.N.H. June 11, 2007)............................................................................25

*Instituto de Prevision Militar* v. *Merrill Lynch*,
    546 F.3d 1340 (11th Cir. 2008) ......................................................................................10, 11

*Jet Star Enters., Ltd.* v. *Soros*,
    2006 WL 2270375 (S.D.N.Y. Aug. 9, 2006)...........................................................................34

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) ...................................................................................................13

*Kaufman* v. *Cohen*,
    307 A.D.2d 113 (1st Dep't 2003) ......................................................................................15, 30

*Kingdom 5-KR-41, Ltd.* v. *Star Cruises PLC*,
    2004 WL 444554 (S.D.N.Y. Mar. 10, 2004) ...........................................................................7

*Kolbeck* v. *LIT America Inc.*,
    939 F. Supp. 240 (S.D.N.Y. 1996) ..................................................................13, 15

*Lander* v. *Hartford Life & Ann. Ins.*,
    251 F.3d 101 (2d Cir. 2001) ...........................................................................6

*Lee* v. *Bankers Trust Co.*,
    166 F.3d 540 (2d Cir. 1999) ...........................................................................23

*Lerner* v. *Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ......................................................................14, 35

*Levinson* v. *PSCC Servs.*,
    2009 WL 5184363 (D. Conn. Dec. 23, 2009)...............................................8

*Mandarin Trading Ltd.* v. *Wildenstein*,
    16 N.Y.3d 173 (2011)......................................................................................33

*Meridian Horizon Fund, LP* v. *Tremont Grp. Holdings, Inc.*,
    747 F. Supp. 2d 406 (S.D.N.Y. 2010) ........................................................5 n.1

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*,
    547 U.S. 71 (2006)..................................................................................2, 6, 7, 9

*MLSMK* v. *JP Morgan Chase & Co.*,
    737 F. Supp. 2d 137 (S.D.N.Y. 2010) .............................................. 23-24, 26, 36, 37

*MLSMK* v. *JP Morgan Chase & Co.*,
    431 F. App'x 17 (2d Cir. 2011) ......................................... 13-14, 24, 28, 29

*Montalvo* v. *J.P. Morgan Chase & Co.*,
    906 N.Y.S.2d 781, 2009 WL 4893939 (Sup. Ct. Kings Co. Dec. 18, 2009).....................14 n.3

*Musalli Factory for Gold & Jewelry* v. *JPMorgan Chase Bank, N.A.*,
    261 F.R.D. 13 (S.D.N.Y. 2009) ...................................................................28, 35

*Nevin* v. *Citibank, N.A.*,
    107 F. Supp. 2d 333 (S.D.N.Y. 2000) ........................................................23

*Newman* v. *Family Mgmt. Corp.*,
    748 F. Supp. 2d 299 (S.D.N.Y. 2010) ........................................................5 n.1

*Nigerian Nat'l Petroleum Corp.* v. *Citibank, N.A.*,
    1999 WL 558141 (S.D.N.Y. July 30, 1999) ...............................................29-30

*OSRecovery, Inc.* v. *One Groupe International*,
    229 F.R.D. 456 (S.D.N.Y. 2005) .................................................................36

*Peoples Westchester Savings Bank* v. *FDIC*,
    961 F.2d 327 (2d Cir. 1992) ................................................................27-28

*Picard* v. *HSBC Bank PLC*,
    454 B.R. 25 (S.D.N.Y. 2011)....................................................................31, 32

*Proctor* v. *Vishay Intertech. Inc.*,
    584 F.3d 1208 (9th Cir. 2009) ......................................................................11

*Reading Int'l, Inc.* v. *Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003) ..........................................................34

*Redtail Leasing, Inc.* v. *Bellezza*,
    1997 WL 603496 (S.D.N.Y. Sept. 30, 1997)..................................................32

*Renner* v. *Chase Manhattan Bank*,
    1999 WL 47239 (S.D.N.Y. Feb. 3, 1999)................................................27, 28

*Renner* v. *Chase Manhattan Bank*,
    2000 WL 781081 (S.D.N.Y. June 16, 2000) ..........................................23, 27, 28

*Romano* v. *Kazacos*,
    609 F.3d 512 (2d Cir. 2010) .........................................................................7

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004) ...........................................................24-25, 25, 35

*Rosner* v. *Bank of China*,
    528 F. Supp. 2d 419 (S.D.N.Y. 2007) ..........................................................30

*Rosner* v. *Bank of China*,
    2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008),
    *aff'd*, 349 F. App'x 637 (2d Cir, 2009)....................................14, 15, 16, 29, 35, 36

*Rowinski* v. *Salomon Smith Barney*,
    398 F.3d 294 (3d Cir. 2005) ..........................................................................8

*Ryan* v. *Hunton & Williams*,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ........................................18, 29

*S & K Sales Co.* v. *Nike, Inc.*,
    816 F.2d 843 (2d Cir. 1987) ........................................................................14

*Saltz* v. *First Frontier, LP*,
    782 F. Supp. 2d 61 (S.D.N.Y. 2010) ......................................................5 n.1, 21

*Schmidt* v. *Fleet Bank*,
    1998 WL 47827 (S.D.N.Y. Feb. 4, 1998)......................................................13

*SEC* v. *Cohmad Sec. Corp.*,
    2010 WL 363844 (S.D.N.Y. Feb. 2, 2010)...........................................22

*SEC* v. *Zandford*,
    535 U.S. 813 (2002).................................................................9

*Sharp Int'l Corp.* v. *State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005)....................................................14, 30

*Silverman Partners* v. *First Bank*,
    687 F. Supp. 2d 269 (E.D.N.Y. 2010)...............................................15

*SIPC* v. *BDO Seidman, LLP*,
    222 F.3d 63 (2d Cir. 2000).........................................................32

*Thermal Imaging, Inc.* v. *Sandgrain Sec., Inc.*,
    158 F. Supp. 2d 335 (S.D.N.Y. 2001)...............................................36

*Tzaras* v. *Evergreen Int'l Spot Trading*,
    2003 WL 470611 (S.D.N.Y. Feb. 25, 2003)...........................................28

*Wechsler* v. *Bowman*,
    285 N.Y. 284 (1941)...............................................................14

*Wells* v. *Bank of New York Co.*,
    181 Misc. 2d 574 (Sup. Ct. N.Y. Co. 1999)........................................33

*Weshnak* v. *Bank of America*,
    2012 WL 233455 (2d Cir. Jan. 26, 2012)............................................29

*Whitney* v. *Citibank, N.A.*,
    782 F.2d 1106 (2d Cir. 1986)......................................................14

*Williams* v. *Bank Leumi Trust Co.*,
    1997 WL 289865 (S.D.N.Y. May 30, 1997)............................................17

**Statutes and Rules**

15 U.S.C. § 77p(b)............................................................1, 7, 11

15 U.S.C. § 77p(f)(2)(A)..........................................................8

15 U.S.C. § 77p(f)(3).............................................................9

15 U.S.C. § 77r(b)................................................................9

15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(bb).........................................5 n.2

15 U.S.C. § 78bb(f)(1).......................................................1, 7, 11

15 U.S.C. § 78bb(f)(5)(B)...........................................................................................8

15 U.S.C. § 78bb(f)(5)(E)...........................................................................................9

31 U.S.C. § 5318(g)(3)..............................................................................................23

N.Y. Penal Law § 155.05........................................................................................14 n.3

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC and J.P. Morgan Securities Ltd. (together, "JPMorgan") respectfully submit this brief in support of their motion to dismiss the Consolidated Amended Class Action Complaint (the "Complaint").

## PRELIMINARY STATEMENT

The Securities Litigation Uniform Standards Act bars this state law securities fraud class action arising out of Madoff's Ponzi scheme. Plaintiffs commenced this lawsuit immediately after this Court dismissed the common law damages claims brought against JPMorgan by the SIPC Trustee. Although the Complaint copies the Trustee's allegations largely verbatim — and is thus replete with allegations of misrepresentations or omissions by Madoff and JPMorgan — plaintiffs rely exclusively on state law theories. Plaintiffs are trying to evade the federal securities laws. Accordingly, this Court should follow the many decisions from this district applying SLUSA to dismiss Madoff-related state law class actions, and it should dismiss the Complaint in its entirety.

SLUSA had its genesis in the Private Securities Litigation Reform Act of 1995, in which Congress promulgated a comprehensive regime imposing procedural and substantive limitations on the filing of federal claims alleging securities fraud. Congress enacted SLUSA to prevent plaintiffs from evading that regime by filing state law securities fraud class actions. SLUSA provides that "[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging — (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1); *see also id.* § 77p(b). The purpose of the statute is to assure that class actions alleging securities fraud are brought in

federal court under federal law, including the heightened pleading requirements of the PSLRA. *See Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71, 86 (2006); *Amorosa* v. *Ernst & Young*, 682 F. Supp. 2d 351, 373 (S.D.N.Y. 2010) (McMahon, J.), *aff'd sub nom. Amorosa* v. *AOL Time Warner*, 409 F. App'x 412 (2d Cir. 2011).

The elements of SLUSA preclusion are easily satisfied here. This class action arises out of Bernard Madoff's massive Ponzi scheme — probably the largest securities fraud in history. The Complaint contains allegations of "purchases or sales" of "covered securities," namely the S&P 100 stocks that Madoff represented he was trading as part of a "split-strike conversion" strategy. And the Complaint also alleges numerous misrepresentations or omissions, including: (1) allegations of fraud by Madoff himself; (2) allegations that JPMorgan knowingly "participated in, promoted, [and] aided and abetted the fraud" conducted by Madoff; and (3) allegations that JPMorgan itself committed "fraud upon federal and state regulators" to conceal Madoff's crimes.

