UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

PAUL SHAPIRO, on behalf of himself as an individual,
and on behalf of all others similarly situated,

        Plaintiff,

    -against-

JPMORGAN CHASE & CO., JPMORGAN CHASE
BANK, N.A., J.P. MORGAN SECURITIES LLC, and
J.P. MORGAN SECURITIES, LTD.,

        Defendants.

------------------------------------------------------------x

STEPHEN and LEYLA HILL, on behalf of themselves
as individuals, and on behalf of all others
similarly situated,

        Plaintiffs,

    -against-

JPMORGAN CHASE & CO., JPMORGAN CHASE
BANK, N.A., J.P. MORGAN SECURITIES LLC, and
J.P. MORGAN SECURITIES, LTD.,

        Defendants.

------------------------------------------------------------x

No. 11 Civ. 8331 (CM) (MHD)

No. 11 Civ. 7961 (CM)

## AMENDED MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTIONS FOR FINAL CLASS ACTION SETTLEMENT APPROVAL AND ATTORNEYS' FEES

McMahon, J.:

On January 10, 2014, this Court preliminarily approved a settlement agreement[1] between

plaintiffs Paul Shapiro, Stephen Hill and Leyla Hill, individually, and on behalf of a putative class

(the "Plaintiffs"), Intervenor Irving H. Picard, Trustee of the SIPA liquidation of Bernard L.

---

[1] A copy of the settlement agreement is attached as Exhibit 2 to the accompanying Joint
Declaration of Andrew J. Entwistle and Reed Kathrein in Support of Plaintiffs' Motion for Final
Approval of Proposed Settlement with Defendants (the "Joint Final Approval Declaration")

Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff (the "SIPA Trustee") and defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. (collectively, "JPMorgan").[2] The settlement of this class action is an integral piece of a global resolution of Madoff-related litigation against JPMorgan involving three simultaneous, separately negotiated settlements totaling $2,243,000,000 consisting of: (i) this class action settlement in the amount of $218 million (the "Settlement"); (ii) the SIPA Trustee's Avoidance Action settlement in the amount of $325 million;[3] and (iii) a civil forfeiture in the amount of $1.7 billion in connection with a resolution of U.S. government claims against JPMorgan concerning Madoff-related matters. The entire $2,243,000,000 will flow to victims of Madoff's Ponzi scheme.

Since the Preliminary Approval Order, Plaintiffs have provided direct notice of the Settlement to what is reasonably believed to be every member of the settlement class, and published notice in accordance with the Preliminary Approval Order. As further described herein, the notices were also available on numerous websites. The deadline by which settlement class members may opt-out of the class or object to the settlement was Friday, February 28, 2014; there was only one objection—though a group of former Madoff "investors" who are not encompassed within the definition of the preliminarily certified Settlement Class filed a notice of intent to "opt out" of a settlement to which they are not parties.

---

[2] *See* January 10, 2014 Order Preliminarily Approving Proposed Settlement and Providing for Notice [ECF No. 52] ("Preliminary Approval Order"), a copy of which is attached as Exhibit 1 to the Joint Final Approval Declaration.

[3] *See* Exhibit 2 to January 7, 2014 Declaration of Andrew J. Entwistle in Support of Plaintiffs' Motion for Preliminary Approval of Proposed Settlement with Defendants  [ECF No. 51-7] ("Trustee's Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9010 of the Federal Rules of Bankruptcy Procedure Approving Settlement of Common Law Claims by and Between the Trustee and the Class Representatives and JPMorgan") for a discussion and description of the Trustee's settlement.

For all of the reasons set forth in the Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Settlement with Defendants [Docket No. 50] ("Preliminary Approval Memorandum"), and as further discussed herein, the court finds that the Settlement easily meets the standards for final approval in this Circuit and merits the approval of this Court.

## BACKGROUND

Subject to the Court's final approval, Plaintiffs have agreed to settle their claims against JPMorgan in exchange for a $218 million cash payment. JPMorgan has also agreed to make a separate payment, in addition to the settlement amount, of up to $18 million for attorneys' fees and expenses to Co-Lead Counsel in connection with the Settlement.

The proposed Settlement, which will resolve all of the Plaintiffs' claims against JPMorgan arising from JPMorgan's conduct as one of Bernard L. Madoff's primary banks, provides a significant benefit to the Settlement Class. The Settlement provides substantial and immediate benefits to the Settlement Class, providing millions of dollars to injured Class members, while avoiding the need for extensive, complex and uncertain litigation against one of the largest banks in the world, represented by highly sophisticated and experienced counsel.

Co-Lead Counsel, who have extensive experience in prosecuting complex class actions, strongly believe the Settlement is in the best interests of the Class, an opinion which is entitled to "great weight."[4] Further, on February 5, 2014, Bankruptcy Judge Bernstein, who is overseeing the SIPA Liquidation of BLMIS, on motion of the SIPA Trustee, approved and authorized the

---

[4] *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465 at 474 (Courts have consistently given "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation."). *See also In re Paine Webber P'ships. Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd* 117 F.3d 721 (2d Cir. 1992) (class counsel's opinion that the settlement is in the best interest of the class is entitled to "great weight"); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 325 (7th Cir. 1980) ("the court is entitled to rely heavily on the opinion of competent counsel").

- 3 -

Settlement pursuant to Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure.[5] Judge Bernstein's intimate familiarity with the Madoff matter causes this court to view his conclusions with particular deference.

## I.    Factual Background

### A.    Class Plaintiffs' Allegations Concerning JPMorgan's Role in Madoff

In the Class Complaint, the Class Plaintiffs alleged that JPMorgan played a central role in the Ponzi scheme perpetrated by Bernard L. Madoff and BLMIS. The Class Plaintiffs allege that JPMorgan had actual knowledge of the scheme, was in a position to stop it, but did nothing. From approximately 1986 on, Madoff's primary account through which most, if not all, of the funds of BLMIS flowed, was a depository account at JPMorgan referred to as the "703 Account."[6] By 2006, and between 2006 and 2008, the 703 Account had billions of dollars in cash deposits.[7] Every customer opening an account with Madoff received an account number, and was instructed to either wire funds or send funds to the 703 Account.[8] As the financial markets began a sharp decline in 2008, the balance in the 703 Account began to drop precipitously and dropped to nearly zero on several occasions.[9] Although the 703 Account was the primary account used by BLMIS, Class Plaintiffs allege that none of the money in the 703 Account was ever used to purchase a single security – a fact that should have been obvious to JPMorgan.[10] Instead, the funds in the

---

[5] *See* Exhibit 4 to the Joint Final Approval Declaration.

[6]    Class Complaint, ¶ 4. The "Class Complaint" refers to the January 20, 2012 Consolidated Amended Class Action Complaint. *See* Docket No. 18. The following is only a summary of certain of the Class Plaintiffs' allegations made in the Class Complaint. Class Plaintiffs respectfully refer the Court to the Class Complaint for a more comprehensive presentation of the allegations made against the defendants.

[7]    *Id.*, ¶¶ 5, 8.

[8]    *Id.*, ¶ 6.

[9]    *Id.*, ¶ 8.

[10]    *Id.*, ¶ 9.

account merely flowed back and forth between Madoff customers in furtherance of the Ponzi scheme.[11]

In this regard, Class Plaintiffs' investigations focused on, among other transactions, numerous round trip transactions involving Madoff friend and insider Norman Levy, internal documents that commented on these questionable transactions very early in the relevant period, and the fees received by JPMorgan in connection with Madoff, including those related to the 703 Account.

In addition to the knowledge that Class Plaintiffs allege JPMorgan had by virtue of the 703 Account, Class Plaintiffs allege that JPMorgan acquired knowledge of the Ponzi scheme in connection with transactions in which JPMorgan was involved during the relevant time period. For example, in 2005 and 2006, JPMorgan was involved in various lending activities with Madoff. In 2006 and 2007, JPMorgan began considering the structuring and issuing of certain financial products that would be based on feeder funds tied to Madoff.[12]   In connection with those transactions, JPMorgan performed due diligence on the feeder funds, and since these funds were invested with Madoff, attempted unsuccessfully to perform due diligence on BLMIS itself.

We now know that, in the process of conducting due diligence, JPMorgan even spoke directly to Madoff, and Madoff stated he would not permit due diligence on his operations.[13]   In addition, JPMorgan's due diligence raised questions about BLMIS' auditor, noting, among other things, that the auditor was not registered with the Public Company Accounting Oversight Board, or subject to peer reviews from the American Institute of Certified Public Accountants.[14]   Finally, the feeder funds themselves often did not permit access to the agreements they had with Madoff,

---

[11]      Id.

[12]      *Id.*, ¶ 93.

[13]      *Id.*, ¶ 107.

[14]      *Id.*, ¶ 98.

preventing JPMorgan from understanding the relationship between such funds and Madoff.[15] Internally, at JPMorgan, during the due diligence with regard to these investments, certain JPMorgan employees unsuccessfully attempted to recreate Madoff results, and raised various other concerns at Underwriting Committee Meetings and in various other contexts and "health checks," with one employee even going so far as to state that there "is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a Ponzi scheme."[16] Notwithstanding these obvious red flags, JPMorgan allowed the scheme to continue without any reporting to U.S. authorities, despite the fact that it filed a SAR report in the UK, and, despite its AML obligations, failed to follow up and take appropriate action in connection with warnings from other banks related to Madoff, and failed to follow through on internal "alerts" or to otherwise heed "triggers" that related to the 703 Account and other Madoff-related activities.

Despite the above and without any reporting to U.S. regulators, JPMorgan redeemed over a quarter billion dollars of its own interests in BMIS feeder funds—managing to redeem all but $80 million in Madoff-related investments before Madoff's December 2008 arrest. BLMIS customers, on the other hand, lost their investment capital of approximately $19 billion.

## B.    Factual and Procedural Background

As is now well documented, in December 2008, it was revealed that Madoff and BLMIS, perpetrated the largest Ponzi scheme in history.   Shortly following this revelation, the Securities Investor Corporation ("SIPC") filed an application in the United States District Court for the Southern District of New York under § 78eee (a)(3) of the Securities Investor Protection Act of 1970 ("SIPA") alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by

---

[15]     *Id.*, ¶ 95.

[16]     *Id.*, ¶ 121.

SIPA.[17]   On December 15, 2008, the District Court granted the SIPC application and entered an

order under SIPA, which, in pertinent part, appointed Irving H. Picard as Trustee for the

liquidation of the business of BLMIS under the SIPA, and removed the case to the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under section

78eee(b)(4) of SIPA, where it is currently pending as *SIPC v. BLMIS*, No. 08-01789 (BRL) (the

"SIPA proceeding").   Bernard Madoff's Chapter 7 case was later substantively consolidated into

the SIPA proceeding.