The analysis is as simple as that. There are no novel or difficult issues of statutory interpretation. By its plain terms, SLUSA squarely forecloses this action.

This result is consistent with numerous cases from this district dismissing state law securities fraud class actions brought on behalf of Madoff investors. Just recently, Judge Berman held that SLUSA required dismissal of very similar aiding and abetting claims brought against JPMorgan. *In re Herald, Primeo, and Thema Sec. Litig.*, 2011 WL 5928952 (S.D.N.Y. Nov. 29, 2011). As Judge Berman observed in *Herald*, "'[v]irtually every attempt by an investor in an investment fund whose assets were held and purportedly invested by Madoff to assert common law class action claims has been rejected under SLUSA.'" 2011 WL 5928952, at *5 (citing eight cases); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 378-81

(S.D.N.Y. 2011) (McMahon, J.) (applying SLUSA to Madoff-related claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment).

Even if SLUSA did not bar this action, the Complaint would have to be dismissed for failure to state a claim. Like the Trustee, plaintiffs assert various "aiding and abetting" claims and allege that JPMorgan was "thoroughly complicit" in Madoff's crimes. But plaintiffs never back up this accusation with particularized allegations, as Rule 9(b) requires. The Complaint never alleges facts showing that anyone at JPMorgan had actual knowledge of Madoff's crimes. The Complaint also never alleges facts showing that JPMorgan had fiduciary or other duties to Madoff's investors. And most fundamentally, the Complaint never provides any reason to credit the facially absurd theory that people at JPMorgan deliberately collaborated with Madoff in perpetrating an inevitably doomed Ponzi scheme so as to earn modest income from a routine banking relationship.

## BACKGROUND

This Court is familiar with the basic facts surrounding Bernard Madoff's securities fraud. *See, e.g.*, *Jeanneret*, 769 F. Supp. 2d at 346-47. Madoff told his customers that he was investing their assets in publicly traded securities through a strategy called "split-strike conversion," which involved the supposed purchase and sale of "S&P 100 equities and options." Compl. ¶¶ 178, 233. Madoff sent account statements to his customers purporting to reflect this trading. *Id.* ¶¶ 50-52. On December 11, 2008, news broke that Madoff had admitted that he was actually operating a massive Ponzi scheme. Rather than using his customers' money to purchase publicly traded securities, as he had told them he was doing, Madoff used new investments from customers to pay returns to other customers. *Id.* ¶¶ 2, 9.

Upon the revelation of this fraud, the U.S. Attorney for the Southern District of New York charged Madoff with violations of the anti-fraud provisions of the federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934. Compl. ¶ 61 (citing criminal information filed against Madoff). Additionally, the SEC filed a complaint in this Court asserting violations of the federal securities laws and alleging that Madoff and BMIS were engaged in "securities and investment advisory fraud." *SEC* v. *Madoff*, No. 08-CV-10791, ECF No. #1 (S.D.N.Y. Dec. 11, 2008). On March 12, 2009, Madoff pled guilty to the criminal charges brought against him. Compl. ¶ 61.

Although the plaintiffs seek to hold JPMorgan liable for Madoff's crimes, they eschew any reliance on the federal securities laws. Their Complaint asserts nine state law causes of action styled as claims for knowing participation in a breach of trust, aiding and abetting embezzlement, aiding and abetting breach of fiduciary duty, conversion, aiding and abetting conversion, unjust enrichment, breach of fiduciary duty, commercial bad faith, and gross negligence. Compl. ¶¶ 295-385.

Despite the absence of a claim labeled "fraud," plaintiffs expressly allege that JPMorgan "participated in, promoted, [and] aided and abetted the fraud." Compl. ¶ 38. The Complaint includes extensive allegations about Madoff's fraud, including the misrepresentations and omissions Madoff made to investors by telling them that he was investing through a split-strike conversion trading strategy that he never in fact executed. *See, e.g.*, *id*. ¶¶ 49, 51-55. The Complaint also includes extensive allegations of supposed misrepresentations and omissions on the part of JPMorgan. For example, the Complaint alleges that JPMorgan committed "fraud upon federal and state regulators" and that the bank helped "cover Madoff's naked theft" by, among other things, ignoring "material omissions in BMIS' FOCUS Reports" that Madoff filed

with the Securities and Exchange Commission.  Compl. ¶¶ 3, 10, 369-70.  The Complaint, in

short, attempts to portray JPMorgan as a participant in and beneficiary of Madoff's Ponzi

scheme, alleging that the bank knowingly facilitated and concealed Madoff's fraudulent

activities as part of a "drive for fees and profits."  *Id.* ¶ 9.

Although they purport to bring a nationwide securities fraud class action seeking

to recover damages of $19 billion or more, *id.* ¶ 19, the named plaintiffs do not say how much

they lost in Madoff's Ponzi scheme or when they suffered their losses.  All they allege is that

they have suffered unspecified "losses and/or damages."  *Id.* ¶¶ 23-24.

## ARGUMENT

## POINT I

## SLUSA PRECLUDES THIS CLASS ACTION.

Plaintiffs are well aware that in applying the heightened pleading requirements of

the PSLRA, courts in this district have repeatedly dismissed federal securities fraud claims

arising out of Madoff's Ponzi scheme.[1]  Plaintiffs are also well aware that under the PSLRA,

they could never hope to lead a putative class of Madoff investors, which would include

institutions that lost hundreds of millions of dollars in the fraud.[2]

---

[1]    *See, e.g.*, *In re Merkin & BDO Seidman Sec. Litig.*, 2011 WL 4435873, at *7-9 (S.D.N.Y. Sept. 23, 2011) (dismissing 10b-5 claims); *accord Saltz* v. *First Frontier, LP*, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010); *Newman* v. *Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 311 (S.D.N.Y. 2010); *Meridian Horizon Fund, LP* v. *Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010); *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010).

[2]    The lead plaintiff provisions of the PSLRA create a rebuttable presumption that the "most adequate" plaintiff is, among other things, the person or group of persons that "has the largest financial interest in the relief sought by the class."  15 U.S.C. § 77z-1(a)(3)(B)(iii)(I)(bb).

Recognizing this, plaintiffs have sought to evade the PSLRA by relying exclusively on state law claims. But in doing so, plaintiffs have run headlong into SLUSA, which was designed to prevent the very type of evasion of the federal securities laws that plaintiffs are attempting here.

## A. By enacting SLUSA, Congress foreclosed securities class actions based on state law.

SLUSA had its genesis in the PSLRA, which imposed new procedural and substantive requirements for filing securities actions under federal law in federal court. Congress enacted the PSLRA to curb "perceived abuses of the class-action vehicle in litigation involving nationally traded securities" and to "deter or at least quickly dispose of those suits whose nuisance value outweighs their merits." *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71, 81-82 (2006). But this reform had an unintended consequence: it prompted the filing of securities suits under state law, often in state court, as purported class representatives sought to circumvent "the obstacles set in their path by the [PSLRA]." *Id.* at 82.

Congress enacted SLUSA in 1998 to "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Reform Act." *Id.* (quoting SLUSA, Pub. L. No. 105-353, § 2(2), (5), 112 Stat. 3227 (1998) (quotation marks omitted)). SLUSA accomplished this objective "by making federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating that such class actions be governed exclusively by federal law." *Lander* v. *Hartford Life & Ann. Ins.*, 251 F.3d 101, 108 (2d Cir. 2001).

SLUSA's preclusion provision states:

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging —

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1); *see also id.* § 77p(b). SLUSA thus mandates dismissal of (1) any covered class action, (2) based on state law, (3) alleging a material misrepresentation or omission or the use of a manipulative or deceptive device or contrivance, (4) in connection with the purchase or sale of a covered security. *E.g.*, *Romano* v. *Kazacos*, 609 F.3d 512, 518 (2d Cir. 2010).

The United States Supreme Court has held that SLUSA must be given a "broad construction" to effectuate Congress's intent, explaining that "[a] narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's stated purpose." *Dabit*, 547 U.S. at 85-86. Moreover, "[c]ourts in this circuit have consistently rejected plaintiffs' attempts through artful pleading to avoid the clear precepts of SLUSA and its preemption of state law securities claims for damages." *Kingdom 5-KR-41, Ltd.* v. *Star Cruises PLC*, 2004 WL 444554, at *3 (S.D.N.Y. Mar. 10, 2004); *see also In re Kingate Mgmt. Ltd. Litig.*, 2011 WL 1362106, at *6 (S.D.N.Y. Mar. 30, 2011) ("Because plaintiffs may seek to avoid SLUSA preemption through artful pleading, courts 'must look beyond the face of the complaint to analyze the substance of the allegations made.'" (quoting *Dabit* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 395 F.3d 25, 34 (2d Cir. 2005))).

Consistent with these principles, class action plaintiffs cannot avoid SLUSA by arguing that they have not asserted a claim expressly styled as one for "fraud." If the action alleges "misrepresentations or omissions" in connection with the purchase or sale of covered securities, then SLUSA applies, regardless of what labels plaintiffs may place on their claims.