On December 2, 2010, the Trustee filed a complaint commencing an adversary proceeding

captioned *Picard v. JPMorgan Chase & Co. et al.*, No. 10-4932 (BRL) (the "JPMorgan Adversary

Proceeding") against JPMorgan seeking to avoid and recover under 11 U.S.C. §§ 544(b), 547, 548

and 550 and the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor

Law §§ 270-281) (collectively, the "Avoidance Claims") approximately $425 million of transfers

or other payments (the "Transfers") received by JPMorgan prior to the collapse of BLMIS.   The

Trustee also asserted common law claims (the "Common Law Claims") against JPMorgan,

including aiding and abetting fraud, aiding and abetting breach of fiduciary duty, conversion,

unjust enrichment, and contribution.   On February 8, 2011, JPMorgan moved to withdraw the

reference from the Bankruptcy Court, which was granted by this Court on May 23, 2011.

On June 24, 2011, the Trustee filed an amended complaint (the "Trustee Amended

Complaint").   On August 1, 2011, JPMorgan moved to dismiss the Common Law Claims and

certain of the Avoidance Claims in the Trustee Amended Complaint.   On November 1, 2011, the

District Court granted JPMorgan's motion to dismiss the Trustee's Common Law Claims and

returned all the Avoidance Claims to the Bankruptcy Court for further proceedings.   *Picard v.*

---

[17]      Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities,
LLC, 08-CV-10791 (S.D.N.Y.).

*JPMorgan Chase & Co.*, 460 B.R. 84 (S.D.N.Y. 2011). That decision was subsequently affirmed by the Second Circuit.

Shortly after the District Court dismissed the Trustee's Common Law Claims, two class action complaints were filed in the District Court against JPMorgan in the names of the Class Plaintiffs, Stephen and Leyla Hill, captioned *Hill v. JPMorgan Chase & Co.*, 11 Civ. 7961(CM); and Paul Shapiro, *Shapiro v. JPMorgan Chase & Co.*, 11 Civ. 8331(CM), based upon their ongoing investigation and that of the Trustee. These complaints asserted various claims against JPMorgan on behalf of BLMIS customers who directly had capital invested with BLMIS as of December 2008, *i.e.*, BLMIS customers who were Net Losers (as defined below). Specifically, the complaints contained several common law causes of action based on alleged breaches of fiduciary duties, embezzlement, conversion, unjust enrichment, and gross negligence.

On December 5, 2011, the District Court consolidated these two actions into the Consolidated Class Action. On January 20, 2012, the Class Plaintiffs filed their Consolidated Amended Class Action Complaint ("Class Complaint") against JPMorgan, again asserting on behalf of the proposed class various claims against JPMorgan arising out of its relationship to Madoff (the claims set forth in the Class Complaint together with the dismissed Common Law Claims are collectively referred to hereafter as the "Class Claims").

On March 9, 2012, JPMorgan filed a motion to dismiss the Class Complaint. One of JPMorgan's primary arguments in support of their motion to dismiss was that the Class Claims (which were common law claims), were all precluded under the Securities Litigation Uniform Standards Act ("SLUSA"). In support of their SLUSA arguments, JPMorgan cited numerous Madoff-related cases from this District, including cases from this Court, which dismissed Madoff

claims under SLUSA.[18] JPMorgan also moved to dismiss on the basis that the Class Complaint failed to state a claim for relief, contending, among other things, that the complaint does not show JPMorgan's actual knowledge of or participation in Madoff's fraud. The Class Plaintiffs opposed the motion to dismiss and continued their ongoing investigation of the facts and circumstances related to Madoff generally and JPMorgan's involvement in Madoff specifically.

In addition to JPMorgan's motion to dismiss the Class Complaint, the Trustee filed a motion seeking limited intervention pursuant to Fed. R. Civ. P. 24(a)(2) in the Consolidated Class Action, which was granted by this Court on October 16, 2012. On September 26, 2013, this Court placed the Consolidated Class Action on the suspense calendar pending a decision from the United States Supreme Court in *Roland v. Green*, 675 F.3d 503 (5th Cir. 2012), *cert. granted sub nom. Chadbourne & Parke LLP v. Troice*, 133 S. Ct. 977 (U.S. Jan. 18, 2013) (No. 12-79), cases concerning the fraud perpetrated by Allan Stanford and which raised certain issues concerning the interpretation of SLUSA. The parties submitted various letter briefs regarding *Chadbourne* and related issues with the result that the matter remains on the suspense calendar. Throughout that period, counsel for the Class Plaintiffs, Representatives continued to investigate the claims here and to prosecute other Madoff-related litigations.

## II.    Reasons for the Settlement

The Settlement represents the culmination of extensive investigations by the Class Plaintiffs and the Trustee into JPMorgan's potential liability to BLMIS and the customers.

Settlement Class Counsel conducted an independent and exhaustive investigation of the relationship between BLMIS and JPMorgan, including JPMorgan's activities as BLMIS's bank; reviewed and analyzed document productions by JPMorgan and the Trustee totaling more than a

---

[18]    *See, e.g., In re Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) (McMahon, J.). *See also, In re Herald*, 730 F.3d 112, 118 (2d Cir. 2013), decided while JPMorgan's motion to dismiss was *sub judice*.

million pages; reviewed and analyzed Bankruptcy Rule 2004 examination, trial and other Madoff related testimony; reviewed numerous related Madoff documents, including materials developed in related investigations by regulators and others; developed expert testimony on related issues and conducted their own interviews of numerous JPMorgan senior executive witnesses. Settlement Class counsel and their consultants also independently analyzed the Class' potential claims and damages against JPMorgan.

The Trustee's professionals also conducted an exhaustive review of JPMorgan's documents, interviewed numerous JPMorgan witnesses, deposed several former and current employees of JPMorgan, and reviewed related BLMIS documents which were shared with Class Counsel during the period after the motions to dismiss were filed as part of Lead Counsel's ongoing investigation and effort to maximize recoveries on behalf of Madoff victims.

JPMorgan voluntarily cooperated with both the Trustee and counsel for the Class Plaintiffs during the course of these investigations.

The Trustee and Class Plaintiffs believe the Settlement represents an excellent resolution to what would otherwise be a costly and protracted legal battle, the outcome of which is uncertain. While the various potential claims against JPMorgan may be colorable, the independent and collaborative investigations by the Trustee and Class Plaintiffs – including discussions with JPMorgan's skilled counsel – have caused counsel to conclude that the Trustee and Class Plaintiffs face substantial challenges in litigation of common law damages claims against JPMorgan and that JPMorgan has substantial defenses. Most notable, is the fact that Class Plaintiffs faced a substantial risk of their claims being adversely impacted by developing law interpreting SLUSA.

In contrast to the difficulty and cost of protracted litigation of the potential claims against JPMorgan, the Settlement will provide timely increased recovery to customers and certainty to the Madoff estate, and permit the Trustee to make substantial progress toward completion of the SIPA Liquidation of Madoff. The Class Claims – *i.e.* the common law damages claims asserted on

behalf of the class of net-loser Madoff customers – are being settled for $218 million. The combined settlement of the Class Claims and the Trustee's Avoidance claims is $543 million. The Class and Trustee settlements, combined with the contemporaneous Government resolution, will result in a total recovery of $2.243 billion for Madoff victims.

## III. The Terms of the Class Action Settlement

The key terms of the Settlement of the Class Claims are as follows:

    (a)    In connection with the Class Claims, within 14 days following orders by this Court preliminarily approving the Settlement and by the Bankruptcy Court approving the Settlement (in connection with the Trustee's settlement of his Common Law Claims), JPMorgan has agreed to pay $218 million into an escrow account managed by City National Bank ("Class Settlement Funds"). As further described below, in exchange for these settlement payments, members of the Settlement Class will release JPMorgan from all claims related to Madoff or BLMIS or that were alleged in the Class Complaint.

    (b)    In addition to the $218 million settlement amount, within 14 days following the Court's ruling on Class Plaintiffs' application for attorneys' fees and expenses, JPMorgan has agreed to pay up to $18 million to Plaintiffs' Counsel as attorneys' fees and expenses.

The Settlement Agreement provides that the Class Settlement Funds will be distributed to members of the Settlement Class following the Effective Date of the Settlement Agreement.[19] Settlement Class members will be able to make a claim on the Class Settlement Funds regardless of whether they have submitted a claim in the SIPA proceeding. For purposes of distributions from the Class Settlement Fund, a claim filed with the Trustee in the SIPA proceeding will be deemed a claim against the Class Settlement Fund.[20] If a Settlement Class member did not file a claim in the SIPA proceeding, that Class member will need to file a claim against the Class Settlement Fund.[21] Members of the Settlement Class, including those Net Losers that are

---

[19]    Settlement Agreement, ¶ 9.

[20]    Id.

[21]    *Id.*

defendants in avoidance actions by the Trustee, shall receive their *pro rata* shares of the Class

Settlement Fund based on their Net Losses as of December 11, 2008.[22]

## DISCUSSION

## I. THE STANDARDS FOR ASSESSING WHETHER THE CLASS SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE.

Federal courts have long expressed a preference for the negotiated resolution of

litigation.[23] While the decision to grant or deny approval of a settlement lies within the broad

discretion of the trial court, there is a general policy favoring settlement, especially with respect to

class actions.[24]

The standard for reviewing the proposed settlement of a class action in the Second Circuit,

as in other circuits, is whether the proposed settlement is "fair, reasonable, and adequate."[25] In

assessing a settlement, the Court should neither substitute its judgment for that of the parties who

negotiated the settlement, nor conduct a mini-trial on the merits of the action.[26] Recognizing that a

settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has

cautioned that, while a court should not give "rubber stamp approval" to a settlement, it must stop

---

[22] *Id.*

[23] *See, e.g., Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts.").

[24] *See, e.g., Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.") (citation omitted); *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as reduction of litigation and related expenses, for the general policy favoring the settlement of litigation.") (citing 3 Newberg, *Class Actions* §5570c, at 479-80 (1977)); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) ("Indeed, there is a 'general policy favoring the settlement of litigation.'. . . This is particularly true of class actions.") (quoting *Weinberger*, 698 F.2d 61 at 73).

[25] *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689, 2003 U.S. Dist. LEXIS 17090, at *9 (S.D.N.Y. Sept. 29, 2003); *In re Currency Conversion Fee Antitrust Litig.* ("*CCF*"), 263 F.R.D. 110, 122 (S.D.N.Y. 2009).