*See, e.g.*, *Herald*, 2011 WL 5928952, at *4, *7 (SLUSA precluded claims alleging aiding and abetting breach of fiduciary duty, conversion, gross negligence, and unjust enrichment); *Jeanneret*, 769 F. Supp. 2d at 378-81 (SLUSA held to preclude, *inter alia*, claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment); *Levinson* v. *PSCC Servs.*, 2009 WL 5184363, at *12-13 (D. Conn. Dec. 23, 2009) (SLUSA precluded aiding and abetting conversion claim); *see also Rowinski* v. *Salomon Smith Barney*, 398 F.3d 294, 300 (3d Cir. 2005) ("[P]reemption does not turn on whether allegations are characterized as facts or as essential legal elements of a claim, but rather on whether the SLUSA prerequisites are 'alleged' in one form or another.").

**B.     The requirements for SLUSA preemption are all satisfied in this case.**

SLUSA precludes this action.  Here, as in *Herald*, the Complaint satisfies all the requirements for SLUSA preemption.  2011 WL 5928952, at *5 (dismissing state law securities fraud class action against JPMorgan arising out of Madoff's Ponzi scheme).

**1.     This action is a covered class action.**

SLUSA defines a "covered class action" as a lawsuit in which "damages are sought on behalf of more than 50 persons or prospective class members" or "one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated." 15 U.S.C. §§ 77p(f)(2)(A); 78bb(f)(5)(B).  Plaintiffs in this case pray for money damages, purport to sue on behalf of a class, and allege that there are "several hundred, if not thousands, of members in the proposed Class."  Compl. ¶ 290.

**2.     This action is based on state law.**

The Complaint asserts no claims under federal law.  Rather, the Complaint asserts only state law claims.

### 3. This action alleges the purchase and sale of covered securities.

As set forth by the Supreme Court in *Dabit*, the "purchase or sale" element of SLUSA is satisfied if the misrepresentations or omissions alleged in the complaint "coincide with a securities transaction — whether by the plaintiff or by someone else." 547 U.S. at 85 (quotation marks omitted).

There is no question that the securities Madoff purported to be buying and selling were "covered securities" under SLUSA. A security is a "covered security" if it is listed or authorized for listing on the New York Stock Exchange or another national exchange. *See* 15 U.S.C. § 77r(b), *cited in* 15 U.S.C. §§ 78bb(f)(5)(E), 77p(f)(3). The stocks in the S&P 100 Index that Madoff reported he was trading are publicly traded, as are some of the S&P 100 options that he said he was trading. *See* Compl. ¶¶ 52, 233; *Herald*, 2011 WL 5928952, at *6 ("Madoff's purported trading strategy utilized 'indisputably covered securities.'"); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 430 (S.D.N.Y. 2010) ("There is 'no question that Madoff's Ponzi scheme was "in connection with" the purchase and sale of securities.'").

Under SLUSA, it makes no difference that Madoff, contrary to his representations, never actually traded the covered securities. In *SEC* v. *Zandford*, the Supreme Court observed that "the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security'" and has "maintained that a broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5." 535 U.S. 813, 819 (2002). The *Zandford* Court found the SEC's interpretation to be "reasonable" and entitled to deference. *Id.* at 819-20.

Consistent with *Zandford*, the courts in this district, including this Court, have consistently held that Madoff's falsified securities trades satisfy SLUSA's covered securities

requirement. *Jeanneret*, 769 F. Supp. 2d at 363 ("[A]ll of my colleagues who have encountered this issue in Madoff-related cases have concluded that, in the context of his Ponzi scheme, the 'in connection with' requirement is satisfied by his phony purchases and sales."); *Herald*, 2011 WL 5928952, at \*8 ("Madoff's announced intention to purchase covered securities . . . satisfies the requirement that Plaintiffs' claims against [JPMorgan] and BNY, Madoff's bankers, were made 'in connection with the purchase or sale of a covered security.'"); *Barron* v. *Igolnikov*, 2010 WL 882890, at \*4 (S.D.N.Y. Mar. 10, 2010) ("[I]t is not necessary that the purchase or sale actually transpired . . . ."); *Beacon*, 745 F. Supp. 2d at 410-11 ("Madoff's purported purchase and sale of securities" satisfies the statute).

These decisions are fully consistent with the case law outside the Madoff context. *See, e.g.*, *Instituto de Prevision Militar* v. *Merrill Lynch*, 546 F.3d 1340, 1347-51 (11th Cir. 2008) (SLUSA precluded class action seeking to hold defendant liable for fraud in which third party stole investors' money rather than purchasing securities); *Falkowski* v. *Imation Corp.*, 309 F.3d 1123, 1129-30 (9th Cir. 2002) (SLUSA precluded class action relating to unexercised stock options because "if a person contracts to sell a security, that contract is a 'sale' even if the sale is never consummated"), *amended by* 320 F.3d 905 (9th Cir. 2002); *see also In re Jett*, Securities Act Rel. No. 8395, Exchange Act Rel. No. 49366, 2004 SEC LEXIS 504, at \*72 & n.41 (Mar. 5, 2004) ("When a person portrays activities as securities purchases and sales that, in fact, are no such thing, that conduct can, and here does, constitute securities fraud." (citing cases)).

### 4. This action alleges material misrepresentations and omissions in connection with purchases and sales.

The Complaint is replete with allegations of misrepresentations or omissions by Madoff and JPMorgan itself, including allegations that the bank knowingly facilitated Madoff's Ponzi scheme by defrauding regulators. These alleged misrepresentations and omissions

coincided with Madoff's phony purchases and sales of covered securities and satisfy SLUSA's misrepresentation or omission element.

This entire action is grounded upon the massive securities fraud perpetrated by Madoff and contains repeated allegations of his deceitful conduct. *See, e.g.*, Compl. ¶¶ 2, 49-60. The Complaint alleges that plaintiffs and the other members of the putative class were duped by Madoff and lost money when his Ponzi scheme was revealed. As is clear from the statutory language, it is not necessary for SLUSA preclusion that the "misrepresentations or omissions" in question have been made by the defendants. Under the plain language of SLUSA, the statute applies to all cases "alleging . . . a misrepresentation or omission of a material fact." 15 U.S.C. § 78bb(f)(1); *see also id.* § 77p(b)(1). In this case, the allegations of Madoff's misrepresentations and omissions directed to the putative class satisfy the statute. *See, e.g.*, *Barron*, 2010 WL 882890, at *5; *Herald*, 2011 WL 5928952, at *7.

Here, moreover, plaintiffs claim that JPMorgan aided and abetted Madoff's fraudulent conduct and seek to hold the bank liable for the damage caused by Madoff's lies. Compl. ¶¶ 19, 38. The Complaint expressly alleges that JPMorgan itself "participated in, promoted, [and] aided and abetted the fraud" and was "thoroughly complicit" in the Ponzi scheme. *Id.* ¶¶ 3, 38. As a result, the aiding and abetting allegations against JPMorgan are "integrally tied to the underlying fraud committed by Madoff, for whom [JPMorgan] served as banker," and thus satisfy the misrepresentation or omission element of SLUSA preemption. *Herald*, 2011 WL 5928952, at *7 (holding that SLUSA barred aiding and abetting claims against JPMorgan); *see also Proctor* v. *Vishay Intertech. Inc.*, 584 F.3d 1208, 1222-23 (9th Cir. 2009) (applying SLUSA to aiding and abetting claim); *Instituto de Prevision Militar*, 546 F.3d at 1348-49 (same).

In addition, the Complaint does not remotely limit itself to allegations of misrepresentations and omissions by Madoff. To the contrary, the Complaint is replete with allegations of misrepresentations and omissions by *JPMorgan* itself, including allegations: (i) that JPMorgan deceived Madoff's investors "by helping to cover Madoff's naked theft with the imprimatur of a globally recognized financial institution"; (ii) that JPMorgan kept the bank's due diligence findings "a secret"; (iii) that JPMorgan "by its silence . . . lent legitimacy and cover to BMIS' operations"; (iv) that JPMorgan "was careful not to discuss with third parties its redemptions from BMIS-related products"; and (v) that JPMorgan "chose to keep its knowledge [of Madoff's scam] private." Compl. ¶¶ 3, 10, 135, 159, 170.

The allegations of JPMorgan's supposed misrepresentations or omissions do not stop there. Plaintiffs allege that JPMorgan committed "fraud upon federal and state regulators" by not revealing Madoff's crimes. Compl. ¶ 370. And plaintiffs allege that JPMorgan's failure to "fully and accurately report to regulators was intentional." *Id.* ¶¶ 261, 288. These allegations of misrepresentations and omissions by JPMorgan go well beyond the allegations that gave rise to SLUSA preemption in the *Herald* case. 2011 WL 5928952, at *7 (SLUSA satisfied by allegations that JPMorgan "knew or should have also known that Madoff and/or [Madoff Securities'] business was fraudulent" and that JPMorgan "ignored the evidence of fraud and failed to disclose the fraud").

\*            \*            \*

For the reasons set forth above, the Complaint satisfies all of the elements of SLUSA preclusion. This Court should follow *Herald*, *Jeanneret*, and the many other cases in this district applying SLUSA to Madoff-related state law class actions, and it should dismiss the Complaint in its entirety.