[26] *Weinberger*, 698 F.2d at 74; *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993).

short of the detailed and thorough investigation that it would undertake if it were actually trying the case."[27]   In any case, "there is a range of reasonableness with respect to a settlement."[28]

Where, as here, a $218 million settlement was agreed to by experienced counsel, who are most closely acquainted with the facts of the underlying litigation, after extensive arm's-length negotiations, a strong initial presumption of fairness attaches to the proposed settlement.[29]

In addition to the presumption of fairness, the Second Circuit in *Grinnell* has identified nine factors to be utilized in assessing a proposed class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[30]

All of the *Grinnell* factors need not be satisfied.[31]  Instead, the Court should look at the totality of these factors in light of the circumstances.[32]

## II.   THE SETTLEMENT IS ENTITLED TO A PRESUMPTION OF FAIRNESS BECAUSE IT IS THE RESULT OF EXTENSIVE ARM'S-LENGTH NEGOTIATIONS CONDUCTED BY HIGHLY EXPERIENCED COUNSEL.

A class action settlement is entitled to a presumption of fairness when it is the product of extensive arm's-length negotiations.[33]  "So long as the integrity of the arm's length negotiation

---

[27]  *Grinnell*, 495 F.2d at 462.

[28]  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

[29]  *Luxottica*, 233 F.R.D. at 315; *see also In re Alloy, Inc. Sec. Litig.*, 03 Civ. 1597, 2004 U.S. Dist. LEXIS 24129, at *5 (S.D.N.Y. Dec. 2, 2004); *In re Automotive Refinishing Paint Antitrust Litig.*, No. 1426, 2007 WL 4570918, at *3 (E.D. Pa. Dec. 28, 2007).

[30]  *Grinnell*, 495 F.2d at 463; *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001); *In re AMF Bowling Sec. Litig.*, 334 F. Supp. 2d 462, 464 (S.D.N.Y. 2004).

[31]  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citation omitted).

[32]  *See CCF*, 263 F.R.D. at 123; *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003).

process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement."[34] The Court may presume that a settlement negotiated at arm's-length by experienced counsel is fair and reasonable.[35]

Here, highly experienced counsel on both sides, all with a strong understanding of the strengths and weaknesses of each party's respective potential claims and defenses, vigorously negotiated the Settlement at arm's-length. The settlement process was initiated by Plaintiffs' Co-Lead Counsel who negotiated the Settlement following significant investigation and informal discovery and analysis in this matter, as well as extensive efforts in connection with the investigation and prosecution of other Madoff-related litigation, and helped to facilitate these global resolutions. The hard-fought arm's-length settlement negotiations took place over the course of almost one year, amid a myriad of complicated issues, including the simultaneous settlements of the Trustee's avoidance claims and the civil forfeiture with the United States government, and included numerous in-person and telephonic meetings.[36] During the course of the negotiations, the parties debated the merits of their respective potential claims and defenses. Plaintiffs' Co-Lead Counsel zealously and knowledgeably advanced the Settlement

---

[33] *See* 4 Alba Conte, Herbert B. Newberg, *Newberg on Class Actions* §11.41 (4th ed. 2002).

[34] *NASDAQ*, 187 F.R.D. at 474 (S.D.N.Y. 1998). *See also Wal-Mart Stores*, 396 F.3d at 116; *Teachers' Ret. Sys. of La. v. A.C.N.U., Ltd.*, No. 01-CV-11814, 2004 WL 1087261, at *1 (S.D.N.Y. May 14, 2004) ("A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if . . . it was the product of arm's length negotiations conducted by capable counsel experienced in class action litigation . . . and if it occurred after meaningful discovery.").

[35] *See In re IMAX Secs. Litig.*, 283 F.R.D. 178 at 189; *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if, as is the case here, it was the product of arm's-length negotiations conducted by capable counsel, well-experienced in class action litigation arising under the federal securities laws.") (citation omitted).

[36] *See* Joint Final Approval Declaration at ¶¶ 33-39 for a detailed discussion of the settlement negotiations.

Class' positions and were fully prepared to pursue litigation against JPMorgan rather than accept a settlement that was not in the best interest of the Settlement Class.

By the time of the Settlement, Plaintiffs' Co-Lead Counsel were well-positioned, following an extensive investigation, to critically evaluate the propriety of settlement.[37] And while counsel were undoubtedly interested in their compensation, the separate $18 million payment of attorneys' fees and expenses by JPMorgan was negotiated with JPMorgan only *after* the parties had structured and agreed to the terms of the Settlement.

The hard-fought and arduous settlement negotiations demonstrate that the Settlement is the result of fair and honest negotiations. Further, Plaintiffs' Co-Lead Counsel, who have extensive experience in the prosecution of complex class action litigation, with particular expertise in complex commercial and financial litigation, have made a considered judgment that the Settlement is not only fair, reasonable and adequate, but an excellent result for the Settlement Class.[38]

As a result, the court gives the Settlement a strong presumption of fairness.

## III.    THE *GRINNELL* FACTORS CONFIRM THAT THE CLASS SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE.

A presumption is, of course, only a presumption – it can be rebutted. Here, however, independent analysis of the terms of the settlement, using the Grinnell factors, confirms the propriety of the presumption.

---

[37] *See In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 400 (D.N.J. 2006) ("Where this negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent.") (citing *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003)).

[38] *See D'Amato*, 236 F.3d at 85 ("the settlement resulted from arm's-length negotiations and [] plaintiffs' counsel have possessed the experience and ability . . . necessary to [the] effective representation of the class's interest").

## A. Complexity, Expense and Likely Duration of the Litigation Support Approval of the Settlement.

This factor captures the probable costs, in both time and money, of continued litigation.[39] "Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."[40]

Absent this Settlement, JPMorgan would likely litigate against Class Plaintiffs for years to come, consuming thousands of hours of professional time and substantial expense, assuming plaintiff's claims were able to survive a dispositive motion. Given the lengthy time period at issue in this case, this litigation would also likely involve massive discovery – far more than the discovery already taken in aid of the settlement negotiations -- millions of pages of documents, and scores of depositions. In addition, any litigation here would involve extensive and contested motion practice, and, assuming the success of the Class Plaintiffs at each of these stages, a complex and costly trial, followed by likely appeals.[41] Throughout this process, the Class Plaintiffs would face numerous hurdles to establishing JPMorgan's liability. Moreover, even if the Plaintiffs were to prevail at all stages of such litigation, any potential recovery (in the absence of a settlement) would occur years from now, substantially delaying payment and other relief to the Settlement Class.

In contrast, the Settlement, if approved, would provide for an immediate cash payment of $218 million to the Settlement Class. In addition, in connection with the Class Settlement,

---

[39] *See In re Bears Stearns Cos., Inc. Secs., Derivative, and ERISA Litig.,* 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012); *CCF,* 263 F.R.D. at 123.

[40] *Luxottica,* 233 F.R.D. at 310 (citations omitted).

[41] *See New York v. Nintendo, Inc.,* 775 F. Supp. 676, 681 (S.D.N.Y. 1991) (approving settlement in complex litigation where court held: "If the litigation proceeds to trial, it no doubt will be complex, protracted and costly. Even if [plaintiffs] ultimately prevail, it could be years before consumers received any meaningful restitution."); *Hicks v. Morgan Stanley,* 01 Civ. 10071, 2005 WL 2757792, at *6 ("Further litigation would necessarily involve further costs; justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").

JPMorgan has agreed to pay $325 million to the Trustee in connection with the Trustee's avoidance claims against JPMorgan. Finally, JPMorgan has also agreed to a civil forfeiture of $1.7 billion to the United States Department of Justice. In total, therefore, JPMorgan has agreed to make a payment of $2,243,000,000 -- all of which will be distributed to Madoff victims. The proposed distributions represent an immediate and substantial benefit to the Settlement Class, free of the risk of many years of complex litigation.

## B. Reaction of the Class Supports Approval of the Settlement.

A favorable reception by the Settlement Class constitutes "strong evidence" of the fairness of a proposed settlement and supports judicial approval.[42] A small number of objections are convincing evidence of strong support by class members.[43] Indeed, "In litigation involving a large class it would be 'extremely unusual' not to encounter objections."[44] In *Stoetzner v. U.S. Steel Corp.*,[45] the Third Circuit held that the fact that "only" 29 members of a 281 member class (*i.e.*, 10% of the class) had objected "strongly favors settlement." Likewise, in *Boyd v. Bechtel Corp.*,[46] the fact that only 16% of the class objected was deemed "persuasive" of the adequacy of the settlement.

The Settlement has received overwhelming support. Nearly 2,800 notices were mailed to Class members.[47] Only ten opt-out requests were filed.[48] One of those was filed by attorney

---

[42] *Grinnell*, 495 F.2d at 462; *see also Wal-Mart*, 396 F.3d at 119 ("the favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in our *Grinnell* inquiry").

[43] *Id.* ("Any claim by appellants that the settlement offer is grossly and unreasonably inadequate is belied by the fact that . . . [o]nly *twenty* objectors appeared from the group of 14,156 claimants.") (emphasis added).

[44] *NASDAQ*, 187 F.R.D. at 478 (citation omitted).

[45] 897 F.2d 115, 118-19 (3d Cir. 1990).

[46] 485 F. Supp. 610, 624 (N.D. Cal. 1979).

[47] *See* Declaration of Vineet Sehgal of Alix Partners, LLP [ECF No. 64].

Helen Davis Chaitman, Esq. on behalf of a group of so-called "net winner" BLMIS customers (the "Net Winner Customer Group").[49] The "net winners," in brief, are Madoff investors who were deemed ineligible for SIPA recovery or recovery in the Bankruptcy Court because, over time, they withdrew more money from their Madoff Investment Accounts than they invested with BLMIS, which meant that they had not really lost any money. Their theory – that they should have been allowed to recover some or all of the money they thought they had earned from their BMLIS investments – was not adopted by the Trustee or the Bankruptcy Court, which decision was affirmed by the United States Court of Appeals for the Second Circuit.[50] As a result, a decision was made not to include them in the definition of the Settlement Class. There is nothing for them to "opt out" of, because any claims they might have against JP Morgan are by definition not compromised by the settlement. I can and do, therefore, treat the Chaitman "opt out" as a nullity.[51] In addition to the Chaitman "opt out," AlixPartners received opt-out requests from five other "Net Winner" accounts, as determined by the Trustee, which are also excluded from the definition of the Settlement Class, and which, for this court's purposes, are of no interest.

---

[48] The SIPA Trustee entered a default judgment against the main opt-out, in a far greater sum than the value of its claim against the settlement fund. *See* Account 1 of Exhibit G to the Declaration of Vineet Sehgal of Alix Partners, LLP [ECF No. 64]. The main opt-out is a foreign entity that may not wish to subject itself to the jurisdiction of this Court.

[49] *See Notice of Intention to Opt Out of the Proposed Settlement Agreement Among the Trustee, The Class Action Plaintiffs and JPMorgan Chase*, ECF No. 19 (Case No. 11-cv-07961), ECF No. 55 (Case No. 11-cv-08331), Exhibit A.