# POINT II

## THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING MADOFF'S PONZI SCHEME (COUNTS I, II, III, AND V).

Even assuming that plaintiffs could proceed past SLUSA, all of their causes of action should be dismissed for failure to state a claim. Counts I, II, III, and V of the Complaint are all different articulations of the same claim — namely, that JPMorgan aided and abetted Madoff's Ponzi scheme. These claims must be dismissed for failure to plead the key elements of aiding and abetting liability. Plaintiffs have failed to allege particularized facts showing that anyone at JPMorgan had "actual knowledge" of Madoff's crimes or did anything to lend "substantial assistance" to those crimes. And plaintiffs have alleged no facts that would allow the Court to find plausible their theory that JPMorgan knowingly facilitated Madoff's inevitably doomed Ponzi scheme in order to earn routine banking income. *See Schmidt* v. *Fleet Bank*, 1998 WL 47827, at *6 (S.D.N.Y. Feb. 4, 1998) ("Ponzi schemes are doomed to collapse . . . and while an individual may be able to escape with the proceeds of a Ponzi scheme, a bank cannot. Thus, participation in the scheme would not appear to be in the bank's economic interest."); *Harborview Value Masterfund* v. *Freeline Sports, Inc.*, 2012 WL 612358, at *11-12 (S.D.N.Y. Feb. 23, 2012) (McMahon, J.) (dismissing aiding and abetting claim where "entire theory of fraud" was "implausible on its face"); *Kalnit* v. *Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) (refusing to credit allegations of fraudulent conduct that "def[y] economic reason").

### A.    Plaintiffs must plead the elements of aiding and abetting liability with particularity.

To plead an aiding and abetting claim, a plaintiff must plead facts showing that the defendant had "actual knowledge" of the primary violator's wrongdoing. *E.g.*, *Kolbeck* v. *LIT America Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996); *see also MLSMK* v. *JP Morgan Chase*

& *Co.*, 431 F. App'x 17, 19-20 (2d Cir. 2011) (Madoff customer failed to allege facts showing JPMorgan's "actual knowledge" of Madoff's fraud). A plaintiff must also plead facts showing that the defendant "provided substantial assistance to advance the fraud's commission." *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006).[3]

Although pleaded as a separate claim, plaintiffs' claim for "knowing participation in a breach of trust" is the same as their claim for aiding and abetting breach of fiduciary duty. The Second Circuit has explained that "the gravamen of the claim of participation in a breach of fiduciary duty is the 'knowing participation' . . . of the third party in the fiduciary's breach of trust." *S & K Sales Co.* v. *Nike, Inc.*, 816 F.2d 843, 848 (2d Cir. 1987) (quoting *Wechsler* v. *Bowman*, 285 N.Y. 284, 291 (1941)); *see also Sharp Int'l Corp.* v. *State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 49-50 (2d Cir. 2005) (equating claim for aiding and abetting breach of fiduciary duty with claim for knowing participation in breach of trust); *Whitney* v. *Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986) (describing a "knowing participation" claim as "analogous" to claim for "aiding and abetting a securities fraud").

"The Second Circuit has applied the heightened pleading requirements of Rule 9(b) to claims for aiding and abetting fraud." *Rosner* v. *Bank of China*, 2008 WL 5416380, at *4 (S.D.N.Y. Dec. 18, 2008). Those requirements also apply to claims for aiding and abetting a

---

[3] Although plaintiffs style one of their claims as "aiding and abetting embezzlement," such a claim does not exist under New York law. Embezzlement is a criminal offense known as "larceny," and "criminal offenses . . . which are specifically defined in the Penal Law may not be pleaded as separate causes of action in a civil action." *Montalvo* v. *J.P. Morgan Chase & Co.*, 906 N.Y.S.2d 781, 2009 WL 4893939, at *6 (Sup. Ct. Kings Co. Dec. 18, 2009); *see also* N.Y. Penal Law § 155.05 (defining larceny to include, *inter alia*, "conduct heretofore . . . known as common law . . . embezzlement"). For this reason, courts in New York have dismissed civil claims for larceny and aiding and abetting larceny. *See Montalvo*, 906 N.Y.S.2d 781, 2009 WL 4893939, at *6; *Cohain D.D.S.* v. *Klimley*, 2011 WL 3896095, at *4 (S.D.N.Y. Aug. 31, 2011).

breach of fiduciary duty or aiding and abetting conversion where, as here, "the underlying primary violations are based on fraud." *Kolbeck*, 939 F. Supp. at 245; *see also Silverman Partners* v. *First Bank*, 687 F. Supp. 2d 269, 288 (E.D.N.Y. 2010); *Berman* v. *Morgan Keegan & Co.*, 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 14, 2011).

Additionally, to survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)). A complaint does not state a claim by making allegations that are "'merely consistent with'" a defendant's liability. *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009). Rather, the complaint's non-conclusory factual allegations must "state a claim to relief that is plausible on its face" by creating a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation marks omitted).

**B.    The burden of pleading actual knowledge is a heavy one.**

The burden of pleading actual knowledge is a heavy one. Actual knowledge means just that: "Ordinarily, evidence of recklessness, conscious avoidance, or willful blindness as to whether the primary actor is engaged in fraud is not sufficient to satisfy the knowledge element of [an] aiding and abetting fraud claim." *In re Agape Litig.*, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011) (quotation marks and alteration omitted). By the same measure, "constructive knowledge" of another's wrongdoing is "legally insufficient to impose aiding and abetting liability." *Kaufman* v. *Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003); *accord, e.g.*, *Berman*, 2011 WL 1002683, at *10. Moreover, "conclusory statements" of "actual knowledge" are "insufficient to support an aiding-and-abetting claim under New York law." *Rosner* v. *Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009).

Numerous decisions in this Circuit demonstrate the difficulty of pleading an aiding and abetting claim against a financial intermediary. For example, in *Rosner* v. *Bank of China*, the Second Circuit affirmed the dismissal of aiding and abetting claims against a bank. 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009). In *Rosner*, the receiver for a corporation that had defrauded investors attempted to show that Bank of China had knowledge of the fraud by virtue of suspicious banking activity, including large, almost daily cash movements that were inconsistent with the corporation's business as a currency trader. Dismissing the case, the district court observed that "New York courts overwhelmingly recognize that a plaintiff does not satisfy Rule 9(b) by alleging a bank's actual knowledge of a fraud based on allegations of the bank's suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence." *Id.* at *6. The Second Circuit affirmed, holding that allegations of what a bank "should have known" are "insufficient." 349 F. App'x at 639 ("Even if [the bank] had reason to suspect that [a customer] was laundering money, this does not mean that [the bank] had actual knowledge of the fraudulent scheme.").

In *Berman* v. *Morgan Keegan & Co.*, Judge Castel cited *Rosner* in dismissing aiding and abetting claims against a broker-dealer brought by investors in a Ponzi scheme. 2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011). The broker-dealer maintained an account for a corporation that was fraudulently marketing tax deferral devices. In attempting to show actual knowledge, the investors relied on a close relationship between an executive of the broker-dealer and the customer's principals, as well as suspicious account activity. *Id.* at *4-5. The plaintiff-investors also alleged that the broker-dealer must have known about the customer's fraud as a result of "Know Your Customer Rules." *Id*. at *5, *10. As in *Rosner*, the court held that the facts alleged did "not give rise to a strong inference" of actual knowledge. *Id.* at *12; *see also id*.

at *10 (explaining that the "Know Your Customer Rules" governing the broker-dealer "at most speak to whether [the broker-dealer] should have known of the fraud; they do not reflect actual knowledge of fraud"). In affirming that decision, the Second Circuit recently made clear that the defendant's "'Know Your Customer' obligations are, standing alone, far from sufficient to support a strong inference that it had actual knowledge of [the] fraud." 2012 WL 147907, at *3 (2d Cir. Jan. 19, 2012).

Judge Spatt of the Eastern District followed *Rosner* and *Berman* in dismissing aiding and abetting claims by investors in a Ponzi scheme. *See In re Agape Litig.*, 773 F. Supp. 2d 298 (E.D.N.Y. 2011), *aff'd sub nom. Weshnak* v. *Bank of America*, 2012 WL 233455 (2d Cir. Jan. 26, 2012). In *Agape*, the plaintiff-investors tried to show actual knowledge by alleging that the bank established a special branch at a fraudulent customer's headquarters; allowed the customer, a convicted felon, to open numerous accounts under different names; and enabled the customer to transfer investor funds and commingle that money with other funds. *Id*. at 302-04. The investors also relied heavily on allegations of suspicious account activity, including commingling of investor funds, transfers in and out of the account in equal amounts, empty accounts, and unusually large transfers. *Id.* at 310. The court rejected the claim, holding that even if "hindsight" would tend to "indicate the obviousness of the fraud," the investors had failed to show actual knowledge with the "level of specificity that New York state courts and courts in the Second Circuit have routinely required." *Id.* at 318; *see also Williams* v. *Bank Leumi Trust Co.*, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) (dismissing aiding and abetting claim

predicated on "conclusory allegations" that a bank had "actual knowledge" of fraudulent scheme based on allegedly suspicious account activity).[4]

New York cases are also clear that, even if a bank becomes suspicious that an account holder is involved in fraud, such suspicion "cannot be equated with actual knowledge." *Albion Alliance Mezzanine Fund* v. *State St. Bank & Trust Co.*, 8 Misc. 3d 264, 273 (N.Y. Sup. Ct. N.Y. Co. 2003), *aff'd*, 2 A.D.3d 162 (1st Dep't 2003). To impose aiding and abetting liability, "suspicions" are simply not enough:

> [W]hile the . . . inaccuracies in [the company's] account information certainly gave the Bank reason to be *highly suspicious* of its veracity, *such suspicions cannot be equated with actual knowledge* — particularly not actual knowledge that the [fraudsters] were diverting tens of millions of dollar of corporate funds.