[50] *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 242 (2d Cir. 2011).

[51] The parties to the settlement argued that such group opt-outs are not permitted. *See* NEWBERG ON CLASS ACTIONS § 9:49 (5th ed.) ("The right to opt out in a Rule 23(b)(3) class action is considered an individual right. . . . [A] plaintiff . . . may not also opt out a group en masse without the express consent of each individual."); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998). From this I erroneously concluded that Attorney Chaitman was part of the group that was purporting to opt out. I now appreciate that Attorney Chaitman was appearing on behalf of a group of 193 of her clients. I am filing an amended decision to correct the record. The fact remains that Attorney Chaitman's clients are not members of the Settlement Class, so there is no basis on which they could "opt out" of the settlement.

In sum, there appear to be nine valid opt outs from a Settlement Class of nearly 2,800 members. Support for the settlement is indeed overwhelming.

The only objection to the Settlement was filed by Philip Toop, Elizabeth Scott and the Elizabeth F. Scott Family GST Exempt Trust UA (collectively referred to as the "Toop Objection").[52] It will be discussed below.

## C. The Stage of the Proceedings and the Extent of the Investigation Support Approval of the Class Settlement.

In determining whether a class action settlement is fair, reasonable and adequate, courts consider the stage of the proceedings and the amount of discovery completed to ensure that plaintiffs had access to sufficient information to evaluate their case properly and to assess the adequacy of any settlement proposal.[53] Here, Plaintiffs and their counsel had ample information to evaluate the strengths and weaknesses of their claims and the defenses that could be asserted by JPMorgan, as well as the propriety of settlement.

By the time the Settlement was reached, Plaintiffs' Co-Lead Counsel had thoroughly analyzed the possible legal claims against JPMorgan and the substantial legal and factual defenses raised by JPMorgan. In addition, as further described at ¶¶ 34-36 of the Joint Final Approval Declaration, Plaintiffs' Co-Lead Counsel reviewed and analyzed over a million pages of documents produced by JPMorgan and interviewed numerous JPMorgan senior executives, in order to fully understand and evaluate the relationship between JPMorgan and Madoff, and the

---

[52] This objection, focused predominately on the business judgment of the SIPA Trustee, should have more appropriately been filed in the Bankruptcy Court in which the SIPA liquidation of BLMIS is pending. However, the time to file objections in the Bankruptcy Court to the Trustee's settlements with JPMorgan Chase expired on January 28, 2014 and no objections were filed in that proceeding. Moreover, the Bankruptcy Court approved the Trustee's settlements with JPMorgan on February 5, 2014 and the time for appeal has since passed. As such, the arguments in the Toop Objection are misplaced and untimely, and should not be considered by this Court.

[53] *See Weinberger*, 698 F.2d at 74; *Chatelain v. Prudential-Bache Sec.*, 805 F. Supp. 209, 213-14 (S.D.N.Y. 1992).

quantum of evidence that exists concerning JPMorgan's alleged role in Madoff's Ponzi scheme. Co-Lead Counsel also had the benefit of the discovery record generated in the Trustee's proceeding related to Madoff, and held detailed collaborative discussions with the Trustee's professionals who had conducted their own exhaustive investigation of potential claims against JPMorgan. Furthermore, Co-Lead Counsel, themselves, conducted detailed interviews with numerous important JPMorgan senior executives who had not previously been examined by the Trustee. As a result, the court is satisfied that plaintiffs have a full understanding of the strengths and weaknesses of possible claims against JPMorgan and the difficulties they would encounter in this litigation.

**D.      The Risks of Establishing Liability Support Approval of the Settlement.**

It has long been recognized that complex class actions are difficult to litigate.[54] "The legal and factual issues involved are always numerous and uncertain in outcome."[55] Thus, in assessing this factor, the Court is not required to "decide the merits of the case or resolve unsettled legal questions,"[56] or to "foresee with absolute certainty the outcome of the case."[57] "[R]ather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement."[58] This litigation is no exception; as this Court has already opined, Madoff investor

---

[54] *See CCF*, 263 F.R.D. at 123 ("The complexity of Plaintiff's claims *ipso facto* creates uncertainty.") (citations omitted); *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367, 372 (N.D. Ohio 1983).

[55] *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000).

[56] *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

[57] *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000).

[58] *Global Crossing*, 225 F.R.D. at 459.

cases against third parties like JP Morgan would involve numerous complex and novel issues of fact and law.[59]

For example, Class Plaintiffs faced a substantial risk of their claims being adversely impacted by developing law interpreting SLUSA. In addition, Class Plaintiffs' aiding and abetting theories require proof of *substantial knowledge* and participation in the primary wrongdoing. Although JP Morgan has elected to settle, including with the Government, for a substantial payment, it continues to maintain that its employees did nothing wrong, and there is no "smoking gun" in the evidence reviewed during Plaintiffs' investigation. Finally, substantial legal questions exist concerning discovery into, and JPMorgan's liability with respect to, key submissions JPMorgan made to regulators concerning Madoff. While Plaintiffs' Co-Lead Counsel believe that Class Plaintiffs can bring a strong case against JPMorgan, they recognize that a favorable verdict is never assured -- especially where, as here, the issues are novel and the theories are untested.

### E.     The Risks of Proving Damages Support Approval of the Class Settlement.

Should Class Plaintiffs in a case against JPMorgan overcome any dispositive motions and ultimately prove JPMorgan's liability, they would still face the risks of proving damages. Proof of damages in complex class actions is always complex and difficult and often subject to expert testimony.[60]

---

[59] *See, e.g., Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 92 (S.D.N.Y. 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013); *Picard v. HSBC Bank PLC*, 454 B.R. 25 (S.D.N.Y. 2011), *amended sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, ADV. 08-1789 BRL, 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54 (2d Cir. 2013).

[60] *See Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1042 (N.D. Cal. 2001) ("Plaintiffs cannot prove causation of actual [antitrust] injury without . . . expert testimony, because only expert testimony can demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct, and not because of lawful competition or other factors.").

**F.     The Risks of Maintaining the Class Action Through Trial Support Approval of the Class Settlement.**

"This factor allows the Court to weigh the possibility that, if a class were certified for trial in this case, it would be decertified prior to trial."[61] Settlement permits the parties to ensure that class status will not be lost. Courts may always exercise their discretion to re-evaluate the appropriateness of class certification at any time, and no one can deny that developments in class action law, including multiple decisions from the United States Supreme Court, have altered the landscape in which class status is determined.[62]   The possibility of decertification thus favors settlement.

**G.     The Reasonableness of the Class Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation Supports Approval.**

The reasonableness of the Settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."[63] The issue for the Court is not whether the Settlement represents the "best possible recovery," but how it relates to the strengths and weakness of plaintiffs' claims and the risks of continued litigation.  In making this determination, the Court should recognize that "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"[64]

As discussed above, approval of the $218 million Settlement will result in an immediate distribution to the Settlement Class, rather than a speculative payment many years down the

---

[61] *Meijer, Inc. v. 3M*, No. 04-5871, 2006 U.S. Dist. LEXIS 56744, at *50 (E.D. Pa. 2006).

[62] *See Chatelain*, 805 F. Supp. at 214 ("Even if certified, the class would face the risk of decertification."); *see also, e.g., Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).

[63] *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984).

[64] *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (citations omitted).

road.[65] All told, the Settlement, along with JPMorgan's $325 million payment to the Trustee, and $1.7 billion forfeiture to the United States, will ultimately enable Madoff victims to receive over $2 billion from JPMorgan, to the benefit of the Settlement Class. The Settlement represents a substantial recovery for the Settlement Class, and, as such, may well be the best possible recovery in light of the circumstances of a possible lawsuit against JPMorgan.[66]

## H.    The Ability of JPMorgan to Withstand a Greater Judgment.

JPMorgan can withstand a judgment greater than that secured by the Settlement. "But a defendant is not required to 'empty its coffers' before a settlement can be found adequate."[67] JP Morgan's financial circumstances do not ameliorate the force of the other *Grinnell* factors, which lead to the conclusion that the settlement is fair, reasonable and adequate.

## I.    The Toop Objection Does Not Counsel Against the Result Suggested by the Grinnell Factors.

The Toop Objection acknowledges that "any test of reasonableness must weigh the benefits of the settlement . . . against the consequences of not settling at this time for this amount." Nonetheless, it argues that reasonableness should not require them to "defer to the judgments of the Lead Plaintiffs and the SIPA Trustee."[68] However, courts have long recognized that complex class actions, such as the present case, are notoriously difficult to litigate.[69] Thus, the Court is not

---

[65] *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, MDL No. 1500, 2006 U.S. Dist. LEXIS 17588, at *44 (S.D.N.Y. Apr. 6, 2006) (where settlement amount has been paid, "the benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery").

[66] *See Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *13 (noting few cases tried before a jury result in the full amount of damages claimed).

[67] *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 U.S. Dist. LEXIS 36093, at *23 (S.D.N.Y. May 1, 2008) (*quoting McBean v. City of New York*, 233 F.R.D. 377, 388 (S.D.N.Y. 2006)); s*ee also IMAX*, 283 F.R.D. at 189 (same).

[68] Toop Objection ¶ 2.2.1.

[69] *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 123 (S.D.N.Y. 2009) ("The complexity of Plaintiff's claims *ipso facto* creates uncertainty."), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *In re Art Mat. Antitrust Litig.*, 100 F.R.D. 367, 372 (N.D. Ohio 1983).

required to "decide the merits of the case or resolve unsettled legal questions."[70] "[R]ather, the Court need only assess the risks of litigation against the certainty of recovery under the settlement."[71]

The Toop Objection contends that the Settlement is unreasonable because it does not consider the continued litigation costs stemming from separate actions brought by the SIPA Trustee against other financial institutions. It is wrong. In determining reasonableness under *Grinnell*, courts have consistently looked to the continued litigation of the case at issue, not of separate actions.[72] The issue for the Court is how the Settlement relates to the strengths and weaknesses of Plaintiffs' claims in this particular action and the risks of continued litigation. In making this determination, the Court should recognize that "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"[73] Approval of the $218 million Settlement will result in an immediate distribution to the Settlement Class, rather than a speculative payment many years down the road. Consequently, the Settlement represents a substantial recovery for the Settlement Class, and, as such, may well be the best possible recovery in light of the circumstances of a possible lawsuit against JPMorgan.

The Toop Objection contends that the $218 million Settlement is unreasonable because it "ignores the consequences of JPMorgan's deferred prosecution agreement" with the United States Government and "falls outside the bounds of any likely finding of damage given the scale of the

---

[70] *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

[71] *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004).