*Id.* at 273 (emphasis added); *see also Ryan* v. *Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (bank's "suspicions" of fraud based on account activity and analysis by the bank's in-house fraud investigators did "not raise an inference of actual knowledge").

## C.    Plaintiffs have failed to allege facts showing that JPMorgan had actual knowledge of Madoff's fraud.

These principles of New York law foreclose plaintiffs' aiding and abetting claims. The Complaint attempts to establish actual knowledge through two sets of allegations, both of

---

[4]     In discussing the "actual knowledge" requirement, the *Agape* court noted that certain courts have allowed a plaintiff to meet that burden by showing "conscious avoidance," which only "occurs when it can almost be said that a defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." *Agape*, 773 F. Supp. 2d at 308 (quoting *Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007)). The *Agape* court also observed that "a theory of actual knowledge based on conscious avoidance requires facts supporting an inference that the defendant acted with a culpable state of mind," such that "[p]lausibly alleging actual knowledge through conscious avoidance is a very high bar." *Id.* at 308-09, 319.

which are lifted wholesale from the SIPC Trustee's complaint. The first involves BMIS's supposedly "suspicious" activity in its bank account at JPMorgan; the second involves JPMorgan's due diligence in connection with the issuance of Madoff-related structured products. Neither set of allegations shows actual knowledge of fraud.

1.    **Plaintiffs' allegations with respect to the 703 Account do not show actual knowledge of fraud.**

To try to show that JPMorgan knew about Madoff's fraud, plaintiffs rely on alleged irregularities in the 703 Account that Madoff opened at a predecessor bank in 1986. Those allegations, however, fall far short of establishing actual knowledge.

The Complaint is replete with allegations concerning what JPMorgan "should" have done as to the 703 Account and what a review of Madoff's accounts "would have revealed." Compl. ¶¶ 10, 189, 197, 204, 249(e), 302. For instance, plaintiffs suggest that the activity in the accounts should have triggered JPMorgan's anti-money laundering system. *Id*. ¶ 197. Plaintiffs also suggest that JPMorgan should have investigated transactions between BMIS and other bank clients, including Norman Levy and Sterling Equities. *Id*. ¶ 204.

These allegations go nowhere in terms of showing JPMorgan's actual knowledge. Plaintiffs do not allege that JPMorgan ever disabled, compromised, or ignored its detection system for Madoff's benefit; indeed, plaintiffs recognize that the system *did* alert once, and plaintiffs fail to provide any facts surrounding the handling of that alert. *E.g.*, Compl. ¶ 303. Likewise, while the Complaint alleges that Madoff's FOCUS Reports "contained glaring irregularities that [JPMorgan] should have probed," *id*. ¶¶ 10, 218-40, it is devoid of any allegation that anyone at JPMorgan recognized these irregularities. Ultimately, the Complaint boils down to the theory that JPMorgan, by virtue of its banking services, was "uniquely positioned" to uncover the fraud. *Id*. ¶ 227. But in the same breath, the Complaint itself

acknowledges that JPMorgan, rather than uncovering a fraud, "fail[ed] to 'know' Madoff or BMIS" and even made large loans to BMIS, refuting any claim that JPMorgan had actual knowledge of Madoff's Ponzi scheme.  *Id*. ¶¶ 241, 267-84.

Plaintiffs' other factual allegations likewise do not come close to establishing that JPMorgan had "actual knowledge" of Madoff's fraud.  Plaintiffs allege that "in or about 1997" two anonymous employees at an unnamed financial institution observed Madoff drawing checks on his account at the same institution and depositing them on "virtually a daily basis" into his JPMorgan account.  Compl. ¶¶ 11, 214.  When this other financial institution "failed to receive a satisfactory explanation" for the activity, it closed Madoff's account.  *Id.*  But plaintiffs never even allege that the other institution acquired knowledge of the Ponzi scheme or alerted JPMorgan to its suspicions.  All plaintiffs allege is that the other institution "*would* have contacted" JPMorgan under normal operating procedures.  *Id.* (emphasis added).  But what "would have" happened is nothing more than speculation, which is insufficient to plead actual knowledge.  *See MLSMK*, 431 F. App'x at 19-20.

The Complaint also alleges additional facts regarding JPMorgan's business relationships with BMIS customers Norman Levy and Sterling Equities.  *E.g.*, Compl. ¶¶ 89-90, 250-59.  At most, however, those allegations identify account activity that, in retrospect, plaintiffs believe "*should* have prompted investigation."  *Id.* ¶ 250 (emphasis added).  None of these allegations remotely supports plaintiffs' claim of actual knowledge.

## 2. Plaintiffs' allegations concerning JPMorgan's structured products due diligence do not show actual knowledge of fraud.

The Complaint also makes various allegations relating to the due diligence that JPMorgan conducted, beginning in 2006, in connection with structured products issued by JPMorgan that were tied to the returns of Madoff feeder funds.  According to the Complaint, as

of 2007, when JPMorgan's UK affiliate began issuing those products, JPMorgan had unspecified "concerns" about Madoff. But plaintiffs do not allege that anyone at JPMorgan learned at that time that Madoff was engaged in fraud. *Id.* ¶ 100.

Plaintiffs allege that JPMorgan engaged in another round of due diligence beginning in March 2008, when it acquired Bear Stearns and sought to reassess firm-wide exposure to hedge funds. Compl. ¶¶ 130-31. The Complaint recites various "questions" that JPMorgan was asking at this time — "many of the same questions it had asked more than a year before." *Id*. ¶¶ 137-38.

Plaintiffs make no effort to explain why JPMorgan would conduct multiple rounds of due diligence relating to Madoff if the bank actually knew he was operating a Ponzi scheme. Instead, plaintiffs rely on generic "red flags" to allege that JPMorgan "could have," "should have," and "would have" discovered the fraud if it had only done more. *E.g.*, Compl. ¶¶ 100, 180, 189, 205. For instance, plaintiffs cite Madoff's lack of transparency (*id*. ¶¶ 12, 150); Madoff's role as clearing broker, sub-custodian, and investment advisor (*id*. ¶ 12); the fact that JPMorgan could not identify Madoff's counterparties for options trades (*id*. ¶¶ 12, 109, 112); the consistency of Madoff's returns (*id*. ¶ 12); Madoff's use of a small, unknown auditor (*id*. ¶¶ 12, 15, 98, 144, 150); and "public speculation" that Madoff was operating a Ponzi scheme or was otherwise engaged in illegal activity (*id*. ¶ 12).

These "red flag" allegations do not satisfy the high standard of pleading actual knowledge of fraud. Indeed, in numerous Madoff-related cases, courts have rejected attempts by plaintiffs to rely on precisely these same red flags. *See, e.g.*, *Saltz*, 782 F. Supp. 2d at 69, 76-77 (dismissing common law fraud claims against auditors of Madoff feeder fund where plaintiff alleged such "red flags" as the "uncanny consistency" of investment returns and Madoff's use of

a small, unknown audit firm); *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 368, 371 (S.D.N.Y. 2010) (dismissing securities fraud claims against auditors of Madoff feeder fund and rejecting "red flags" such as the inability to duplicate Madoff's returns and Madoff's lack of transparency); *SEC* v. *Cohmad Sec. Corp.*, 2010 WL 363844, at *5-6 (S.D.N.Y. Feb. 2, 2010) ("In light of Madoff's established reputation as a successful and respected investment adviser, the high returns he produced were not generally perceived (even by professionals) as a badge of fraud.").[5]

Plaintiffs also rely on a suspicious activity report, or "SAR," that JPMorgan filed in the UK at the end of October 2008, just 45 days before Madoff's fraud was revealed to the world. As alleged, after conducting further due diligence, JPMorgan began in October 2008 to redeem some — but not all — of its investments in BMIS feeder funds. According to the Complaint, these redemptions led to a phone call in which a third party threatened a JPMorgan employee by saying that "Colombian friends" would "cause havoc" if JPMorgan went through with its plan to redeem the investments. Compl. ¶ 153. Following this conversation, JPMorgan filed a "suspicious activity report" with the British government. *Id*. ¶ 156. According to the Complaint, the report described the background of JPMorgan's redemptions, but it did not point to new evidence about Madoff showing that he was engaged in a fraud. Rather, the report stated that Madoff's returns "appear" to be too good to be true and that thus they "probably" are. *Id*. ¶¶ 17, 156. At most, the report indicates suspicion, *not* the actual knowledge required to sustain

---

[5]     In *Anwar* v. *Fairfield Greenwich Ltd.*, although the court sustained an aiding and abetting claim against the administrator of a Madoff feeder fund, the complaint alleged that the administrator had "actual knowledge" not of the Ponzi scheme but of the manager's misrepresentations to investors in the fund regarding the extent and quality of the manager's due diligence on Madoff. 728 F. Supp. 2d 372, 442-43 (S.D.N.Y. 2010).

an aiding and abetting claim. *See, e.g.*, *Renner* v. *Chase Manhattan Bank*, 2000 WL 781081, at *17, *21 (S.D.N.Y. June 16, 2000) (dismissing aiding and abetting claim for failure to plead actual knowledge, despite alleged "suspicions" of fraud on the part of Chase).