[72] *See In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) ("Given the daunting legal standard . . . plaintiffs would have faced very substantial risks in continuing to prosecute *this action.*") (emphasis added); *Odom v. Hazen Transp., Inc.*, 275 F.R.D. 400, 412 (W.D.N.Y. 2011) ("The Settlement Agreement . . . represents . . . a reasonable compromise that accounts for the risks and rewards posed by this litigation.").

[73] *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982).

losses sustained by customers. . . ."[74] This contention is misguided. First, the Settlement is an integral part of a global resolution of Madoff-related litigation against JPMorgan involving three simultaneous, separately negotiated settlements, totaling over $2 billion from JPMorgan, all of which will flow to victims of Madoff's Ponzi scheme.

Second, the reasonableness of the Settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of *plaintiffs' case*."[75] Despite the Toop Objection's contention that the Settlement ignores information gleaned from JPMorgan's deferred prosecution agreement with the U.S. Government, Co-Lead Counsel reviewed and analyzed the deferred prosecution agreement before finalizing the Settlement, with the express purpose of ensuring there was no materially new information beyond the facts previously reviewed by Co-Lead Counsel through extensive and informal discovery provided by JPMorgan. In any event, Plaintiffs face several significant obstacles in surviving dispositive motions. While Co-Lead Counsel believes Plaintiffs' claims against JP Morgan are strong, a favorable verdict is never assured, especially where, as here, JPMorgan has valid defenses that could absolve it of liability.[76]

## IV. THE PROPOSED PLAN OF ALLOCATION IS APPROVED.

The proposed Plan of Allocation is set forth in the Notice at pages 13 – 14 [ECF No. 57, pp. 20-21].[77] It is fair and adequate, and should be approved.

---

[74] Toop Objection ¶ 2.2.2, Reason 2.

[75] *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).

[76] *Taft v. Ackermans*, No. 02 Civ. 7951(PKL), 2007 WL 414493, at *6 (S.D.N.Y. Jan. 31, 2007) ("…[T]he Court's inquiry is into whether the plaintiffs have sufficient information to evaluate the adequacy of the proposed settlement, not whether they have availed themselves of all possible information." )

[77] A copy of the Notice is Exhibit A to the Alix Partners Declaration, Exhibit 5 to the Joint Final Approval Declaration.

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized—namely, it must be fair and adequate.... An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."[78]

As noted above, JPMorgan will pay $218 million to settle the claims advanced in the Action. The Notice, including the Plan of Allocation at pp. 13 – 14, was mailed to all class members. Alix Partners Declaration, ¶ 10. The $218 million settlement amount, less any costs in connection with the administration of the Settlement by the Claims Administrator, will be distributed to all members of the Settlement Class who file a timely Proof of Claim ("POC"), on a *pro rata* basis, based on a Settlement Class Member's "Net Losses" as of December 11, 2008.[79] If a Settlement Class Member has already filed a POC in connection with the SIPA Proceeding, that Class Member will not be required to file another POC, and their POC filed in the SIPA proceeding will be used in this proceeding.[80] A Class Member's Net Losses are calculated by taking the amount of money a Class Member deposited into their Madoff account, and subtracting any withdrawals.[81] This calculation of Net losses is intended to be coextensive with the Trustee's "net investment method," the method of loss calculation that has been upheld by the Second Circuit.[82]

---

[78] *Bear Stearns,* 909 F. Supp. 2d at 270 (quoting *In re WorldCom, Inc. Sec. Litig.,* 388 F.Supp.2d 319, 344 (S.D.N.Y. 2005) (internal citations and quotation marks omitted); *see also In re Am. Int'l. Grp., Inc. Secs. Litig.,* No. 04 Civ. 8141, 2013 WL 1499412, at *6 (S.D.N.Y. April 11, 2013).

[79] *See* pages 13-14 of the Notice, ¶ 9 and Section D, "Plan of Allocation." [ECF 57, pp. 20-21]

[80] *Id.*

[81] *Id.*

[82] *See generally In re Bernard L. Madoff Inv. Sec., LLC,* 654 F.3d 229 (2d Cir. 2011).

The Plan of Allocation is designed to fairly allocate funds to members of the Settlement Class. It is approved.

## V. CERTIFICATION OF A SETTLEMENT CLASS IS APPROPRIATE.

The Court hereby certifies the Settlement Class for purposes of the Settlement under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

The proposed Settlement Class here is defined as all BLMIS customers or their successors, transferees or assignees, who directly had capital invested with BLMIS as of December 11, 2008.[83] This class definition is intended to include only "Net Losers." The Settlement Class does not include: (i) BLMIS insiders and their families; (ii) defendants in any criminal Madoff-related proceeding; (iii) BLMIS accountholders whose claims against the BLMIS estate were extinguished by virtue of three separate settlements with the Trustee, the estate of Jeffry Picower, *Picard v. Picower*, 09-1197 (BRL) (Bankr. S.D.N.Y.) (ECF No. 43), the Carl Shapiro Family, *SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y.) (ECF No. 3551), and Jeanne Levy-Church and Francis N. Levy, *SIPC v. BLMIS*, 08-1789 (Bankr. S.D.N.Y.) (ECF No. 1964); or (iv) any persons or entities that exclude themselves from the Settlement Class by filing a request for exclusion that is accepted by the Court.[84]

Pursuant to the Settlement Agreement, the parties agreed, for settlement purposes only, to request certification under Federal Rules of Civil Procedure Rules 23(a) and (b)(3) of the Plaintiffs' claims against JPMorgan, and that the Judgment would provide for the releases of JPMorgan and any parents, subsidiaries, affiliates and employees.[85]

---

[83] Settlement Agreement [ECF No. 51-1], ¶ 6.

[84] *Id.*

[85] *See* Settlement Agreement [ECF No. 51-1], ¶ 13.

The Second Circuit recognizes the propriety of certifying a class solely for purposes of a class action settlement.[86] I hereby conclude that the proposed Settlement Class satisfies Rule 23(a) and Rule 23(b), certify the Settlement Class, appoint the Plaintiffs to lead the Settlement Class, and appoint Entwistle and Cappucci and Hagens Berman Sobol Shapiro as Settlement Class Counsel.

## A.   The Settlement Class Satisfies the Requirements of Rule 23(a).

Certification is appropriate because the proposed Settlement Class readily meets each of the four requirements of Rule 23(a).

### 1.   The Settlement Class Members Are Too Numerous to Be Joined.

Plaintiffs meet the first requirement of Rule 23(a) because the proposed Class is so numerous that joinder of all members is impracticable.[87] To satisfy the numerosity requirement, "a plaintiff need not show that joinder is impossible. Nor need the plaintiff know the exact number of class members."[88] Rather, while "[t]here is no strict numerical test for determining impracticability of joinder[,] .... [w]hen class size reaches substantial proportions . . . the impracticability requirement is usually satisfied by the numbers alone."[89] Judicial consensus is that a class with as few as 40 members satisfies the requirement.[90] Here, the Settlement Class consists of over 2,000 individuals and entities throughout the world. The number of potential Settlement Class members, coupled with their widely-dispersed locations in the United States and around the world, makes joinder impracticable and class treatment appropriate.

---

[86] *See In re Am. Int'l Grp. Inc. Sec. Litig.*, 689 F.3d 229, 238-39 (2d Cir. 2012).

[87] *See* Fed. R. Civ. P. 23(a)(1).

[88] *Saddle Rock Partners Ltd. v. Hiatt*, No. 96 Civ. 9474, 2000 WL 1182793, at *2 (S.D.N.Y. Aug. 21, 2000) (citations omitted).

[89] *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citations omitted).

[90] *See, e.g., Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013, 2006 WL 330113, at *5 (S.D.N.Y. Feb. 14, 2006).

## 2.  There Are Common Questions of Law and Fact.

Rule 23(a)(2) requires that there must be questions of law or fact common to the class. The commonality requirement of Rule 23(a) is met if the claims involve questions of law or fact that are common to the class.[91] The commonality requirement is satisfied if the named plaintiffs share at least one question of fact or law in common with the purported class.[92]

The Plaintiffs and members of the proposed Class have numerous issues of law and fact in common, including:

(a)     Whether JPMorgan violated duties owed to Plaintiffs and members of the Class;

(b)     Whether JPMorgan aided and abetted BLMIS' theft from Plaintiffs and members of the Class; and

(c)     The extent to which Plaintiffs have suffered damages and the measure of such damages.

These common issues are more than sufficient to satisfy Rule 23(a)(2).

## 3.  The Class Representatives' Claims Are Typical.

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."[93] Like the test for commonality, "[t]he typicality requirement is 'not demanding.'"[94] The typicality requirement is readily met where "the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the

---

[91]  *See Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001).

[92]  *See Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).

[93]  Fed. R. Civ. P. 23(a)(3).

[94]  *In re Initial Pub. Offering Sec. Litig. (IPO II)*, 227 F.R.D. 65, 87 (S.D.N.Y. 2004) vacated on other grounds, 471 F.3d 24 (2d Cir. 2006) (citations omitted).

proposed class members."[95] There is no requirement, however, that the claims of all members of a proposed class be identical.[96]

The Plaintiffs' claims are typical of the claims of other members of the Settlement Class because their losses all derive from the same course of JPMorgan's conduct. The facts necessary to advance Plaintiffs' potential claims are the same as those necessary for absent Class members to establish theirs; thus, typicality is established.

### 4. The Class Representatives Fairly and Adequately Protect the Interests of the Settlement Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interest of the class." This requirement is met if it appears that: (1) the named plaintiffs' interests are not antagonistic to the class' interests; and (2) the plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation.[97]

Here, Plaintiffs and members of the Class are similarly situated because they share the same claims and have the same interest in maximizing the recovery from JPMorgan.[98] The Plaintiffs have thus far protected the interests of the proposed Settlement Class vigorously and without conflict, and they will continue to do so throughout the litigation. Plaintiffs are individuals who, as customers of Bernard L. Madoff Investment Securities LLC ("BLMIS"), deposited funds with BLMIS and are "Net Losers." Each has the same interest as members of the

---

[95] *In re Vivendi Universal S.A.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007) (internal quotation and citation omitted).

[96] *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144, 2009 WL 5178546, at *10, (S.D.N.Y. Dec. 23, 2009).

[97] *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 291 (2d Cir. 1992); *In re Marsh*, 2009 WL 5178546, at *10.

[98] *See Drexel*, 960 F.2d at 291; *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) (no conflict of interest between class representatives and absent class members where they share the common goal of maximizing recovery).

Class in establishing that JPMorgan's conduct caused or contributed to their damages; therefore, their incentives align perfectly.