Plaintiffs' reliance on this SAR as a basis to impose liability on JPMorgan is not only unavailing in showing actual knowledge, but it also violates federal law prohibiting the imposition of liability on a financial institution for filing such a report. The entire purpose of the suspicious activity reporting regime is to encourage early reporting of possible wrongdoing. That objective would be severely undermined if financial institutions faced potential liability for reporting questionable activity. Accordingly, under federal statute, "[a]ny financial institution that makes a voluntary disclosure of any possible violation of law or regulation . . . *shall not be liable to any person under any law* or regulation of the United States or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure . . . ." 31 U.S.C. § 5318(g)(3) (emphasis added). In relying on a SAR to prosecute their claims, plaintiffs flout this federal statute, as well as Second Circuit precedent holding that the statute creates "an unqualified privilege" that "broadly and unambiguously provides for immunity from any law (except the federal Constitution) for any statement" contained in a SAR filing. *Lee* v. *Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999); *see also Nevin* v. *Citibank, N.A.*, 107 F. Supp. 2d 333, 342 (S.D.N.Y. 2000) (McMahon, J.) ("[N]ot only the plain language of the statute but also sound public policy dictate[] that anything contained in a SAR enjoy an unqualified privilege.").

Nor does JPMorgan's redemption of investments in Madoff feeder funds show actual knowledge of fraud. The decision in *MLSMK* makes that plain. The plaintiff in that case, like the plaintiffs here, sought to rely upon JPMorgan's decision to redeem investments in the feeder funds as evidence that JPMorgan was aware of Madoff's fraud. *MLSMK* v. *JP Morgan*

*Chase & Co.*, 737 F. Supp. 2d 137, 144-45 (S.D.N.Y. 2010).  The court dismissed the claim for aiding and abetting breach of fiduciary duty — observing that *even if* JPMorgan "could have connected the dots to determine that Madoff was committing fraud, Plaintiff offers no facts to support the claim that [JPMorgan] *actually reached such a conclusion*."  *Id*. at 144 (emphasis added).[6]

### 3.  Plaintiffs' assertion that the 703 Account was a "fiduciary account" is irrelevant and baseless.

Recognizing that they cannot plead particularized facts showing that JPMorgan had actual knowledge of Madoff's Ponzi scheme, plaintiffs claim that the 703 Account at JPMorgan was a "fiduciary account" in which funds were "impressed with a trust."  Compl. ¶¶ 201, 297.  The obvious purpose of that allegation is to try to escape Rule 9(b) and exploit language in Second Circuit decisions stating that, although "[b]anks generally do not owe non-customers a duty to protect them from fraud perpetrated by customers," the court "on occasion" has "recognized a narrow exception to this rule that arises when a bank fails to act to safeguard trust funds on deposit in a fiduciary account after receiving 'clear evidence' of misappropriation."  *MLSMK*, 431 F. App'x at 20.

This gambit fails.  As the Second Circuit has recognized, Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  *Rombach* v. *Chang*,

---

[6]     Plaintiffs' conclusory allegations that JPMorgan "consciously avoided knowledge" of the fraud are likewise insufficient.  *E.g.*, Compl. ¶ 328.  The Complaint alleges no facts showing that anyone at JPMorgan avoided "confirming" knowledge of the fraud "in order later to be able to deny" such knowledge, as required by the case law to show conscious avoidance.  *See, e.g.*, *In re Agape Litig.*, 773 F. Supp. 2d at 308.

355 F.3d 164, 171 (2d Cir. 2004).  Accordingly, where, as here, a complaint is suffused with

allegations of fraud, *see, e.g.*, Compl. ¶¶ 3, 10, 135, 159, 170, 369-70, the courts will subject the

plaintiff's claims to Rule 9(b), including those claims not expressly styled as claims for fraud.

*See, e.g.*, *Rombach*, 355 F.3d at 171 (dismissing Section 11 claim for failure to satisfy Rule

9(b)); *DeBlasio* v. *Merrill Lynch*, 2009 WL 2242605, at *11 (S.D.N.Y. 2009) (dismissing claims

for  negligence, breach of fiduciary duty, breach of contract, and unjust enrichment under Rule

9(b)); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 2008 WL 2594819, at *8

(S.D.N.Y. June 26, 2008) (applying Rule 9(b) to claims for breach of fiduciary duty where such

claims were "based on plaintiffs' allegations of Defendant's fraudulent conduct"); *In re Tyco*

*Int'l, Ltd.*, 2007 WL 1703023, at *14 (D.N.H. June 11, 2007) (where "all of plaintiffs' common

law claims arise from a unified course of allegedly fraudulent conduct . . . they are subject to

Rule 9(b) even though several of the claims are nominally based on alternative theories").[7]

　　　　As shown above, the Complaint here is replete with allegations that JPMorgan

knowingly assisted, indeed, was "thoroughly complicit" in, the largest securities fraud in history.

These allegations of fraud pervade the Complaint and are incorporated by reference in all of the

claims, including their claim for knowing participation in breach of trust.  *See, e.g.*, Compl.

¶ 295.  Accordingly, having premised this action on allegations that JPMorgan was "thoroughly

complicit" in Madoff's Ponzi scheme, plaintiffs must satisfy the heightened pleading

requirements of Rule 9(b).  They cannot avoid dismissal by arguing that their claims really rest

---

[7]　　　As this Court has recognized, even a disclaimer of the fraud allegations in a complaint is
insufficient to avoid application of Rule 9(b) to nonfraud claims.  *See In re American Bank Note*
*Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 439-40 (S.D.N.Y. 2000) (McMahon, J.)
(applying Rule 9(b) to section 11 claims).

on some lesser standard of culpability. *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 410 (S.D.N.Y. 2005) ("[p]laintiffs cannot so facilely put the fraud genie back in the bottle").

In any event, the Complaint alleges no facts to support the claim that Madoff's account was a "fiduciary account" of any kind. The facts pled show that the 703 Account was a routine checking account — *not* a fiduciary account. The Complaint alleges that the 703 Account "was opened in Madoff's name" and was later "placed in the name of BMIS." Compl. ¶ 201. Plaintiffs also allege that this was "BMIS's main account," that the account "belonged to BMIS," and that the money deposited in the account was "commingled." *Id.* ¶¶ 3, 6, 7.

Moreover, the Complaint does *not* allege that the 703 Account had any attributes of a trust account, such as an account name reflecting fiduciary status or an agreement requiring that funds in the account be held in trust. Thus, as Judge Jones correctly recognized in granting JPMorgan's motion to dismiss in the *MLSMK* case, the 703 Account was a simple "demand deposit account, *not* a fiduciary account." *MLSMK*, 737 F. Supp. 2d at 147 n.2 (emphasis added). As in *MLSMK*, the allegations in the Complaint here are inconsistent with the notion that the 703 Account was a "fiduciary account." Plaintiffs here have in fact *expressly pled* that the funds deposited into the 703 Account were "*demand deposits*, meaning that [JPMorgan] had full use of the funds until Madoff withdrew them." Compl. ¶ 5 (emphasis added).

To support the assertion that the 703 Account was something other than a simple deposit account, plaintiffs intimate that the account should be treated as a "fiduciary account" because BMIS, the holder of the account, owed fiduciary obligations to *its* customers, including as a trustee for retirement accounts, pension funds, and trusts. Compl. ¶ 201. Plaintiffs thus allege "[u]pon information and belief" that JPMorgan knew that the money in the 703 Account was held for Madoff's clients. *Id.* But whatever the nature of BMIS's relationships with its

customers, New York courts have repeatedly held that a bank account is *not* a "fiduciary account" merely because the account holder may owe fiduciary duties to its own clients. For example, in *Agape*, plaintiff-investors sought to hold a depository bank liable for its supposed participation in an account holder's Ponzi scheme based on allegedly suspicious account activity. *In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010). The court rejected this argument, recognizing that the "conventional depository accounts" at issue in that case were *not* fiduciary accounts. *Id.* In words that apply with full force to this case, the court observed that "[n]either the Plaintiffs nor the Court have been able to locate a case which even suggests that New York law imposes upon banks a duty to protect non-customers from a fraud involving *depository* accounts." *Id.* (emphasis in original).

       *Renner* reached the same result. The plaintiff in that case was an investor who was defrauded of $3 million by a Chase account holder. *Renner* v. *Chase Manhattan Bank*, 1999 WL 47239, at *1 (S.D.N.Y. Feb. 3, 1999). Because the plaintiff-investor had transferred those funds directly to the Chase account, the plaintiff sued Chase on a number of theories, including aiding and abetting fraud. *Id.* at *11, *14. In dismissing the claims, the court observed that the plaintiff was "not a customer of Chase" to which Chase owed any duty. *Id.* at *13. The court concluded that the account "was not a fiduciary account" and, accordingly, that there was "no reason to depart from the general rule that a bank cannot be held accountable for the ways in which its customers manage their accounts." *Id.* at *14. In amending his complaint, the plaintiff claimed that the Chase account differed from a general deposit account because of the account holder's fiduciary duties. *Renner*, 2000 WL 781081, at *13. But just as the court had earlier rejected plaintiff's characterization of the account as a "fiduciary account," the court rejected plaintiff's new theory. Citing the Second Circuit's decision in *Peoples Westchester Savings*

27

*Bank* v. *FDIC*, 961 F.2d 327, 330 (2d Cir. 1992), the court held that although the account holder "may have had a special duty with respect to [the plaintiff's] funds, . . . that duty did not pass to Chase." *Renner*, 2000 WL 781081, at *13; *see also Tzaras* v. *Evergreen Int'l Spot Trading*, 2003 WL 470611, at *6 (S.D.N.Y. Feb. 25, 2003) (dismissing claims against JPMorgan predicated on account holder's wrongdoing and rejecting claim that account held by a fraudulent investment firm at Chase was a "fiduciary account"); *Musalli Factory for Gold & Jewelry* v. *JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 27 (S.D.N.Y. 2009) (dismissing breach of fiduciary duty claims against Chase based on allegations that an investment advisor defrauded an investor into making deposits into the advisor's account at Chase).