Co-Lead Counsel – Entwistle & Cappucci and Hagens Berman Sobol Shapiro – have extensive experience and expertise in complex litigation and class action proceedings throughout the United States, and are uniquely qualified to conduct this litigation by virtue of their extensive experience in successfully prosecuting other Madoff-related litigation against third parties and by virtue of their experience in working with SIPA trustees and in prosecuting similar litigation against JPMorgan. Thus, the requirements of Rule 23(a)(4) are satisfied.

**B.      The Predominance Requirement of Rule 23(b)(3) is Satisfied.**

Rule 23(b)(3) requires that the common questions of law or fact predominate over any questions affecting only individual class members and that a class action is superior to other available methods of adjudication. Both of these requirements are met.

### 1. Common Questions Predominate.

Rule 23(b)(3) does not require a complete absence of any individual issues.[99] Rather, it requires predominance, which entails that "some of the legal or factual questions" can be resolved through "generalized proof" and that "these particular issues are more substantial than the issues subject only to individualized proof."[100] The Supreme Court has defined this inquiry as establishing "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[101] This inquiry is "similar" to Rule 23(a)(3)'s typicality requirement.[102] The

---

[99] *See Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("To be sure, individual issues will likely arise in this as in all class action cases.").

[100] *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

[101] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

[102] *Id.* at 623 n.18.

Court added that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."[103]

This case involves the type of "common nucleus of operative facts and issues 'with which the predominance inquiry is concerned.'"[104] The proof of any liability on the part of JPMorgan in this case, if such claims were to be brought by Plaintiffs, would be common to the Class as a whole, and because such class-wide proof will be the overriding focus of any trial of this case, Rule 23(b)(3)'s predominance requirement is thus satisfied, and the proposed Class should be certified.

### 2.  A Class Action Is the Superior Method of Adjudication.

Rule 23(b)(3) also sets forth the following non-exhaustive factors to be considered in making a determination of whether class certification is the superior method of litigation: "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members . . . and (D) the likely difficulties in managing a class action."[105] Considering these factors, proceeding by means of a class action is clearly "superior to other available methods for fairly and efficiently adjudicating" the potential claims against JPMorgan.

### a.  Any Individual Interest in Controlling the Prosecution of Separate Actions Is Limited.

The scope and complexity of Class Plaintiffs' potential claims against JPMorgan, together with the high cost of individualized litigation, make it unlikely that the vast majority of the Settlement Class members would be able to pursue their own potential claims and obtain relief without class certification.  Separate actions would also "risk disparate results among those

---

[103]  *Id.* at 625.

[104]  *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006).

[105]  Fed. R. Civ. P. 23(b)(3).

seeking redress, . . . exponentially increase the costs of litigation for all, and [] be a particularly inefficient use of judicial resources."[106]

### b. Settlement-Only Class Certification Moots Manageability.

The final factor asks the Court to consider "the difficulties likely to be encountered in the management of a class action."[107] Although management of this case as a class action would not render individual actions a better alternative, the factor is moot because when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial."[108] Accordingly, the requirements of Rule 23(b)(3) are satisfied.

### C.    The Proposed Method of Class Notice Is Appropriate and Satisfies Due Process.

Rule 23(e)(1) requires that a "court must direct notice in a reasonable manner to all class members who would be bound by the proposal" to settle a class action. "'Due Process requires that the notice to class members 'fairly apprise the . . . members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'"[109] The Second Circuit has held that the adequacy of a class action settlement notice is "measured by reasonableness" and that "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings. Notice is

---

[106]  *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 133 (S.D.N.Y. 2001) (footnote omitted).

[107]  Fed. R. Civ. P. 23(b)(3)(D).

[108]  *Amchem*, 521 U.S. at 620; *In re Am. Int'l Group Secs. Litig.*, 689 F.3d at 239-40 (2d Cir. 2012) (internal citation omitted).

[109]  *Consol. Edison, Inc. v. Northeast Utils.*, 332 F. Supp. 2d 639, 652 (S.D.N.Y. 2004) (citation omitted); *see also Weinberger* 698 F.2d 61 at 70.

adequate if it may be understood by the average class member."[110] "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."[111]

Where, as here, "the parties seek simultaneously to certify a settlement class and to settle a class action, the elements of Rule 23(c) notice (for class certification) are combined with the elements of Rule 23(e) notice (for settlement or dismissal)."[112] Rule 23(c)(2) requires the "best practicable notice," while Rule 23(e) requires notice that is "reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections."[113] Neither Rule 23 nor due process requires actual notice to each possible class member,[114] although here, Plaintiffs reasonably believe that actual notice has been provided to each and every potential member of the class.

Pursuant to the Court's Preliminary Approval Order, two types of notice were provided to potential members of the class: (1) a notice of the settlement which was sent by first-class mail to all identifiable members of the class, along with a proof of claim form ("Mailed Notice"); and (2) a summary notice was published ("Summary Notice"). The Mailed Notice was mailed to all identifiable Settlement Class members who filed claims in the SIPA Proceeding, and the Mailed Notice also informed Settlement Class members that if they previously filed a claim in the SIPA proceeding, they need not file another proof of claim and will automatically participate in the

---

[110] *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 438 (2d Cir. 2007).

[111] Fed. R. Civ. P. Rule 23(c)(2)(B).

[112] *Global Crossing*, 225 F.R.D. at 448 (S.D.N.Y. 2004).

[113] *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 527 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998).

[114] *See In re Marsh*, 2009 WL 5178546, at *23-24; *Buxbaum v. Deutsche Bank AG*, 216 F.R.D. 72, 80-81 (S.D.N.Y. 2003).

settlement, unless they elect to opt-out of the Settlement Class. These notices were mailed to the address Settlement Class members provided in their SIPA claim form and, where appropriate, to the transferee of any such claim.[115] The Summary Notice was published in four separate locations: (1) *Bloomberg*;[116] (2) the website of the SIPA Trustee;[117] and (3) the two websites of each of the two Co-Lead Counsel.[118] In addition, the Claims Administrator established and maintains a website – www.shapiro-hillclasssettlement.com – on which anyone can obtain a copy of the Mailed Notice, or other pleadings and documents related to the case.[119]

These Notices, consistent with Rule 23(c)(2), Rule 23(e) and Rule 23(h), as well as paragraph 8 of the Preliminary Approval Order, included the following information: (1) a description of the class action; (2) a definition of the Settlement Class; (3) notification that the Court will exclude a class member upon request by a certain date; (4) notification that the judgment will include all members of the class who do not request exclusion; (5) notification that any class member who does not request exclusion may enter an appearance through counsel; (6) a description of the potential claims and defenses as well as the issues on which the parties disagree; (7) the general terms of the Class Settlement; (8) a clear explanation of the binding nature of the Class Settlement; (9) the Plan of Allocation pursuant to which the settlement proceeds would be allocated; (10) notification that complete information is available from the court files; (11) notification that any class member may appear and be heard at the Fairness Hearing; and (12) notice of the application for fees and expenses.

---

[115] *See* ¶¶ 9-10 of the February 12, 2014 Declaration of John Franks of Alix Partners LLP (ECF No. 57) ("Alix Partners Declaration"), a copy of which is attached as Exhibit 5 to the Joint Final Approval Declaration .

[116] Alix Partners Declaration, ¶ 15.

[117] http://www.madofftrustee.com/class-action-09.html.

[118] *See* Joint Final Approval Declaration, ¶ 72 (attesting to posting of Summary Notice on http://www.entwistle-law.com/index and www.hbsslaw.com).

[119] Alix Partners Declaration, ¶ 17.

The content of the Mailed Notice and the Summary Notice, as well as the method of notification, each satisfy the requirements under Rules 23(c), 23(e) and 23(h) as those rules have been interpreted in this District.

## VI.    CO-LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND EXPENSES IS GRANTED.

### A.    Co-Lead Counsel Is Entitled To An Award Of Attorneys' Fees And Expenses In Connection With The Settlement.

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Goldberger*, 209 F.3d at 47; *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999).[120] The purpose of the common fund doctrine is to fairly and adequately compensate counsel for services rendered and to ensure that all class members contribute equally towards the costs associated with litigation pursued on their behalf. *See Goldberger*, 209 F.3d at 47; *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007). Moreover, the Second Circuit Court of Appeals has confirmed that fees in common fund cases may be awarded under either the lodestar or percentage of the fund methods, but that "the trend in this Circuit is toward the percentage method." *Wal-Mart Stores Inc. v. Visa U.S.A.*, 396 F.3d 96, 121 (2d Cir. 2005).

In addition, courts have recognized that awards of reasonable attorneys' fees from a common fund should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a

---

[120]    Although the fee in this action was separately negotiated with JPMorgan, the common fund principles are applicable in that counsel here is entitled to a reasonable fee for the substantial benefit achieved on behalf of the Class.

similar nature. *See, e.g., Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002).

Here, the proposed Attorneys' Fees Payment is not derived from the $218 million Class Settlement Fund, and it will not reduce the award to the Settlement Class in any way. Rather, JPMorgan has agreed to pay a separate Attorneys' Fees Payment to Co-Lead Counsel, as a result of arms-length negotiations, conducted separate from and subsequent to the Class Settlement Amount agreement. The structure of the Attorneys' Fees Payment was designed intentionally by the Parties "to preserve as much of the settlement as possible for the Settlement Class." Settlement at ¶ P. *Cf., Thompson,* 216 F.R.D. at 67 ("[U]nlike common fund cases, where attorneys' fees can erase a considerable portion of the funds allocated for settlement, the fees were negotiated separately and after the settlement amount had been decided, thus considerably removing the danger that attorneys' fees would unfairly swallow the proceeds that should go to class members.")

### B.   The Percentage-Of-The-Fund Method

The Supreme Court has consistently held that it is appropriate for a fee to be analyzed as a percentage of the fund recovered. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class"); *see also Trustees v. Greenough*, 105 U.S. 527, 532 (1881); *Central R.R. & Banking Co. of Ga. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-66 (1939). The percentage-of-the-fund method is preferred, in part, because of its "ease of administration, permitting the judge to focus on 'a showing that the fund conferring a benefit on the class resulted from the lawyers' efforts' . . . . rather than collateral disputes over billing." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 485 (S.D.N.Y. 1998) (citation omitted).

The Second Circuit authorizes district courts to employ the "percentage-of-the-fund method" when awarding fees in common fund cases. *See Goldberger*, 209 F.3d at 47 (holding that the percentage-of-the-fund method may be used to determine appropriate attorneys' fees, although

the lodestar method may also be used). Indeed, in *Wal-Mart*, 396 F.3d at 121, the Second Circuit recognized that the trend in determining the amount of a common fund fee in this Circuit is toward the percentage-of-the-fund method.[121]

Here, the requested Attorneys' Fee Payment is not being paid from the Class Settlement Fund. *Cf., Thompson*, 216 F.R.D. at 67. *See also, McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006) ("If, however, money paid to the attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members.").