In this case, plaintiffs have alleged no facts suggesting that the relationship between JPMorgan and BMIS was anything more than an ordinary relationship between a bank and a general depositor. There are no allegations that Madoff or JPMorgan intended to create anything other than an ordinary deposit account. Nor are there allegations that the documents governing the 703 Account identified the account as a trust account. There is thus "no reason to depart from the general rule that a bank cannot be held accountable for the ways in which its customers manage their accounts." *Renner*, 1999 WL 47239, at *14.

Finally, even assuming that the 703 Account was a "fiduciary account," plaintiffs' claims must be rejected. It is well settled that "[a]s a general rule, a bank has no duty to monitor even a fiduciary account under New York law." *Renner*, 1999 WL 47239, at *14. And a bank is entitled "'to presume that the fiduciary will apply the funds to their proper purposes.'" *In re Agape Litig.*, 773 F. Supp. 2d at 325. Thus, a bank is only subject to possible liability if it fails to safeguard funds in such an account "after receiving 'clear evidence' of misappropriation." *MLSMK*, 431 F. App'x at 20. Nothing in the Complaint shows that JPMorgan received "clear

evidence of misappropriation." As the Second Circuit observed in affirming the dismissal of a Madoff customer's claims against JPMorgan, "it is not unusual for money to be transferred into and out of investment accounts; investment advisors could not buy and sell securities on behalf of their clients if they did not transfer money to and from various accounts." *Id.*

**D.     Plaintiffs have failed to allege facts showing that JPMorgan substantially assisted Madoff's fraud.**

Just as plaintiffs have failed to plead any facts showing that JPMorgan had actual knowledge of Madoff's Ponzi scheme, they have also failed to plead facts showing that JPMorgan substantially assisted the scheme. Plaintiffs' argument is that JPMorgan assisted the fraud by (1) providing commercial banking services to BMIS, (2) investing approximately $250 million in Madoff feeder funds, and (3) not reporting Madoff to regulators.

*First*, "the mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance." *Rosner*, 2008 WL 5416380, at *12 (quotation marks omitted). The banking services provided by JPMorgan to Madoff are precisely the "conventional banking services" that New York courts have consistently held to be insufficient to show "substantial assistance" as a predicate for aiding and abetting liability. *In re Agape Litig.*, 681 F. Supp. 2d at 365; *accord Weshnak*, 2012 WL 233455, at *1 ("A bank's provision of 'its usual banking services to a customer . . . does not in and of itself rise to the level of substantial assistance.'"); *In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 392-93 (S.D.N.Y. 2009) (characterizing bank's extension of credit to fraudulent customer as "routine" banking service insufficient to support an aiding and abetting claim); *Ryan*, 2000 WL 1375265, at *9 ("The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts . . . do not constitute substantial assistance."); *Nigerian Nat'l Petroleum Corp.* v.

29

*Citibank, N.A.*, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (bank's execution of repeated wire transfers did not constitute substantial "assistance").

*Second*, plaintiffs' allegation that JPMorgan substantially assisted Madoff by investing $250 million in the feeder funds turns the substantial assistance requirement on its head. Whether that money ever actually made its way to BMIS is never alleged. But even if it did, such a tiny fraction of the tens of billions of dollars that Madoff is known to have collected from investors cannot plausibly be characterized as "substantial assistance." Moreover, by plaintiffs' theory, everyone who invested in one of the feeder funds or directly with Madoff himself — *i.e.*, Madoff victims, seemingly including plaintiffs themselves — "substantially assisted" his fraud. This argument is absurd.

*Third*, plaintiffs cannot adequately plead substantial assistance by alleging that JPMorgan failed to comply with federal anti-money laundering laws or that it "ignor[ed]" allegedly suspicious activity in Madoff's account. Compl. ¶ 340. These allegations all amount to *inaction*, which *cannot* amount to substantial assistance unless the defendant owes a fiduciary duty "directly to the plaintiff." *Kaufman*, 307 A.D.2d at 126; *see also Sharp International*, 403 F.3d at 51-52 (allegations that "come down to omissions or failures to act" do not support a claim of "substantial assistance"). The alleged failure "to comply with domestic and international bank secrecy, know-your-customer, and anti-money laundering laws, decrees, and regulations" does "not elevate [defendants'] actions into the realm of 'substantial assistance.'" *Rosner* v. *Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007); *see also Berman*, 2011 WL 1002683, at *10.

**E.     Plaintiffs have failed to plead individual fraud claims.**

The aiding and abetting claims also fail because the named plaintiffs make no attempt to satisfy the requirements for pleading their own underlying fraud claims against Madoff, let alone any of the absent class members' individual fraud claims against Madoff.  "It is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003).  To state an aiding and abetting fraud claim, plaintiffs must plead the "existence of a fraud."  *Harborview*, 2012 WL 612358, at *11.  And under Rule 9(b), the circumstances surrounding that fraud must be stated with particularity.  *E.g.*, *Cohain*, 2011 WL 3896095, at *3.

Here, however, while the named plaintiffs have alleged that Madoff perpetrated a Ponzi scheme, they have not attempted to satisfy the basic requirements of Rule 9(b) with respect to their own individual fraud claims.  They have not alleged when they invested with Madoff, how much they invested with him, what statements they relied upon, why such reliance was reasonable, and how much money (if any) they lost when the fraud was revealed.  All they allege about themselves is that they suffered "losses and/or damages."  Compl. ¶¶ 23-24.

Moreover, to assert common law fraud claims on behalf of a nationwide class of Madoff investors, plaintiffs would have to identify each customer who was defrauded, specify the misstatements or omissions that each customer relied upon, and explain why each customer's reliance was reasonable.  Madoff's customers invested at different times, were told different things, conducted different levels of due diligence, and had different levels of sophistication.  Yet plaintiffs lump all of Madoff's customers together as if they were a single, unitary fraud plaintiff.  The Court should not indulge plaintiffs' fiction.  As Judge Rakoff observed in the *HSBC* case brought by the SIPC Trustee, "common law claims (such as those asserted here)

generally require proof of individual reliance and causation." *Picard* v. *HSBC Bank PLC*, 454

B.R. 25, 35 (S.D.N.Y. 2011). This case is not a fraud-on-the-market case where the plaintiffs

may dispense with pleading the individual elements of fraud claims. *SIPC* v. *BDO Seidman,*

*LLP*, 222 F.3d 63, 73 (2d Cir. 2000) ("federal courts repeatedly have refused to apply the fraud

on the market theory to state common law cases despite its wide acceptance in the federal

securities fraud context").

    This Court should follow the other courts in this district that have dismissed

putative common law fraud class actions where the plaintiffs have failed to plead the individual

elements of their fraud claims, including reliance. *See In re Pfizer Inc. Sec. Litig.*, 584 F. Supp.

2d 621, 644 (S.D.N.Y. 2008) (dismissing common law fraud claim pled in putative class action

where the plaintiffs "only included general allegations of direct reliance"); *Redtail Leasing, Inc.*

v. *Bellezza*, 1997 WL 603496, at *7 (S.D.N.Y. Sept. 30, 1997) (dismissing common law fraud

claim from class action: "Common law fraud claims must be supported by factual allegations

demonstrating the plaintiff's actual, direct reliance on the misrepresentation or omission."); *Gelb*

v. *AT&T*, 813 F. Supp. 1022, 1025 (S.D.N.Y. 1993) (dismissing common law fraud claim from

putative class action for "failure to plead fraud with particularity").

## POINT III

## THE COMPLAINT FAILS TO STATE A CLAIM FOR CONVERSION, UNJUST ENRICHMENT, OR COMMERCIAL BAD FAITH (COUNTS IV, VI, AND VIII).

**A.  The Complaint fails to state a claim for conversion.**

    Plaintiffs claim in Count IV that JPMorgan converted customer property when it

debited the 703 Account to repay BMIS's outstanding loan. Compl. ¶¶ 344-47. Under New

York law, "conversion takes place when someone, intentionally and without authority, assumes

or exercises control over personal property belonging to someone else, interfering with that

person's right of possession." *Colavito* v. *N.Y. Organ Donor Network*, 8 N.Y.3d 43, 49-50

(2006). In this case, the Complaint alleges that JPMorgan followed the instructions of its

customer to repay the loan by debiting the 703 Account. *See, e.g.*, Compl. ¶¶ 269-70, 273-74,

277. In such circumstances, the conversion claims thus rest on the allegation that JPMorgan

somehow knew that BMIS was a fraud. As demonstrated, plaintiffs have failed to plead

particularized facts substantiating that claim, as required by Rule 9(b). *See Daly* v. *Castro*

*Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (where conversion claim "rests on an allegation

of fraudulent taking," Rule 9(b) applies).

Moreover, when JPMorgan debited BMIS's deposit account to repay the loan, it

did not exercise control over specifically identifiable property belonging to "someone else."