But even if, *arguendo,* the Class Settlement Amount were to be constructively "pooled" together with the requested Attorneys' Fee Payment (for a total of $236 million), the Attorneys' Fee Payment would only represent approximately 7.6% of the total. By way of example, a review of district court decisions in this Circuit applying the *Goldberger* factors place a reasonable percentage-of-the-fund range between 10% and 30%. *See Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250, 272-73 (E.D.N.Y. 2009) (finding that a survey of 2008 district court decisions in this Circuit cases applying the *Goldberger* factors shows a percentage-of-the-fund range between 10% and 25% to be reasonable); *see also In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 385-387, 391 (S.D.N.Y. 2005) (approving a fee of 30% of the constructive value of the "total fund"). An Attorneys' Fee Payment of approximately 7.6% falls well within the standard of reasonableness articulated in this Circuit.

---

[121] *See also Clark v. Ecolab Inc.*, No. 07 Civ. 8623(PAC), 2010 WL 1948198, at *8 (S.D.N.Y. May 11, 2010) ("In this Circuit, the 'percentage-of-recovery' method is the 'trend.'") (citation omitted); *Hicks v. Morgan Stanley*, No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *8 (S.D.N.Y. Oct. 24, 2005) ("The trend in the Second Circuit recently has been to use the percentage method."); *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV 3288(DLC), 2004 WL 2591402, at *21 (S.D.N.Y. Nov. 12, 2004); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 520 (E.D.N.Y. 2003).

## C. The Requested Attorneys' Fee Payment Is Fair And Reasonable Based On All Six *Goldberger* Factors.

In *Goldberger*, the Second Circuit held that:

> [N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'

*Goldberger*, 209 F.3d at 50 (citation omitted).

As set forth below, the $18 million fee award sought by Co-Lead Counsel is fair and reasonable based on all six *Goldberger* factors.

### 1. The Time and Labor Expended by Counsel

The first factor for determining whether a fee is reasonable is "the time and labor expended by counsel." *Id.* As of February 8, 2014, Co-Lead Counsel and their staffs have spent more than 9,964 hours of professional time representing the interests of the Class, at a time value of $5,853,767 plus expenses of $52,812, for a total of $5,906,579.

| Firm | Hours | Lodestar |
|------|-------|----------|
| Entwistle & Cappucci LLP | 7,397.9 | $ 4,015,276.00 |
| Hagens Berman Sobol Shapiro LLP | 2,566.3 | $ 1,848,491.75 |
| **Total** | **9,964.2** | **$ 5,863,767.75** |

*See* Joint Attorneys' Fee Declaration, ¶¶ 7 – 10.

The work performed by counsel to date has been complex and wide ranging. Settlement ¶ L-M. Co-Lead Counsel conducted an independent and exhaustive investigation of the relationship between BLMIS and JPMorgan, including JPMorgan's activities as BLMIS's bank; reviewed and analyzed document productions by JPMorgan and the SIPA Trustee totaling more than a million pages; reviewed and analyzed Bankruptcy Rule 2004 examinations, trial and other Madoff related testimony; reviewed numerous related Madoff documents, including materials

developed in related investigations by regulators and others; developed expert testimony on related issues and conducted their own interviews of numerous JPMorgan senior executive witnesses.

Accordingly, the time and effort devoted by Co-Lead Counsel to obtain $218 million on behalf of the Settlement Class well justifies the requested Attorneys' Fee Payment.

### 2. The Magnitude and Complexities of the Litigation

The Attorneys' Fee Payment is reasonable in light of the magnitude and complexity of the Class Action. As is now well documented, in December 2008, it was revealed that Madoff and BLMIS perpetrated the largest Ponzi scheme in history. Plaintiffs allege that JPMorgan played a central role in the Ponzi scheme perpetrated by Bernard L. Madoff and BLMIS. Plaintiffs contend that JPMorgan had actual knowledge of the scheme, was in a position to stop it, but did nothing. From approximately 1986 on, Madoff's primary account through which most, if not all, of the funds of BLMIS flowed, was a depository account at JPMorgan referred to as the "703 Account." In addition, Plaintiffs allege that JPMorgan acquired knowledge of the Ponzi scheme in connection with the structuring and issuing of certain financial products that would be based on feeder funds tied to Madoff. In connection with those transactions, JPMorgan performed due diligence on the feeder funds, and since these funds were invested with Madoff, attempted unsuccessfully to perform due diligence on BLMIS itself.

Plaintiffs' investigations into JPMorgan's involvement with Madoff focused on, *inter alia,* numerous round trip transactions involving Madoff's friend and insider Norman Levy, structured products very early in the relevant period, and the fees received by JPMorgan in connection with Madoff, including those related to the 703 Account.

On March 9, 2012, JPMorgan moved to dismiss the Class Complaint. One of JPMorgan's primary arguments in support of their motion to dismiss was that the Class Claims (which were common law claims), were all precluded under the Securities Litigation Uniform

Standards Act ("SLUSA"). In support of their SLUSA arguments, JPMorgan cited numerous Madoff-related cases from this District, including from this very Court, which dismissed Madoff-related common law claims under SLUSA.[122] JPMorgan also moved to dismiss on the basis that the Class Complaint failed to state a claim for relief, contending, among other things, that the complaint does not show JPMorgan's actual knowledge of or participation in Madoff's fraud. Co-Lead Counsel opposed the motion to dismiss and continued their ongoing investigation of the facts and circumstances related to Madoff generally and JPMorgan's involvement in Madoff specifically.

As a threshold matter, the issues in the case are novel and complex given that the case involves the largest Ponzi scheme in US history. Co-Lead Counsel has researched and evaluated novel and complex claims and areas of law arising from the unprecedented fraud. In sum, through the combined efforts of Co-Lead Counsel and the SIPA Trustee, Customer Class members who have waited over 5 years to recover their losses will be able to partake in the $218 million dollar settlement.

### 3. The Risks of Litigation

The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining" a reasonable fee award. *Goldberger*, 209 F.3d at 54 (citation omitted).

#### a. Risks of Establishing Liability

It is well settled that class actions are notoriously complex and difficult to litigate. *See, e.g., Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814(MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation"). "The legal and factual issues involved are always

---

[122] *See, e.g., In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) (McMahon, J.); *See also, In re Herald*, 730 F.3d 112, 118 (2d Cir. 2013), decided while JPMorgan's motion to dismiss was *sub judice.*

numerous and uncertain in outcome." *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000).

This litigation is no exception. It involves numerous complex and novel issues of fact and law, and JPMorgan asserted numerous factual and legal defenses to any potential liability.

Moreover, even if JPMorgan was ultimately found liable – a matter JPMorgan vigorously disputes and which is subject to significant uncertainty both factually and legally – additional substantial distributions to Net Losers would be delayed for a number of years.

Assuming the potential claims that Plaintiffs may have brought against JPMorgan would have survived dispositive motion practice, Co-Lead Counsel could not be certain that they would ultimately succeed in achieving a determination of liability against JPMorgan.

### b. Risks of Establishing Damages

Even if Plaintiffs were able to defeat dispositive motions and to overcome the risks in proving liability, they would still face the risks of proving damages. Proof of damages in complex class actions is always complex and difficult and often subject to expert testimony.[123] Here, even if Co-Lead Counsel could prove liability, JPMorgan has asserted substantial arguments in defense that any alleged shortfall was not legally or factually attributable to its conduct and that the shortfall should properly be made up in whole or part through recoveries from other parties.

### c. Risks to Counsel

The Second Circuit long ago recognized that courts should consider the risks associated with lawyers undertaking a case on a contingent fee basis. *See City of Detroit v. Grinnell Corp.*,

---

[123] *See Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041-43 (N.D. Cal. 2001) ("Plaintiffs cannot prove causation of actual [antitrust] injury without . . . expert testimony, because only expert testimony can demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct, and not because of lawful competition or other factors.").

495 F.2d 448, 470 (2d Cir. 1974), abrogated on other grounds by *Goldberger*, 209 F.3d at 39.

Districts courts within this circuit have also recognized this risk.[124]

Here, Co-Lead Counsel undertook to represent Plaintiffs and the Customer-victims on a wholly contingent-fee basis. For years, Co-Lead Counsel have invested thousands of hours of time without any guarantee of compensation or even a recovery of out-of-pocket expenses. As this Court stated:

> Indeed, the risk of non-payment in complex cases, such as this one, is very real. There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise. There is no guarantee of reaching trial, and even a victory at trial does not guarantee recovery.

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM)(PED), 2010 WL 4537550, at *27 (S.D.N.Y. Nov. 8, 2010) (quotation omitted).

In undertaking to represent Plaintiffs and Customers, Co-Lead Counsel knew that the litigation and related Liquidation Proceedings would be lengthy, complex and labor intensive with no guarantee of compensation for the enormous investment of time and money. To date, counsel has spent 9,964.2 hours representing Customers at a total lodestar of $5,853,767. *See* Joint Attorneys' Fee Declaration, ¶ 7 - 10. Additionally, Co-Lead Counsel's total out-of-pocket expenses are $52,812. *Id.* Clearly, Co-Lead Counsel undertook enormous financial risks in representing Customers on a contingency basis.

---

[124] *See, e.g., Teachers' Ret. Sys.*, 2004 WL 1087261, at *3; *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (concluding it is "appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award") (emphasis omitted); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").

### 4. The Quality of Representation

The fourth factor cited by the Second Circuit is the "quality of representation" delivered by counsel. *Goldberger,* 209 F.3d at 50. To evaluate this factor, courts in the Second Circuit "review the recovery obtained and the background of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litig.,* 249 F.R.D. 124, 141 (S.D.N.Y. 2008).[125]

#### a. Entwistle & Cappucci LLP[126]

Entwistle & Cappucci possesses extensive experience in complex litigation, including class actions, having successfully prosecuted some of the largest and highest-profile class actions in history. As sole or co-lead counsel in class actions, Entwistle & Cappucci has obtained billions of dollars in recoveries on behalf of defrauded class members. *See, e.g., In re Royal Ahold, N.V. Sec. & ERISA Litig.,* No. 03-md-01539-CCB (D. Md. June 16, 2006) (order re-formatted on June 21, 2006) (served as sole lead counsel and obtained a $1.1 billion recovery for the Class); *In re BankAmerica Sec. Litig.,* No. 99-md-1264-CEJ (E.D. Mo. Oct. 18, 2002) ($490 million recovery); *In re DaimlerChrysler AG Sec. Litig.,* No. 00-CV-00993-LPS (D. Del. Feb. 5, 2004) ($300 million recovery).