"[A] customer's bank account is merely a debt owed to it by the bank and funds deposited are

not sufficiently specific and identifiable, in relation to the bank's other funds, to support a claim

for conversion against a bank." *Wells* v. *Bank of New York Co.*, 181 Misc. 2d 574, 577 (Sup. Ct.

N.Y. Co. 1999) (citing cases). Accordingly, money in a bank account is not "held in a 'specific,

identifiable fund,'" as required for a conversion action. *Citadel Mgmt.* v. *Telesis Trust*, 123

F. Supp. 2d 133, 147 (S.D.N.Y. 2000) (citation omitted).

**B.     The Complaint fails to state a claim for
        unjust enrichment.**

Count VI of the Complaint is a cause of action for unjust enrichment, which seeks

to recover fees and alleged profits earned on the Madoff relationship. Compl. ¶ 365. To plead

unjust enrichment under New York law, a plaintiff must allege that "(1) the other party was

enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to

permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd.* v.

*Wildenstein*, 16 N.Y.3d 173, 182 (2011) (quotation marks omitted). In addition, the complaint

must allege the existence, between the plaintiffs and defendant, of "some type of direct dealings or an actual, substantive relationship." *Carmona* v. *Spanish Broadcasting Sys., Inc.*, 2009 WL 890054, at *6 (S.D.N.Y. Mar. 30, 2009); *accord, e.g.*, *Jet Star Enters., Ltd.* v. *Soros*, 2006 WL 2270375, at *5 (S.D.N.Y. Aug. 9, 2006).

The Complaint does not state a claim for unjust enrichment. *First*, although plaintiffs assert summarily that JPMorgan "has unjustly benefitted through its receipt of customer property," Compl. ¶ 364, the Complaint alleges no direct dealings or actual, substantive relationships between JPMorgan and plaintiffs. *See Czech Beer Importers, Inc.* v. *C. Haven Imports, LLC*, 2005 WL 1490097, at *7 (S.D.N.Y. June 23, 2005) (dismissing unjust enrichment claim for failure to allege relationship between plaintiff and defendant); *Reading Int'l, Inc.* v. *Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003) (same).

*Second*, the fact that JPMorgan received repayment of its loan to BMIS, along with interest payments and fees for banking services, does not show that JPMorgan was unjustly enriched. Under New York law, "a party who provides consideration for [a] benefit is not enriched." *First Union National Bank* v. *A.G. Edwards & Sons*, Index No. 601243/98, slip op. at 6-7 (Sup. Ct. N.Y. Co. Jan. 5, 1999), *aff'd*, 262 A.D.2d 106 (1st Dep't 1999). In this case, JPMorgan loaned money to BMIS. The repayment of a loan is not an unjust enrichment. And the payment for banking services rendered is not an unjust enrichment either.

*Third*, plaintiffs have failed to allege particularized facts substantiating their claim that "equity and good conscience" require restitution. That contention once again hinges on plaintiffs' claim that JPMorgan knowingly participated in Madoff's Ponzi scheme. Having alleged that JPMorgan was "thoroughly complicit" in Madoff's fraud, plaintiffs would need to satisfy Rule 9(b) even for those claims that do not include fraud as a formal element of the claim.

As this Court has held, "'where the gravamen of the case is plainly fraud and no effort is made to show any other basis for the claims,'" the "'label used in the pleading'" is not controlling; the Court will not look for some lesser included offense and apply Rule 8 to the claim. *DeBlasio*, 2009 WL 2242605, at *9-11 (dismissing claims for negligence and unjust enrichment under Rule 9(b) where complaint was premised on "averments of fraud") (quoting *Rombach*, 355 F.3d at 172).

**C.    The Complaint fails to state a claim
         for commercial bad faith.**

Plaintiffs claim in Count VIII that JPMorgan is liable on a theory of "commercial bad faith." But that doctrine has no applicability to this case. "The New York Court of Appeals fashioned the doctrine of 'commercial bad faith' as an exception to the general rule that a bank is absolved of liability for a check made out to a fictitious payee when the maker knows that the payee is fictitious." *Lerner*, 459 F.3d at 293. Quite clearly, the Complaint does not "allege fraud in the making and cashing of checks." *Id.* (expressing "considerable doubt" as to whether a "commercial bad faith" claim is cognizable where plaintiff does not allege "fraud in the making and cashing of checks"); *see also, e.g.*, *Musalli*, 261 F.R.D. at 24 n.10 ("Commercial bad faith is a judicial concept created by the New York Court of Appeals within the context of fraudulent checks.").

But even if commercial bad faith were applicable here, the claim still fails for the same reasons that doom plaintiffs' other intentional tort claims. To plead commercial bad faith, plaintiffs must allege with particularity that JPMorgan had "actual knowledge" of Madoff's Ponzi scheme and that JPMorgan became a "participant" in that scheme. *See, e.g.*, *Lerner*, 459 F.3d at 293; *accord Rosner* v. *Bank of China*, 2008 WL 5416380, at *15 (S.D.N.Y. Dec. 18, 2008). As shown, plaintiffs have failed to meet these requirements, and the claim for

commercial bad faith must be dismissed under Rule 9(b). *See, e.g.*, *Rosner*, 349 F. App'x at 640 ("Because a 'commercial bad faith' claim under New York law likewise requires a plaintiff to show actual knowledge of the fraudulent scheme . . . the district court properly dismissed that claim as well."); *MLSMK*, 737 F. Supp. 2d at 145 (dismissing claim for commercial bad faith based on plaintiff's failure to plead actual knowledge with sufficient particularity); *see also Rosner*, 2008 WL 5416380, at *15 ("[C]ourts that dismiss claims of aiding and abetting fraud brought against banks routinely dismiss claims of commercial bad faith on identical grounds.").

## POINT IV

## THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY OR GROSS NEGLIGENCE (COUNTS VII AND IX).

Counts VII and IX set forth causes of action for breach of fiduciary duty and gross negligence. Each of these claims fails because JPMorgan owed no duty to Madoff's customers, who had no relationship with the bank.

It is black-letter New York law that banks do not owe a fiduciary duty even to their own customers in the ordinary course. *E.g.*, *Frutico S.A. de C.V.* v. *Bankers Trust Co.*, 833 F. Supp. 288, 301 (S.D.N.Y. 1993) ("[A] bank does not owe its customers the kind of fiduciary duties which arise in special relationships between parties."). It follows *a fortiori* that banks owe no fiduciary duties to the customers of their customers. *See, e.g.*, *Thermal Imaging, Inc.* v. *Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 344 (S.D.N.Y. 2001) (rejecting argument that broker owed "a fiduciary duty to parties asserting claims adverse to the broker's own customers"). As Judge Kaplan held in *OSRecovery, Inc.* v. *One Groupe International*, "'[b]anks generally do not owe a duty, *fiduciary or otherwise*, to noncustomers with whom they have no direct relationship.'" 229 F.R.D. 456, 459 (S.D.N.Y. 2005) (emphasis added). The fact that Madoff was engaged in a massive fraud does nothing to change this, for it is also black-letter New York

law that banks "do not owe non-customers a duty to protect them from the intentional torts of their customers." *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005) (citing cases).

The Complaint fails to plead the existence of *any* relationship between plaintiffs and JPMorgan. Instead, the Complaint summarily posits that the fiduciary relationship between plaintiffs and BMIS was somehow extended to draw in JPMorgan. *See* Compl. ¶ 375. But courts in this Circuit, including Judge Jones in *MLSMK*, have routinely rejected duty-based claims pled against banks based on the intentional torts of bank customers. *See, e.g.*, *MLSMK*, 737 F. Supp. 2d at 145-47 (holding that JPMorgan did not owe a duty of care to Madoff's customers and dismissing negligence claim); *Agape*, 681 F. Supp. 2d at 360-61 (dismissing negligence claim: "Neither the Plaintiffs nor the Court have been able to locate a case which even suggests that New York law imposes upon banks a duty to protect non-customers from a fraud involving *depository* accounts.") (emphasis in original).

Moreover, in this case, the alleged breach of duty is that JPMorgan was "thoroughly complicit" in Madoff's fraudulent Ponzi scheme. All of the allegations of fraud that pervade the Complaint are incorporated in each of the common law claims. Accordingly, having premised their Complaint on allegations of fraud, the claims for breach of fiduciary duty and gross negligence (indeed, all of the claims) must satisfy the requirements of Rule 9(b). *See, e.g.*, *DeBlasio*, 2009 WL 2242605, at *11 ("'[W]here the complaint incorporates by reference prior allegations of fraud into other claims traditionally not perceived to be grounded in fraud, those claims must be pleaded according to Rule 9(b).'" (citation omitted)). Again, as set forth above, plaintiffs have failed to plead particularized facts showing that JPMorgan had actual knowledge

of Madoff's fraud and thus the breach of fiduciary duty and gross negligence claims should be dismissed on this basis as well.

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed with prejudice.

Dated:   New York, New York
            March 9, 2012

Respectfully submitted,

*Of Counsel:*

WACHTELL, LIPTON, ROSEN & KATZ

Stephen R. DiPrima
Emil A. Kleinhaus
Lauren M. Kofke
Jonathon R. La Chapelle

By: /s/ John F. Savarese
       John F. Savarese

51 West 52nd Street
New York, NY  10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., J.P. Morgan Securities*
*LLC and J.P. Morgan Securities Ltd.*