In addition to its extensive experience leading complex national class actions, Entwistle & Cappucci possesses extensive experience in cases with a liquidation or bankruptcy component. For example, acting as one of the lead counsel in the Tremont Fund Litigation (arising out of the Madoff Ponzi scheme), Entwistle & Cappucci has recovered more than $100 million from third parties, preserved the customers' rights to certain fidelity bond proceeds, and worked with defendants and the SIPA Trustee to negotiate a resolution of certain SIPC claims and related

---

[125] Moreover, an "indication of the quality of the result achieved is the fact that the Settlement will provide compensation to the [victims] expeditiously." *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 467 (S.D.N.Y. 2004).

[126] *See* Joint Attorneys' Fee Declaration, ¶¶ 14 – 15.

litigation which will result in customers recovering in excess of a billion dollars on those claims. Additionally, Entwistle & Cappucci acted as Special Litigation Counsel to the estate of Global Crossing, Ltd. in prosecuting claims of the estate for the benefit of unsatisfied creditors and was appointed to act as Special Counsel for the Receiver in "clawback" actions on behalf of victims in the Ponzi scheme of Edward T. Stein.

### b. Hagens Berman Sobol Shapiro LLP[127]

Hagens Berman is one of the premier law firms in the United States dedicated to the representation of plaintiffs in complex litigation. Hagens Berman collectively possesses hundreds of years of experience in complex litigation of all sorts, including class actions, having successfully prosecuted some of the largest and highest-profile class actions in history. As sole or co-lead counsel in class actions, Hagens Berman has obtained billions of dollars in recoveries on behalf of defrauded class members. *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg, Sales Practices, & Prods. Liab. Litig.*, No. 8:10-ML-2151 JVS (FMOx) (C.D. Cal.) (co-lead counsel; $1.6 billion recovered); *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293 (S.D.N.Y.) (co-lead counsel; litigation still pending; over $100 million recovered to date); *In re Charles Schwab Sec. Litig.*, No. 08-CV-1510 (N.D. Cal.) (sole lead counsel; $235 million recovered); *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, MDL No. 1446 (S.D. Tex.) (co-lead counsel; over $250 million recovered); *In re Visa Check/MasterCard Antitrust Litig.*, 96-CV-5238 (E.D.N.Y.) (co-lead counsel; $3.25 billion recovered).

In addition to its extensive experience leading complex national class actions, Hagens Berman possesses extensive experience in cases with a liquidation or bankruptcy component. For example, along with co-lead counsel in this case (Entwistle & Cappucci) acting as one of the lead counsel in the Tremont Fund Litigation (arising out of the Madoff Ponzi scheme), Hagens

---

[127] *See* Joint Attorneys' Fee Declaration, ¶¶ 17 - 18.

Berman has recovered more than $100 million from third parties, preserved the customers' rights to certain fidelity bond proceeds, and worked with defendants and the SIPA Trustee to negotiate a resolution of certain SIPC claims and related litigation which will result in customers recovering in excess of a billion dollars on those claims.

### 5. The Requested Fee in Relation to the Settlement

As discussed above, Co-Lead Counsel has expended many thousands of hours representing the interests of the Class and, in conjunction with the SIPA Trustee, has achieved the Settlement that will result in a total $218 million cash payment to the Class. Accordingly, the requested Attorneys' Fee Payment, which comprises only approximately 7.6% of the total combined payments by JPMorgan, is well within the range of reasonableness compared to similar settlements in this district.[128]

### 6. Public Policy Considerations

Congress viewed private lawsuits as "critical to protecting the public and fundamental to maintaining the credibility of the futures market." *Cange v. Stotler & Co.*, 826 F.2d 581, 594- 595 (7th Cir. 1987) *citing* to H.R. Rep. No. 97-565(II), pt. 1, at 56-7 (1982), *reprinted* in 1982 U.S.C.C.A.N. 4022, 1982 WL 25140.

---

[128] *See, e.g., Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194 (SAS), 2011 WL 671745, at *4 (S.D.N.Y. Feb. 23, 2011) (one-third of $2.25 million settlement); *Flag Telecom*, 2010 WL 4537550, at *31 (30% of $24.4 million settlement, less expenses); *In re Bisys Sec. Litig.*, No. 04 Civ. 3840(JSR), 2007 WL 2049726, at * 2-3 (S.D.N.Y. July 16, 2007) (30% of $65.87 million settlement); *In re Priceline.com, Inc. Sec. Litig.*, No. 3:00-CV-1884(AVC), 2007 WL 2115592, at *4-5 (D. Conn. July 20, 2007) (30% of $80 million settlement); *Hicks*, 2005 WL 2757792, at *9 (30% of $10 million settlement); *In re Warnaco Grp., Inc., Sec. Litig.*, No. 00 Civ. 6266 (LMM), 2004 WL 1574690, at *3 (S.D.N.Y. July 13, 2004) (30% of $12.85 million settlement); *In re Blech Sec. Litig.*, No. 94 Civ. 7696(RWS), 2002 WL 31720381, at * 1 (S.D.N.Y. Dec. 4, 2002) (33.3% of settlement); *Kurzweil v. Philip Morris Cos., Inc.*, No. 94 Civ. 2373(MBM), 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (30% of $123.82 million settlement); *Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174, 182 (E.D.N.Y. 1999) (one-third fee, plus expenses, is "well within the range accepted by courts in this circuit"); *In re Med. X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *7 (E.D.N.Y. Aug. 7, 1998) (awarding 33.3% of $39.36 million after concluding such an award is "well within the range accepted by courts in this circuit").

In *In re Initial Public Offering Securities Litigation*, 671 F. Supp. 2d 467, 515-16

(S.D.N.Y. 2009), this Court recognized the importance of private enforcement actions and the

corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis:

> [C]lass actions serve as private enforcement tools when…regulatory entities fail
> to adequately protect investors…plaintiffs' attorneys need to be sufficiently
> incentivized to commence such actions in order to ensure that defendants who
> engage in misconduct will suffer serious financial consequences…awarding
> counsel a fee that is too low would therefore be detrimental to this system of
> private enforcement.

*See also Maley*, 186 F. Supp. 2d at 374 ("Private attorneys should be encouraged to take the risks

required to represent those who would not otherwise be protected from socially undesirable

activities").

Public policy considerations here strongly support the requested Attorneys' Fee Payment.

Skilled counsel must be incentivized to pursue complex and risky claims such as those at issue

here.

### D.    The Requested Attorneys' Fees Are Also Reasonable Under The Lodestar Cross-Check With A Reasonable Multiplier.

The Second Circuit has approved district courts' use of counsel's lodestar as a "cross

check" to ensure the reasonableness of a fee awarded under the percentage-of-the-fund method.

*See Goldberger*, 209 F.3d at 50.    Where counsel's lodestar is used as a cross-check, "the hours

documented by counsel need not be exhaustively scrutinized by the district court."    *Id.*    Instead,

"the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case."

*Id.*

A lodestar analysis begins with the calculation of the lodestar, which is "comprised of the

amount of hours devoted by counsel multiplied by the normal, non-contingent hourly billing rate

of counsel." *Prudential*, 985 F. Supp. at 414.

Additionally, "[u]nder the lodestar method, a positive multiplier is typically applied to the

lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent

nature of the engagement, the skill of the attorneys, and other factors." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *20 (S.D.N.Y. Dec. 23, 2009) (citing *Goldberger*, 209 F.3d at 47); *Savoie*, 166 F.3d at 460.

"Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar." *In re Comverse Tech., Inc. Sec. Litig.*, No. 06 CV 1825 (NGG), 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) (multiplier of 2.78 was "well within the range awarded in comparable settlements.").

"Lodestar multipliers of nearly 5 have been deemed 'common' by courts in this District." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *56 n.7 (S.D.N.Y. July 27, 2007); *accord Wal-Mart*, 396 F.3d at 123 (finding as reasonable a lodestar multiplier of 3.5) (citing *NASDAQ*, 187 F.R.D. at 489 (holding that "'multipliers of between 3 and 4.5 have become common'")); *see also, In re Worldcom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354-59 (S.D.N.Y. 2005) (approving $194.6 million fee, for a lodestar multiplier of 4.0).   Under these circumstances, a lodestar multiplier of approximately 3.05 is reasonable and appropriate.

### E.    The Requested Attorneys' Fees Are Reasonable Under Either The Percentage-Of-The-Fund Method Or Lodestar Analysis.

Under either analysis – percentage-of-the-fund or lodestar – the fees awarded in common fund cases must be "reasonable" under the circumstances. *Goldberger*, 209 F.3d at 47. The Attorneys' Fee Payment requested is well within the range of fees awarded by courts in this Circuit, whether considered as a percentage-of-the-fund or as a reasonable multiple of counsel's lodestar.

### F.    Courts Favorably View Fees Negotiated By Settling Parties.

Although the fee in this action was separately negotiated by JPMorgan subsequent to the Settlement, common fund principles are applicable. Co-Lead Counsel are entitled to a reasonable

fee for the substantial benefit achieved on behalf of the Class. That the Attorneys' Fee Payment was later separately negotiated weighs in favor of its reasonableness. *See, e.g., Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 244 (E.D.N.Y. 2010) ("the fact that the parties did not negotiate the issue of attorneys' fees until after deciding on the benefit to the class weighs in favor of the reasonableness of the fees") (internal citation omitted); *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173(RPP), 2008 WL 1956267, at *15 (S.D.N.Y. May 1, 2008) ("[T]he fee was negotiated only *after* agreement had been reached on the substantive terms of the Settlement benefitting the class. This tends to eliminate any danger of the amount of attorneys' fees affecting the amount of the class recovery.") (internal citation omitted).

## G.    Co-Lead Counsel's Expenses Were Reasonable And Necessary.

"Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431(ARR), 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001).

Here, the expenses of Co-Lead Counsel totaled a relatively modest $52,812. No separate payment is requested for such expenses, which are included in the requested Attorneys' Fee Payment.

## CONCLUSION

For the foregoing reasons, the Court hereby: (1) certifies the proposed Class for purposes of this Settlement; (2) finds that the Class notice was fair, adequate and reasonable and in compliance with due process, Rule 23 and the Court's prior orders; (3) appoints Entwistle and Cappucci and Hagens Berman Sobol Shapiro as Settlement Class Counsel; (4) grants final approval of the Settlement Agreement and Plan of Allocation; (5) authorizes Settlement Class Counsel to make disbursements to Class members; and (6) awards attorneys' fees and expenses in the amount of $18,000,000. The Clerk of the Court is directed to remove Docket Nos. 58 and 61 in Case No. 11-cv-8331 and Docket Nos. 22 and 25 in Case No. 11-cv- 7961 from the Court's list of pending motions and to close the files.

Dated: March 24, 2014

_Colleen McMahon_
U.S.D.J.

BY ECF TO ALL COUNSEL

- 50 -